E-FILED
Friday, 23 October, 2015  06:42:35 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMY L. INGENHUTT and TERESA L. ODELL, | NO. 15-cv-01303-JES-JEH |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| STATE FARM INVESTMENT MANAGEMENT CORPORATION, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## PRELIMINARY STATEMENT

This is an action for allegedly "excessive" mutual fund fees in violation of Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b).  That statute authorizes a mutual fund "security holder" to sue the fund's service providers to recover on behalf of the fund for any "excess" fees paid during the past year.  Plaintiffs Amy Ingenhutt and Teresa Odell bring this action against State Farm Investment Management Corporation ("SFIMC") to recoup ostensibly "excessive" fees paid by five State Farm LifePath Funds (the "Funds") for which SFIMC serves as investment adviser.  But the plaintiffs are only shareholders of two of those Funds, and they have no standing to sue on behalf of Funds they do not own.

For the two LifePath Funds the plaintiffs do own, the Complaint does not state a cognizable claim.  The Supreme Court set a high bar for liability in excessive fee cases:  "[t]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's-length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)).  In order to state a Section 36(b) claim, then, the *Jones* standard requires a plaintiff to plead *facts* to support a plausible conclusion that the challenged fee is *outside* the arm's-length range.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Jones*, 559 U.S. at 346.

Here, the Complaint is devoid of non-conclusory facts and flunks the "plausibility" test.

The plaintiffs' claim of "excessiveness" ignores altogether the "range" that *could* have been negotiated.  The Complaint overlooks the fees the Funds actually pay, disregards what similar funds pay their advisers, and makes no attempt to measure the costs of the services the Funds obtain.  But those omissions are gaping holes in the logic *Jones* imposes:  without facts

-1-

from which to deduce what the "negotiating range" *is*, there is no factual predicate for the allegation that the Funds' fees *exceed* that range.

Instead, the Complaint advances broad criticisms of mutual funds in general, claiming that fees across the industry are too high.  And the plaintiffs claim that SFIMC does essentially *nothing* in exchange for its fee.  But the first charge sheds no light whatsoever on SFIMC's fees, where they fit in the competitive market, or even whether fees in the industry reflect what "could" have been fairly negotiated.  And the bald allegation that SFIMC does "nothing" is contradicted by the pleading's own acknowledgement that SFIMC performs a wide array of services for the Funds, including "oversight" of the Funds' sub-adviser and "administrative services," such as "accounting," and regulatory compliance, such as the preparation and maintenance of SEC required documents.  Compl. ¶ 55.

The plaintiffs' criticism of the Funds' fees seems instead to be aimed at the Funds' operating structure, under which SFIMC delegates aspects of its responsibility to manage the Funds – including daily security selection for the portfolios – to BlackRock Fund Advisors ("BFA"), effectively as a sub-adviser.  But that is a structure shareholders know of and approved. And the Complaint does not – and cannot – say that the overall fee paid to SFIMC and BFA for investment advisory and management services to the Funds is "beyond" the range that similar funds with comparable structures pay for the same array of services.  That omission is glaring because such a comparison – in the words of the Seventh Circuit – at a minimum helps "tell[ ] us the bargaining range."  *Jones v. Harris Assocs. L.P.*, 611 Fed. App'x 359, 360 (7th Cir. 2015) (on remand from U.S. Supreme Court).  And the omission is particularly conspicuous because, although the Complaint *identifies* the Funds' competitors, it neglects to mention those similar funds' fees.  Small wonder the Complaint leaves that information out:  public records show the

Funds' management fees to be *below* both the mean and median for the plaintiffs' own comparators. Simply put, the Complaint fails to set forth the facts that the Seventh Circuit says are critical to help define the "negotiating range."

In short, the plaintiffs' allegations of "excessiveness" are devoid of fact. From all that appears in the pleading, there is no basis for evaluating whether SFIMC's fees are inside or outside of the "negotiating range" other than the plaintiffs' say-so. But *ipse dixit* allegations do not suffice under *Iqbal*, and by ignoring the "negotiating range" those allegations are not plausible under *Jones*.

On those threadbare assertions, the plaintiffs ask this Court to overturn the judgment of the Funds' statutorily independent trustees who approved the Funds' advisory fees. That too is inconsistent with the statute and *Jones*. Once again, the plaintiffs offer no facts upon which to discredit the trustees' judgment. They say only that because the Funds' fees are too high in the plaintiffs' judgment, the trustees *must* not have been conscientious and independent. According to the Complaint, the "windfall" fees paid to SFIMC "indicate" insufficient trustee diligence. Compl. ¶ 84. But that logic is circular: the plaintiffs' own say-so about excessive fees "establishes" their own say-so about trustee approval. That irrational reasoning is equally rebutted by the public record. Section 15(c) of the ICA *requires* trustees to request, and SFIMC to provide, all information reasonably necessary to an informed judgment about an advisory contract. 15 U.S.C. § 80a-15(c). The Funds' publicly filed documents attest to precisely what the trustees requested, received and considered in exercising their business judgment. The plaintiffs conveniently ignore that fulsome record. There is accordingly no basis for the Court to do what the plaintiffs request and dishonor the trustees' decision making. Indeed, that would contradict the Supreme Court's explicit admonition that courts *not* "second-guess[ ] . . . informed

board decisions . . . . [or] supplant the judgment of disinterested directors apprised of all relevant information." *Jones*, 559 U.S. at 352.

For the reasons set forth below, the Complaint should be dismissed with prejudice.

## BACKGROUND

### A.      Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a pool of assets, consisting primarily of a portfolio of securities, that belongs to the individual investors who own shares in the fund. *Jones*, 559 U.S. at 338.  Under industry practice, the management and operations of a mutual fund are typically externalized and contractually delegated to a mutual fund's investment adviser.  The ICA directly acknowledges that externalization, and enshrines the legal separation of a mutual fund and its adviser as the hallmark of the Act's principal purpose – to protect mutual fund investors by maintaining a fund's independence from its adviser.  *See Burks v. Lasker*, 441 U.S. 471, 480–87 (1979); 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

The ICA ensures this independence by entrusting noninterested directors or trustees sitting on a mutual fund's board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from any conflicts of interest with the fund's adviser and its affiliates.  A majority of independent trustees must approve the advisory and other service agreements annually, including the compensation received by the adviser for the services it provides to the fund.  15 U.S.C. § 80a-15(c); *accord Jones*, 559 U.S. at 340.  To fulfill that obligation, under Section 15(c) of the ICA, the trustees must "request and evaluate" all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds.  *See* 15 U.S.C. § 80a-15(c).

The ICA's reliance on independent trustees to police conflicts of interest between a fund

-4-

and its adviser also lies at the heart of Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund. 15 U.S.C. § 80a-35(b).  To state a cognizable claim for a breach of this duty, a shareholder plaintiff must show that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's-length bargaining." *Jones*, 559 U.S. at 346 (emphasis added).  In making that inquiry, a court must consider the role of the independent trustees in negotiating that fee:  "[A]pproval by the board of directors of such investment company of such compensation or payments . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. 80a-35(b)(2) (emphasis added).  The statute does not oblige the directors to negotiate the "'best deal' possible." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).  And it does not authorize the Court to sit as a "super-trustee" charged with "setting" a fee, or to second-guess informed board decisions. *See Jones*, 559 U.S. at 352.  Instead, it requires a plaintiff to plausibly allege and ultimately prove that the result of the independent trustees' negotiation could not have derived from an arm's-length negotiation.

## B.    SFIMC and the LifePath Funds

SFIMC offers customers various investment products, including a family of fifteen mutual funds.  State Farm Mutual Fund Trust, Statement of Additional Information, at 1 (May 1, 2015, as supplemented June 24, 2015) ("SAI") (Ex. A to the Declaration of Robert A. Skinner in Support of Defendant's Motion to Dismiss (the "Skinner Declaration")).[1]  Certain of these funds

---

[1]    All exhibits to the Skinner Declaration are cited hereinafter as "Ex. __."  As discussed in the Request for Judicial Notice in Support of Defendant's Motion to Dismiss, filed concurrently herewith (the "Request for Judicial Notice"), the Court may take judicial notice of documents in the public record, such as the Funds' SAI and other required disclosures on file with the SEC, without converting a motion to dismiss into a motion for summary judgment. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691, n.2 (7th Cir. 2008) ("We may take judicial notice of documents

are entirely managed by SFIMC's investment personnel, while some (including the LifePath

Funds) utilize the specialized expertise of external advisory firms like BFA (referred to here for

convenience as "sub-advisers") to perform a portion of the management services – with SFIMC

providing the balance of those services, in addition to bearing all the risks inherent in fund

sponsorship (*i.e.*, developing, launching and maintaining a branded fund in the highly

competitive and regulated fund marketplace).  *Id*. at 1, 68.  The LifePath Funds are "target date"

funds[2] structured as "feeder" funds in a "master-feeder" arrangement.   Each LifePath Fund

invests all its assets in a separate series of an unaffiliated Master Investment Portfolio with a

substantially similar investment objective, which is itself an investment company registered

under the ICA.  *Id*. at 1.  For example, during the relevant period, the State Farm LifePath 2030

Fund invested all its assets in the LifePath 2030 Master Portfolio – a portfolio with the same

investment objective as its corresponding LifePath 2030 Fund.   BFA served as the investment

adviser and administrator to each Master Portfolio.[3]  *Id.* at 68.  The Master Portfolios were then

---

in the public record, including publicly reported stock prices, without converting a motion to
dismiss into a motion for summary judgment."); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284
(7th Cir. 1994); *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009)
("[A] court may take judicial notice of documents filed with the SEC for the purpose of showing
what statements the documents contain[.]") (internal quotation marks omitted).  Further, both the
Supreme Court and the Seventh Circuit have approved consideration of documents referenced in
a complaint in ruling on a motion to dismiss.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551
U.S. 308, 322 (2007); *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).  Having relied
on the Funds' public disclosure documents in the Complaint, the plaintiffs cannot now seek to
block consideration of the same documents for purposes of this motion.

[2]     "Target date" funds, such as the LifePath Funds, seek to provide retirement outcomes
based on quantitatively measured risk that investors accept for a defined time horizon.   State
Farm Mutual Fund Trust, Prospectus, at 70 (May 1, 2015) ("Prospectus") (Ex. B).  For example,
the LifePath Fund 2030 is designed for investors who plan to begin withdrawing a substantial
portion of their investment in the decade beginning in the year 2030.  *Id.*  As is typical with
target date funds, the LifePath Fund's asset mix becomes more conservative as the "target date"
for retirement approaches.  *Id.*

[3]     As part of a structural reorganization approved by the Funds' shareholders by vote on
June 12, 2015, the Funds will transition from a master-feeder structure to a somewhat simpler

invested in a combination of stock, bond and money market funds (the "Underlying Funds"), all of which were advised by BFA affiliates.  *Id.* at 1.

## C.    Advisory Agreement and Fees

SFIMC serves as the investment adviser to the Funds pursuant to the Investment Advisory and Management Service Agreement ("Advisory Agreement") which the entire State Farm Mutual Fund Trust Board (the "Board"), and its independent trustees separately, must approve annually.  SAI at 64 (Ex. A).[4]  In its capacity as investment adviser, SFIMC provides the Funds with an array of advisory services.  The Complaint describes the services SFIMC performs as "oversight of the performance of BFA and the Master Portfolio and administrative services such as performing fund accounting and preparing and keeping current the Trust's registration statement."  Compl. ¶ 55.  But that minimizes what SFIMC does.  The more complete description of the services in the Funds' disclosures includes the following: (1) extensive oversight and monitoring of BFA and the Funds' performance; (2) preparation and

---

structure in which the Funds will directly own securities, though BFA will continue to advise the Underlying Funds and will serve as sub-adviser.  Also as part of this transition, the Funds will move from their current investment strategy – which utilizes a combination of active and indexed BlackRock funds – to a strategy using all index funds.  This will result in lower costs and lower fees for shareholders.  State Farm Mutual Fund Trust, Shareholder Proxy Statement, at 6–7 (Feb. 23, 2015) (Ex. C).  These forthcoming changes are not discussed in the Complaint and will not be in effect during the applicable one-year damages period (July 22, 2014 through July 22, 2015), and therefore are not addressed in this Motion.

[4]      The plaintiffs incorrectly allege in their Complaint that the services performed by SFIMC for the LifePath Funds are not disclosed in the prospectus.  Compl. ¶ 35.  Rather, these services are set forth in the SAI, which is deemed to be incorporated in the prospectus.  SAI at i (Ex. A); Prospectus at 165 (Ex. B); *see* Registration Form Used by Open-End Management Investment Companies; Guidelines, 48 Fed. Reg. 37,928, 37,929 (Aug. 22, 1983) (in order to avoid prospectus disclosures that are "too long and complex," "if a mutual fund incorporates the Statement of Additional Information by reference, the Statement would be part of the prospectus as a matter of law."); *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 225 (S.D.N.Y. 2012) ("The SAI, incorporated by reference into the Prospectus, is legally part thereof."); *White v. Melton*, 757 F. Supp. 267, 269 (S.D.N.Y. 1991) ("The SEC expressly provided that SAIs incorporated by reference are deemed 'a part of the prospectus as a matter of law.'").

provision of written reports on each Fund's investments to the Board; (3) management of compliance risk; (4) management of, and compliance with, valuation procedures in determining each Fund's daily net asset value ("NAV"); (5) regular reporting to the Board and its Committee of Independent Trustees; (6) administration of each Fund's business affairs; (7) provision of clerical personnel, suitable office space, necessary facilities and equipment and administrative services; and (8) research and evaluation of pertinent economic, statistical and financial data relevant to the investment policies of the Funds.  SAI at 57−58, 64−65 (Ex. A).  Further, the Advisory Agreement, also a public record, specifically requires SFIMC to provide the following administrative services to the Funds:

(a)  Preparation and maintenance of the [Funds'] Registration Statement with the SEC;

(b)  Preparation and periodic updating of the [Funds'] prospectus and statement of additional information . . .;

(c)  Preparation, filing . . ., and dissemination of various reports for the Funds, including . . . annual and semiannual reports on Form N-SAR . . .;

(d)  Arrangement for all meetings of shareholders, including the collection of all information required for preparation of proxy statements . . .;

(e)  Maintenance and retention of . . . [the Funds'] charter documents and the filing of all documents required to maintain the [Funds'] status as a Delaware business trust and as a registered open-end investment company;

(f)  Arrangement and preparation and dissemination of all materials for meetings of the Board and committees thereof . . .;

(g)  Preparation and filing of the [Funds'] Federal, state, and local income tax returns and calculation of any tax required to be paid in connection therewith;

(h)  Calculation of all . . . Fund expenses and arrangement for the payment thereof;

(i)  Calculation of and arrangement for payment of all income, capital gain, and other distributions to shareholders of [the Funds];

(j)  Determination . . . of the jurisdictions in which [the Funds' shares] shall be qualified for sale . . . and preparation and maintenance of the qualification of the [Funds' shares] for sale under the securities laws of each such jurisdiction;

(k)  Provision of the services of persons who may be appointed as officers of the [Funds] by the Board . . .;

(l)  Preparation and dissemination of the [Funds'] quarterly financial information to the Board and preparation of such other reports . . . as the officers and Board may . . .

reasonably request;

(m) Administration of the [Funds'] Code of Ethics and required reporting to the Board and officer compliance therewith;

(n) Provision of internal legal, accounting, compliance, audit, and risk management services and periodic reporting to the Board with respect to such services;

(o) Negotiation, administration, and oversight of third party services to the [Funds] including . . . sub-advisory, custody, tax, disaster recovery, audit, and legal services;

(p) Negotiation and arrangement for insurance desired or required of the [Funds] and administering all claims thereunder;

(q) Response to all inquiries by regulatory agencies, the press, and the general public concerning . . . the [Funds], including the oversight of all periodic inspections . . . by regulatory authorities and responses to subpoenas and tax levies;

(r) Handling and resolution of any complaints registered with the [Funds] by shareholders, regulatory authorities, and the general public;

(s) Monitoring legal, tax, regulatory, and industry developments related to . . . the [Funds] and communicating such developments to the officers and the Board . . . ;

(t) Administration of operating policies of the [Funds] and recommendation . . . of modifications to such policies to facilitate the protection of shareholders or market competitiveness . . . [and] to comply with new legal or regulatory requirements;

(u) Responding to surveys conducted by third parties and reporting of Fund performance and other portfolio information; and

(v) Filing of claims, class actions involving portfolio securities, and handling administrative matters in connection with the litigation or settlement of such claims.

Amended and Restated Investment Advisory and Management Services Agreement, at 2–4 (Mar. 28, 2012) ("Advisory Agreement") (Ex. S).  These responsibilities are distinct from those assigned to BFA under its separate advisory agreement with the LifePath Master Portfolios, pursuant to which "BFA provides investment guidance and policy direction in connection with the management of the Master Portfolios' assets."  SAI at 68 (Ex. A).

In addition to the services it provides, as the Funds' sponsor SFIMC also bears a variety of risks that are not borne by any sub-adviser.  These include both investment risk (*i.e.*, risk that the Funds will not succeed or may be inappropriately invested by BFA), and compliance and regulatory risk (*i.e.*, risk that the Funds will not comply with applicable federal and state laws

resulting in enforcement actions, litigation, potential penalties, and other potential harms imposed upon SFIMC).  *Id*. at 57–58.  SFIMC also undertakes significant business risk (*i.e.*, risk that sales of the Funds or redemptions by shareholders will make the Funds uneconomic to offer).  SFIMC works with the Board to continuously evaluate the Funds' risk management processes in connection with these risks and to adjust those processes whenever SFIMC or the Board deems it necessary.  *Id*. at 58.

In exchange for the services it provides and the risks it bears under the Advisory Agreement, the Funds pay a fee to SFIMC that is re-negotiated and approved annually.  As alleged in the Complaint, the net fee paid to SFIMC is equal to 0.28% (or 28 basis points) of the assets under management in the Funds.  Compl. ¶ 45.  The 28 basis point fee is net of a 7 basis point reimbursement that SFIMC voluntarily pays back to the Funds.  State Farm Mutual Fund Trust, Annual Report, at 184–85 (Dec. 31, 2014) ("AR") (Ex. D).  For its work managing the Master Investment Portfolios and the Underlying Funds, BFA is paid a fee (also after various voluntary waivers) equal to 34 basis points for certain of the Funds and 35 basis points for the others.  Compl. ¶ 45; AR at 185 (Ex. D).  Accordingly, the total fee paid by the Funds to SFIMC and BFA for investment management and advisory services (net of all waivers) is 0.62% or 0.63% (or 62 or 63 basis points).[5]  It is only SFIMC's portion of the total management fees that the plaintiffs challenge in this action.  Compl. ¶ 36.

### D.    The Annual Approval of The Advisory Agreement by The Statutorily Independent Board of Trustees

As required by SEC rules, the Funds' public disclosures detail the annual 15(c) approval

---

[5]      Further, in addition to the fee waivers, prior to this lawsuit, SFIMC agreed to reimburse the Funds to the extent any Fund's annual operating expenses exceed defined percentages of the Fund's average net assets.  SAI at 66 (Ex. A).  As a result of the expense reimbursement agreements, SFIMC reimbursed the LifePath 2030 Fund and LifePath 2050 Fund $1,220,636 and $153,387, respectively, in 2014 alone.  *Id*. at 67.

process and the Board's thorough review and analysis of the Funds' service agreements, including the Advisory Agreement with SFIMC, throughout the course of each year.  *See* State Farm Mutual Fund Trust, 2015 Semi-Annual Report, at 22–24 (June 30, 2015) ("2015 SAR") (Ex. E).  The Board is composed of nine trustees, seven of whom (or 77%) are statutorily disinterested as defined in the ICA, exceeding the requirement that 50% of the trustees be disinterested.[6]  *See* SAI at 56 (Ex. A).

In connection with the 15(c) approval process, SFIMC and the external advisory firms – including BFA and the sub-advisers to other funds – provide the Board with written materials relaying information to assist the Board with its consideration of continuing the respective service agreements, including a report prepared by an independent consulting firm, Strategic Insight.  *See* 2015 SAR at 22 (Ex. E).  This report provides information comparing the performance and expenses of the Funds to those of competitor funds with similar investment objectives.  *Id*.  The information provided to the Board includes materials addressing the various so-called "*Gartenberg* factors" raised by the plaintiffs in the Complaint, including information relating to economies of scale, comparisons to the fees and performance of similar funds, and SFIMC's profitability.  *Jones*, 559 U.S. at 344 & n.5 (citing with approval the Second Circuit's non-exhaustive list of factors in *Gartenberg* that may be considered by a court in determining whether "beyond arm's-length" fees were charged);  2015 SAR at 22–24 (Ex. E).  At a meeting on June 13, 2014, the Board completed this review and approved the Advisory Agreement for a one-year period ending June 30, 2015 – which covers most of the relevant time period for this

---

[6]     The disinterested trustees are all knowledgeable and financially sophisticated individuals with a wealth of experience in finance and business.  They include two university presidents, a former partner of a public accounting firm, a former head of the enforcement program for the SEC's Chicago Regional office; and executives of public companies and investment management firms.  *See* SAI at 58-59 (Ex. A).

action.  The Board most recently conducted this review on June 12, 2015 and agreed to extend

the Advisory Agreement for one additional year, until June 30, 2016.  State Farm Mutual Fund

Trust, 2014 Semi-Annual Report, at 20–22 (June 30, 2014) ("2014 SAR") (Ex. F); 2015 SAR at

22–24 (Ex. E).

## ARGUMENT

## I.   THE PLAINTIFFS LACK STANDING TO ASSERT CLAIMS ON BEHALF OF FUNDS THEY DO NOT OWN

"Standing is a threshold inquiry and is particularly important in securities litigation,

where strict application of standing principles is needed to avoid vexatious litigation and abusive

discovery."  *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 118–19 (D. Mass. 2006) (citing

*Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  In their Complaint, the plaintiffs admit they only

own shares in two of the five Funds on whose behalf they are suing:  plaintiff Ingenhutt alleges

ownership in the LifePath 2050 Fund, and plaintiff Odell alleges ownership in the LifePath 2030

Fund.  The plaintiffs nonetheless also bring this lawsuit on behalf of the LifePath 2020 Fund,

LifePath 2040 Fund and LifePath Retirement Fund.  Further, the plaintiffs fail to allege they

either owned shares in those Funds or personally suffered any injury as a result of the advisory

fees charged to those Funds.

The plaintiffs lack standing to sue on behalf of funds they do not own.  Under Section

36(b), a private plaintiff may sue only on behalf of the funds whose shares it owns: "[a]n action

may be brought under this subsection by the Commission, or by a *security holder* of such

registered investment company [*i.e.*, mutual fund] on behalf of such company."  15 U.S.C. § 80a-

35(b) (emphasis added).  Courts have consistently ruled that plaintiffs lack standing to pursue

Section 36(b) claims on behalf of funds whose shares they do not own.  *See Forsythe*, 417 F.

Supp. 2d at 117–18 (dismissing all Section 36(b) claims on behalf of funds in which the

plaintiffs did not personally hold shares); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005) ("The named Plaintiffs do not have standing to sue on behalf of forty-eight AllianceBernstein mutual funds in which they do not own shares."); *Siemers v. Wells Fargo & Co.*, No. 05-civ-04518, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) (plaintiff lacked standing to bring a claim for violation of Section 36(b) because he failed to allege that he owned any shares of the funds at issue).

Quite apart from Section 36(b)'s textual limitation on standing to a "security holder," the plaintiffs do not have the "personal stake" in the litigation necessary to confer standing under Article III of the U.S. Constitution. *See Warth*, 422 U.S. at 498–99 ("[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf."). The plaintiffs have no financial stake in litigation concerning advisory fees charged to shareholders of the three other LifePath Funds, since they would not stand to receive any benefit from a recovery under this claim.

Accordingly, if this action proceeds at all – which it should not – Ms. Odell should only be entitled to challenge fees paid by the LifePath 2030 Fund and Ms. Ingenhutt should only be able to challenge fees paid by the LifePath 2050 Fund.

## II.    THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE ADVISORY FEES UNDER SECTION 36(B) OF THE ICA

### A.    Legal Standard for Pleading a Section 36(b) Claim

The standard established by the Supreme Court to establish a breach of Section 36(b) is exacting: the plaintiff must demonstrate that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 345–46 (emphasis added). Just two

-13-

months ago, when applying this standard on remand to affirm dismissal on summary judgment of the plaintiffs' claims in *Jones*, the Seventh Circuit further explained, "[T]he Supreme Court's approach does not allow a court to assess fairness or reasonableness of advisers' fees; *the goal is to identify the outer bounds* of arm's length bargaining and not engage in rate regulation." *Jones*, 611 Fed. App'x at 360 (emphasis added). The "bargaining range" for these purposes is informed by fees "produced by bargaining at other mutual-fund complexes." *Id.* at 361.

To sustain a cognizable claim, then, the Complaint must plead factual allegations that satisfy *Jones*' rigorous standard and are "plausible on [their] face." *See Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support." *Bissessur v. Indiana Univ. Bd. of Tr.*, 581 F.3d 599, 603 (7th Cir. 2009). Rather, to survive a motion to dismiss a complaint "must state sufficient facts to raise a plaintiff's right to relief above the speculative level." *Id.* at 602–03; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."). In the context of a Section 36(b) claim, that means the allegations of fact must support a *plausible* claim that the fees are "so disproportionately large" relative to the services provided that they are *beyond* the range of what "could" have been bargained at arm's-length by informed businesspersons.

In assessing whether the beyond-arm's-length standard is met, "all relevant circumstances [are to] be taken into account." *Jones*, 559 U.S. at 347 (citing *Gartenberg*, 694 F.2d at 929). These circumstances may include the non-exhaustive list of factors set forth by the Second Circuit in *Gartenberg* and cited favorably by the Supreme Court in *Jones*:

(1) The nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits,"

-14-

>those collateral benefits that accrue to the adviser because of its relationship with
>the mutual fund; (4) comparative fee structure (meaning a comparison of the fees
>with those paid by similar funds); and (5) the independence, expertise, care and
>conscientiousness of the board in evaluating adviser compensation.

*Id.* at 344 n.5 (quoting *Gartenberg*, 694 F.2d at 929–32).   Importantly, these so-called

"*Gartenberg* factors" are not themselves the standard of liability or the elements for establishing

a Section 36(b) claim.   The "factors" only provide a rubric for analyzing whether the beyond-

arm's-length standard is met under *Jones*.   Accordingly, it is not sufficient simply to assert rote

allegations about any one "factor," or even all of them.   Rather, a valid pleading must connect

the dots between the factual allegations about a "factor" and its *effect* on the challenged fee.   *See*

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal

of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship

between fees and services"), *aff'd*, 248 F.3d 321 (4th Cir. 2001); *see also Forsythe*, 417 F. Supp.

2d at 115 ("[C]laims under the statute must allege some connection between the wrongs alleged

and excessive compensation of an investment adviser . . . .").   The nonconclusory allegations

about any "factor" must *push* the fee *outside* of the arm's-length range.   The specifics about any

"factor" must be tied to the challenged fee so that those details permit the inference that the fee is

"so disproportionately large" it "could not have been" negotiated at arm's length.

### B.   The Plaintiffs' Conclusory and Unsupported Allegations Regarding the Services Provided By SFIMC Provide no Basis to Conclude that the Advisory Fee Could Not Have Been Negotiated at Arm's Length

Despite the Seventh Circuit's admonition that a Section 36(b) claim requires a court to

"identify the outer bounds of arm's length bargaining," *Jones*, 611 Fed. App'x at 360, the

Complaint contains no facts from which to discern the arm's-length bargaining range for the

Funds' advisory fees.   The plaintiffs do not allege what fees are paid by comparable target date

funds for services of the type provided by SFIMC – which "tells us the bargaining range,"

according to the Seventh Circuit (*id.* at 361) – or how those fees compare in size to SFIMC's fee. Instead, the pleading simply asserts without elaboration that SFIMC's advisory fee "is much higher than the fees their competitors receive for substantially similar services."  Compl. ¶ 70. The plaintiffs proceed to allege, without either support or citation, that "other investment advisers who offer funds under a model similar to that of the LifePath Funds' . . . charge a substantially smaller management fee than Defendant . . . or, in some cases, no management fee at all."  *Id.* ¶ 71.

The absence of support for that conclusory comparison is itself sufficient to ignore the allegation.  But further, the public record fully contradicts the plaintiffs' contention, and demonstrates that the Funds' fees are easily within the arm's-length range paid by comparable funds.  Indeed, the Complaint identifies a group of eight comparable target date funds with a similar "fund-of-funds" structure that the plaintiffs acknowledge to be the Funds' competitors. Each of the comparators that the Complaint earmarks pays an "acquired fund fee" for management of the funds underlying the target date fund, through which the adviser obtains most or all of its compensation.  *Id.* ¶ 39 & n.2.   An actual comparison of the total management fees those comparator funds pay to the 62 or 63 basis points the plaintiffs' Funds pay shows that the Funds' fees are not only *within* the "bargaining range," but are actually *at or below* all the plaintiff-identified competitors' fees except one:

| Target Date Fund | Total Management Fee |
|---|---|
| John Hancock Retirement Fund | 82 bp |
| Principal LifeTime Fund | 79 bp |
| Fidelity Advisor Freedom Fund | 76 bp |
| American Century One Choice Funds | 75 bp |
| MFS LifeTime Fund | 74 bp |
| MassMutual RetireSMART Fund | 67 bp |
| JPM SmartRetirement Funds | 65 bp |
| **State Farm LifePath Funds** | **62-63 bp** |
| American Funds Target Date Funds | 51 bp |

-16-

Stated differently, the plaintiffs conspicuously omit[7] the information that reveals the "bargaining range," and shows the fees SFIMC charges to be easily within that range.[8]  There is accordingly no plausible basis for the plaintiffs' conclusory allegations that SFIMC's fees *could not* be within the arm's-length range.[9]

The same is true for the plaintiffs' conclusory assertions that "virtually all of the investment management functions of the LifePath Funds are delegated to BFA," and that SFIMC provides only "extremely limited" services to the Funds that cannot justify SFIMC's retention of 28 basis points from the aggregate 62-63 basis point fee.  Compl. ¶ 51.  The Complaint casually asserts that SFIMC "does not provide any day-to-day investment services to the LifePath Funds" or "any investment guidance or policy direction in connection with daily portfolio management."  *Id.* ¶ 54.  But that ignores the public record, which describes the services SFIMC *does* perform.  To the extent the Complaint acknowledges some of SFIMC's services to the Funds, it just

[7]        *See e.g.*, John Hancock Retirement Living through 2050 Portfolio, Summary Prospectus, at 1 (Jan. 1, 2015) (Ex. G); Principal LifeTime 2050 Fund, Summary Prospectus, at 2 (Mar. 1, 2015) (Ex. H); Fidelity Advisor Freedom 2050 Fund, Summary Prospectus, at 1 (Oct. 1, 2015) (Ex. I); American Century Investments One Choice 2050 Portfolio, Summary Prospectus, at 1 (Mar. 20, 2015) (Ex. J); MFS Lifetime 2050 Fund, Summary Prospectus, at 1 (Aug. 28, 2015) (Ex. K); MassMutual RetireSMART 2050 Fund, Summary Prospectus, at 1 (Apr. 1, 2015) (Ex. L); JPMorgan SmartRetirement 2050 Fund, Summary Prospectus, at 1 (Nov. 1, 2014) (Ex. M); American Funds 2050 Target Date Retirement Fund, Summary Prospectus, at 1 (Jan 1, 2015) (Ex. N).

[8]        In addition to falling next-to-last in rank ordering of the fee range, the fees paid by the LifePath Funds are also well below the mid-point or median of the range, which is 75 basis points.

[9]        This also illustrates that the plaintiffs' assertion that two of the referenced competitors – the advisers of the JPMorgan SmartRetirement Funds and the MFS Lifetime Funds – charge "no management fee at all" for similar services is blatantly misleading.  Compl. ¶¶ 58, 71.  Because JPMorgan and MFS manage their funds internally, they capture their income solely through the acquired fund fee, which is equal to or larger than the combined fees paid to SFIMC and BFA for managing the Funds.  It is accordingly misleading to suggest that the advisers to these funds are providing services for free.  Those allegations thus provide absolutely no support for an inference that SFIMC's fee is beyond arm's length.

dismisses them out of hand as "minimal" or non-existent:

> SFIMC purports to justify its share of the management fee as compensation for services it describes as monitoring or oversight of the performance of BFA and the Master Portfolios and administrative services such as performing fund accounting and preparing and keeping the Trust's registration statement. But such services, *to the extent they are performed at all*, are *minimal*, require very few resources and do not justify the extraordinary management fee collected and retained by SFIMC.

*Id*. ¶ 55 (emphases added). The only allegation in the Complaint purporting to demonstrate why the 28 basis points retained by SFIMC is beyond the arm's-length range is an unsupported assertion regarding the cost of SFIMC's services: "On information and belief, and as discovery in this matter will show, the true cost of providing the services for which SFIMC collects its portion of the net management fee is similar to that of its competitors, approximately 2.4 basis points or less." *Id.* ¶ 58.

That meager allegation does not make out a plausible claim under Section 36(b). Indeed, the Complaint is particularly unreliable since the plaintiffs' allegations of "minimal" or non-existent services by SFIMC are directly contradicted by the same public record selectively relied upon elsewhere in the Complaint. *Id.* ¶¶ 28, 29, 45, 58 (citing to SAI). As detailed above, *supra* at [7-9], the Funds' SEC filings, including the Advisory Agreement itself, set forth the array of services provided by SFIMC – which are much more extensive than the abbreviated list alleged by the plaintiffs. SAI at 57−58, 64−65 (Ex. A); Advisory Agreement at 2−4 (Ex. S). In cases like this, where conclusory and unsupported allegations are contradicted by judicially noticeable information such as SEC filings, the allegations need not be accepted as true on a motion to dismiss. *See, e.g.*, *Garcia v. City of Chi.*, 91-civ-5535, 1991 WL 289204, at *1 (N.D. Ill. Dec. 23, 1991) ("To the extent the judicially noticed facts contradict allegations of the complaint, the allegations will not be accepted as true."); *accord Jarmuth v. City of Chi.*, 43 F. Supp. 3d 889,

891 n.2 (N.D. Ill. 2014) (citing *In re Woodmar Realty Co.*, 294 F.2d 785 (7th Cir. 1961)).

Under established pleading standards, a viable claim that is "plausible on its face" must be based on well-pled facts, not merely unsupported conclusions dressed up as ostensible facts. Yet that is all the plaintiffs offer here: *ipse dixit* assertions that SFIMC does little or nothing for its fee, and that the cost to SFIMC of any "extremely limited" services it provides is limited to 2.4 basis points (with no reference to any authority supporting this figure[10]).   In short, the plaintiffs ask the Court to take their word for it that the services are non-existent or inexpensive, so they can prove it up later with the benefit of discovery.   But this is precisely the style of pleading that is no longer valid in the wake of *Twombly*, *Iqbal* and their progeny.   The plausibility of the plaintiffs' allegations is directly undermined by the established public record detailing (i) the array of services actually provided by SFIMC to the Funds, (ii) the additional risks it bears as fund sponsor, and (iii) the review of those services and risks by a statutorily independent board of trustees prior to approving the fee.

Accordingly, the Complaint's flimsy assertions do not come close to moving the plaintiffs' theory from merely *possible* to the required plausible.   *See Iqbal*, 556 U.S. at 678–89 (holding that plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," and that pleading facts that are "merely consistent with a defendant's liability . . .

---

[10]     The sheen of precision suggested by a specific figure like 2.4 basis points, which the plaintiffs' proffer "on information and belief," does not make it a well-pled fact about SFIMC's actual costs.   The plaintiffs nowhere suggest how this figure was derived, who performed the calculation, whether it is based in any way on SFIMC's actual costs, whether the "competitors" referred to as having such costs manage investments comparable to the Funds, or what array of services such competitors supposedly provide when incurring such costs.  Compl. ¶ 58.  The plaintiffs suggest that all will be made clear in discovery.  *Id.*  But deficient allegations cannot be saved by a promise to discover unknown facts; that puts the cart before the horse.  *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (rejecting plaintiffs' attempt to short-circuit the pleading requirements at the motion to dismiss stage by asserting that specific factual allegations – including those relating to the adviser's costs to provide services – were impossible without discovery).

stops short of the line between possibility and plausibility") (citation omitted); *see also In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 CIV. 4885, 2006 WL 74439, at \*2 (S.D.N.Y. Jan. 11, 2006) (granting motion to dismiss Section 36(b) claim where allegations were contradicted by public records that "paint a more complete picture . . . of the Fund in question"). Indeed, if the allegations in this Complaint were adequate to state a plausible claim, the very same allegations – that the adviser retains a fee in exchange for little or no work – could be leveled (without supporting factual allegations) against *any* adviser that utilizes a sub-adviser and survive a motion to dismiss. *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (recognizing that "investment advisers and sub-advisers perform distinct services," and that these "differences . . . alone justify" different fee arrangements). But courts have routinely rejected such attempts to base Section 36(b) claims on conclusory allegations with no nexus to a beyond-arm's-length fee – repeatedly dismissing such claims at the pleading stage – and this Complaint fares no better.[11]

The plaintiffs cannot save their Complaint by ignoring this authority and pointing instead to cases where courts have recently denied motions to dismiss complaints alleging improper

---

[11]     *See, e.g.*, *Amron*, 464 F.3d 338; *Migdal*, 2000 WL 350400, at \*3; *Turner v. Davis Select Advisers*, 08-cv-00421, slip. op. (D. Ariz. June 1, 2011), *aff'd*, No. 13-15742 (9th Cir. Sept. 29, 2015); *Hoffman*, 591 F. Supp. 2d at 540; *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Fitzgerald v. Citigroup, Inc.*, No. 03 CIV. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *AllianceBernstein*, 2006 WL 74439; *Forsythe*, 417 F. Supp. 2d 100; *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163 (D. Mass. 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000); *Strougo v. BEA Assocs.*, No. 98 Civ. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999); *Kalish v. Franklin Advisers, Inc.*, 74 F. Supp. 1222 (S.D.N.Y. 1990).

"gaps" between advisory and sub-advisory fees.  Those complaints did not rest on such uniquely

barren allegations.  While all of those cases asserted the similar theory that the adviser-defendant

does little or nothing in exchange for the portion of the advisory fee it retains, the plaintiffs in the

other cases have at least asserted *facts* describing the supposed paucity of services by the adviser

– supporting facts that are noticeably absent here.  For example, in *Zehrer v. Harbor Capital

Advisors, Inc.*, the complaint cites extensively to the respective advisory and sub-advisory

agreements to support its claim that the "Subadvisory Agreements require the Subadvisers to

provide substantially all of the investment advisory services required by the [investment advisory

agreements] . . . ."  Consolidated Am. Compl. ¶ 44, No. 14-CV-00789 (N.D. Ill. Dec. 22, 2014),

ECF No. 82 (Ex. R) (chart allegedly comparing the specific services Harbor Capital provides to

the funds in exchange for its advisory fee to the those provided by the sub-advisers pursuant to

separate sub-advisory agreements); *id.* ¶¶ 65−68 (describing services – including regulatory

compliance, preparation of materials for meetings of the board, preparation of shareholder

reports and SEC filings, legal and regulatory support for the funds, and fund valuation –

allegedly performed by the sub-advisers under the sub-advisory agreement rather than the

adviser); *id.* ¶¶ 69−89 (setting forth a list of other fees and expenses (*e.g.*, "professional fees" for

legal, auditing, and accounting services, custodian fees and distribution expenses, registration

fees, expenses to trustees for overseeing the funds' service providers) allegedly paid directly by

the funds in addition to the advisory fee paid to the adviser ).[12]  The allegations in the plaintiffs'

Complaint here, by contrast, say *nothing* regarding the specific services provided by SFIMC,

---

[12]     As discussed in the Request for Judicial Notice, the Court is permitted to consider
publicly filed complaints in deciding SFIMC's motion to dismiss.  *See Pirelli Armstrong Tire
Corp. Retiree Med. Benefits Trust v. Walgreen Co*., 631 F.3d 436, 443 (7th Cir. 2011) (taking
judicial notice of a complaint in another lawsuit); *Henson*, 29 F.3d at 284 (on motion to dismiss,
a court may take notice of documents in the public record, including public court documents).

BFA, or any other service provider, relying instead on the wholly unsupported conclusion that "virtually all of the investment management functions of the LifePath Funds are delegated to BFA." Compl. ¶ 51.

The decisions by some courts to allow such sub-advisory fee "gap" claims to proceed to discovery thus have no bearing in this case.[13] Here, the plaintiffs have utterly failed to allege any facts which raise their allegations to the requisite level of plausibility to state a claim for relief. Rather, this case fits neatly into the lengthy list of cases where unsupported conclusory allegations were held insufficient to state a valid Section 36(b) claim.

C.   **The Plaintiffs' Recitation of the Remaining *Gartenberg* Factors Provides no Basis for a Conclusion that the Fees were Outside an Arm's-Length Range**

Following the allegations regarding the services provided in exchange for SFIMC's fee, discussed above, the Complaint walks through the remaining "*Gartenberg* factors," advancing strictly conclusory allegations about profitability, economies of scale, comparative fee structures,

---

[13]    The Complaint fails when measured against all other similar complaints that have recently survived motions to dismiss. *See also* Verified Amend. Compl. ¶¶ 35–36, 43, *Curd v. SEI Inv. Mgmt. Corp.*, No. 2:13-cv-07219 (E.D. Pa. Oct. 2, 2014), ECF No. 51 (Ex. O) (setting forth a detailed comparison of the services allegedly provided by the adviser pursuant to the advisory contract to those services provided by sub-advisers pursuant to separate sub-advisory agreements and also alleging that the retained advisory fee cannot be justified in light of the fact that the defendant-adviser's own affiliate serves as sub-adviser to some of the funds thereby reducing the adviser's costs of oversight); Second Am. Compl. ¶¶ 50–70, *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 11-cv-01083 (D.N.J. Nov. 14, 2011), ECF No. 35 (Ex. P) (supporting its allegation that the defendant-adviser delegates "substantially all" of its investment management responsibilities to the sub-advisers with a chart comparing the advisory services provided under the advisory contract to those provided by sub-advisers under separate sub-advisory contracts and with allegations that specific "administrative services" – including the supervision of all aspects of funds' operations (*e.g.*, custodial, legal, accounting, etc.) and provision of office space – allegedly provided under the advisory agreement are actually paid for by the funds pursuant to separate agreements and/or fees); Compl. ¶¶ 5–12, 14–23, 47–49, 56, *Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, 13-cv-01601 (N.D. Ala. Aug. 28, 2013), ECF No. 1 (Ex. Q) (challenging the defendant-adviser's retention of a fee *twice* as large as that retained by its sub-advisers (retaining $80 million of the total $120 million) with allegations regarding the adviser's additional retention of a wholly separate management fee in exchange for the advisory services actually provided pursuant to the advisory contract).

"fallout benefits," and the independence and conscientiousness of the Board.  Viewed individually or collectively, these allegations do not help the Complaint state a viable claim under Section 36(b).  No allegation about any "factor" permits an inference that it affected the challenged fee at all, much less pushed it outside of the range that could be negotiated.

### 1.  *Profitability*

Although courts may consider a fund's profitability in evaluating whether an adviser's fee exceeded the arm's-length range, courts have recognized that "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."  *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755, at *50 (C.D. Cal. Dec. 28, 2009) (citing S. Rep. No. 91-184, at 15 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902); *see also Gartenberg*, 694 F.2d at 928 (Senate Report indicated that "a 'cost-plus' type of [advisory] contract is not required").

The plaintiffs assert that SFIMC's management of the Funds is "astronomically profitable," but offer no supporting factual allegations.  Compl. ¶ 59.  Indeed, the plaintiffs say *nothing* about SFIMC's revenue *or* the costs incurred by SFIMC in providing the Funds the suite of services discussed above.  From all that appears in the Complaint, one cannot tell whether the adjective "astronomical" means 1 basis point or 27; nothing is advanced to justify the label at all.  Instead, the plaintiffs focus on the assets under collective management of all five LifePath Funds (*id.* ¶ 57) – without tying those assets to SFIMC's revenue for each Fund – and the purported costs incurred by SFIMC's *competitors* in providing an undefined set of services to their wholly separate and distinct funds.  *Id.* ¶ 58.  But that comparison is meaningless.  Without context, including the identity of the purported competitors, whether they provide the same services, and the basis for the Complaint's claims about costs, the comparison does not permit *any* inference

about SFIMC's profitability.  Indeed, since the plaintiffs did not accurately describe to the Court the services SFIMC provides to the Funds, selectively ignoring portions of the Funds' public disclosures, the pleading's unadorned allegations about the undefined cost of undefined services supplied by undefined "competitors" do not permit the Court to draw any inferences about profitability, "astronomical" or not.  *See, e.g.*, *Amron*, 464 F.3d at 344 (dismissing Section 36(b) claim and finding plaintiffs' assertions regarding the size of the investment advisory fees "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds").

Most importantly, the absence of specifics about profitability omits the lynchpin that establishes a connection between some degree of profitability and the size of the challenged fee. As noted above, it is not enough merely to invoke some "factor" like "profitability."  Rather, the plaintiffs must *link* the facts about the invoked "factor" to an adverse effect on the fee; something about the "factor" must tip the fee into the range *beyond* what could be negotiated for the "factor" to assume any significance. [14]  Merely claiming SFIMC's profitability to be "astronomical" does no such thing.

2.  *Economies of Scale*

The plaintiffs' conclusory allegations about the growth in assets under management and presumed economies of scale do not plausibly support an inference that the fees were outside the range of what could have been bargained at arm's length.  The plaintiffs plead no *facts* suggesting that economies of scale actually existed.  They simply assert that "assets under

---

[14]     *See Migdal*, 248 F.3d at 327 (affirming district court's granting of defendant's motion to dismiss Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services"); *Forsythe*, 417 F. Supp. 2d at 115 ("[C]laims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser . . . .").

management have grown, and so the advisory and distribution fees paid to Defendant have grown dramatically, despite the economies of scale realized by Defendant."  Compl. ¶ 69.  The plaintiffs then assert that these presumed economies of scale have not been shared with the plaintiffs.  *Id.*  They cite to industry articles about economies of scale generally, but allege absolutely nothing of substance specific to SFIMC or its cost structure.[15]  These allegations lend no weight whatsoever to the plausibility of SFIMC's advisory fee being outside the arm's-length range.  *See Hoffman*, 591 F. Supp. 2d at 540 (to sufficiently allege economies of scale, "Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew"); *Goldman Sachs*, 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").[16]

### 3.   *Comparative Fee Structures*

In the two paragraphs the plaintiffs devote to the "comparative fee structure[]" factor, they provide no data regarding the advisory fees paid by allegedly comparable funds or how those fees compare in size to SFIMC's fee of 28 basis points or the Funds' total management

---

[15]   Indeed, the Complaint's own allegations hint that "economies of scale" *were* shared with the Funds, because SFIMC waived a portion of its fee in order to reduce it to 28 basis points, and to cap the overall investment advisory and management fee of the Funds at 62 or 63 basis points. Compl. ¶¶ 42, 43.

[16]   *See also Franklin Mut. Funds*, 478 F. Supp. 2d at 687; *Scudder*, 2007 WL 2325862; *Kalish*, 74 F. Supp. at 1238.  In contrast, the complaint in *Harbor Capital* at least alleges (i) facts and figures regarding the Funds' alleged growth in assets over time; (ii) how much the advisory fees have increased as a result of increased assets over the years; and (iii) examples as to why the adviser's cost have allegedly not increased as assets have increased.  Consolidated Am. Compl. ¶¶ 92–95; 98–106, *Zehrer v. Harbor Capital*, No. 14-CV-00789 (N.D. Ill. Dec. 22, 2014), ECF No. 82 (Ex. R).

fees of 62-63 basis points.  Compl. ¶¶ 70–71.  As discussed above, they simply assert that SFIMC's advisory fee "is much higher than the fees their competitors receive for substantially similar services."  *Id.* ¶ 70.  The plaintiffs also allege, without support or citation, that "other investment advisers who offer funds under a model similar to that of the LifePath Funds' . . . charge a substantially smaller management fee than Defendant . . . or, in some cases, no management fee at all."  *Id*. ¶ 71.  As explained above, these assertions are baseless, if not outright misleading.  In any event, they certainly provide no basis for a plausible inference that SFIMC's fees could not have been bargained at arm's length.

### 4.  *Fallout Benefits*

With respect to indirect or "fallout" benefits received by SFIMC as the result of its management of the Funds, the Complaint asserts that SFIMC benefits from "soft-dollar" arrangements (*i.e.*, research credits from brokers based on portfolio trade execution business) and securities lending arrangements with portfolio securities.  Compl. ¶¶ 74–75.  The Complaint includes no factual allegations supporting these assertions, nor could it.  As is made clear in the Fund's public disclosures cited elsewhere in the Complaint, because *BFA* manages the day-to-day investment of the securities in the Master Portfolios underlying the Funds (including the selection of brokers to execute portfolio trades), it is only *BFA* that has the ability to engage in soft-dollar arrangements and securities lending – not SFIMC.  *See* SAI at 23–24, 93–95 (Ex. A).  The issue of fallout benefits was expressly considered by the Board as part of the 15(c) process, and the "[t]he Board concluded that the *lack of any* ancillary or so-called 'fallout' benefits enables SFIMC . . . to manage assets of the Funds in a manner that appears to be free of conflicts of interest."  2015 SAR at 24 (Ex. E) (emphasis added).

Ironically, the plaintiffs go on to assert that "[a] highly profitable fallout benefit to

Defendant is the ability to sell investment advisory services paid for by the LifePath Funds at virtually no additional cost."  Compl. ¶ 76.  This reflects an about-face for the plaintiffs, who have otherwise alleged throughout their pleading that SFIMC's advisory services to the Funds are extremely limited, non-existent, and without value.  The plaintiffs cannot have it both ways.  They cannot plausibly allege that SFIMC obtains a great benefit from the ability to "resell these services to third parties" without charge, while simultaneously contending the services do not exist or are costless.  Inconsistency aside, this unsupported allegation also flies in the face of the Funds' clear disclosure that SFIMC in fact *does not have* other clients beyond its mutual fund family – a fact considered by the Board in approving the fee.  2015 SAR at 23 (Ex. E) ("The Board also took note that SFIMC does not manage any institutional clients, and that it only manages the Funds, and the assets of other State Farm-sponsored mutual funds.").

In short, the plaintiffs' fallout benefit allegations are demonstrably false and not entitled to any presumption of truth.  Nothing about them provides any support for an inference that SFIMC's advisory fee is beyond what could have been bargained at arm's length.

### 5.  *Board independence and conscientiousness*

With respect to approval of the fees by the independent trustees, the plaintiffs offer nothing but circular allegations that the Board *must have* lacked independence, conscientiousness, and adequate information because – on the plaintiffs' otherwise unsupported allegations – SFIMC charged excessive fees.  Compl. ¶¶ 79–80, 84.  The Complaint does not say what the Board did, reviewed, or neglected to examine.  It just leaps to the conclusion that the trustees were not diligent by virtue of the result the plaintiffs criticize.

The public record contradicts the plaintiffs' illogical conclusion by supplying the requisite premise.  It tells an entirely different story regarding the Board's review and approval

of the fees.  The Funds' Semi-Annual Shareholder reports for the relevant period, both publicly

filed with the SEC, describe in detail the rigorous fee review process undertaken by the Board,

with advice of independent counsel, and based upon extensive materials provided by SFIMC,

BFA and third-party consultant Strategic Insight.  2015 SAR at 22–24 (Ex. E); 2014 SAR at

20–22 (Ex. F).  The materials reflect information relating to the *Gartenberg* factors, include the

Funds' performance record, and how that performance and the Funds' fees compare to those of a

universe of peer funds.  2015 SAR at 22–24 (Ex. E); 2014 SAR at 20–22 (Ex. F).[17]

That public record is dispositive, because it illustrates the holes in the plaintiffs' pleading.

The Complaint makes no factual allegation that calls into question the independence of the seven

noninterested trustees.  It offers no specifics attesting to the Board's processes.  It says nothing

about the trustees' conscientiousness.  The pleading does not identify a shred of information the

trustees lacked, does not point to a single fact they failed to examine, and even omits to disclose

what the plaintiffs contend they *should* have considered but did not.  In short, those lapses do not

justify invoking the Board's "independence and conscientiousness" as a "factor" relevant to

scrutinizing the challenged fees.  They instead warrant the Court's application of the statutory

mandate to *defer* to independent trustee decision-making.  *See* 15 U.S.C. 80a-35(b)(2) ("In any

such action approval by the board of directors . . . *shall* be given such consideration by the court

as is deemed appropriate under all the circumstances.") (emphasis added); *Jones*, 559 U.S. at 351

("Where a board's process for negotiating and reviewing investment-adviser compensation is

---

[17]      As discussed in the Request for Judicial Notice, the plaintiffs relied extensively on the
Funds' SEC disclosures in the Complaint and therefore have no basis to suggest that the same
disclosures should be ignored for purposes of the Board's approval process.  *See Tellabs*, 551
U.S. at 322 (holding that the district court may consider "documents incorporated into the
complaint by reference" when ruling on a motion to dismiss); *United States v. Wood*, 925 F.2d
1580, 1582 (7th Cir. 1991) (same); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir.
2002) (courts should consider documents referenced in the complaint "to prevent parties from
surviving a motion to dismiss by artful pleading or by failing to attach relevant documents").

robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process."). On the plaintiffs' allegations and the public record, the Court should not "second-guess[ ] . . . informed board decisions . . . or supplant the judgment of disinterested directors apprised of all relevant information." *Jones*, 559 U.S. at 352.

## III.  SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM

The plaintiffs' prayer for relief includes a request to rescind the Advisory Agreement under Section 47(b) of the ICA. Compl. ¶ 89. Section 47(b) authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter." 15 U.S.C. § 80a-46(b)(1). Since the plaintiffs have failed to adequately plead a violation of Section 36(b) there can be no rescission under Section 47(b).

Equally important, the plaintiffs are not parties to the Advisory Agreement and lack standing to seek its rescission. The plain language of Section 47(b) makes rescission available only to a "party" to that contract. The only parties to the advisory agreement are the State Farm Mutual Fund Trust and SFIMC. *See Turner v. Davis Selected Advisers, LP*, No. 08-cv-00421, slip. op. at 18–19 (D. Ariz. June 1, 2011), *aff'd*, No. 13-15742 (9th Cir. Sept. 29, 2015) (granting motion to dismiss Section 47(b) claim because Section 36(b) plaintiff was not standing in the shoes of the fund and was not a party to the advisory agreement he was challenging); *see also Davis v. Bailey*, No. 05-civ-0042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting rescission of advisory agreement because "[p]laintiffs were not parties" to it).

## IV.  THE PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL

The Complaint's demand for a jury trial is also a dead letter. Controlling authority from the Seventh Circuit – echoed by courts across the nation – holds that Section 36(b) claims are equitable in nature and therefore do not fall within the Seventh Amendment's right to jury trial on actions at law. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir.

1990) (holding that plaintiff was not entitled to a jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line"), *rev'd on other grounds*, 500 U.S. 90, 95 n.3 (1991); *see also In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) ("The issue in this case involves the equitable inquiry whether the Trust adviser violated its fiduciary obligations by charging an exorbitant fee . . . . [Plaintiff] is not entitled to a jury trial.").  Under the Seventh Circuit's explicit ruling in *Kamen*, the plaintiffs' jury trial demand contravenes controlling authority and should be stricken.  *See Zehrer v. Harbor Capital Advisors, Inc*., No. 14 C 789, 2014 WL 6478054, at *5 (N.D. Ill. Nov. 18, 2014) (striking plaintiff's jury trial demand at motion to dismiss stage).

## CONCLUSION

For the foregoing reasons, the plaintiffs' Complaint should be dismissed with prejudice.

Dated: October 23, 2015                          Respectfully submitted,

                                                 /s/ Timothy L. Bertschy
                                                 Timothy L. Bertschy/ARDC #199931
                                                 Nathan R. Bach/ARDC #6292316
                                                 **Heyl, Royster, Voelker & Allen, P.C.**
                                                 300 Hamilton Boulevard
                                                 Peoria, IL 61601-6199
                                                 Tel: (309) 676-0400
                                                 Fax: (309) 676-3374
                                                 TBertschy@heylroyster.com
                                                 NBach@heylroyster.com

*Of Counsel*

John D. Donovan, Jr.
Robert A. Skinner
Amy D. Roy
**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600

Tel: (617) 951-7000
Fax: (617) 951-7050
john.donovan@ropesgray.com
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

*Attorneys for Defendant State Farm
Investment Management Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 23, 2015.

/s/ Timothy L. Bertschy
Timothy L. Bertschy