E-FILED
Friday, 13 November, 2015  09:15:45 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMY L. INGENHUTT and TERESA L. ODELL, | NO. 15-cv-01303-JES-JEH |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| STATE FARM INVESTMENT MANAGEMENT CORPORATION | |
| Defendant. | |

**NATURE OF THE ACTION**

1.     This is an action for breach of fiduciary duty under Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) ("ICA"), which authorizes mutual fund investors to bring an action against the mutual fund's investment adviser with respect to the adviser's receipt of compensation for services or of payments of a material nature.

2.     As authorized by Section 36(b), Plaintiffs Amy Ingenhutt and Teresa Odell bring this action derivatively against Defendant STATE FARM INVESTMENT MANAGEMENT CORPORATION ("SFIMC" or "Defendant") on behalf of the target date mutual funds, known as the "LifePath Funds," in which they have invested.

3.     SFIMC serves as the investment adviser within the meaning of 15 U.S.C. 80a-2(a)(20) for each of the LifePath Funds. Defendant SFIMC breached its fiduciary duties to the

LifePath Funds under Section 36(b) by collecting excessive management fees from the LifePath Funds. As a result, the LifePath Funds and the holders of shares of those funds, including Plaintiffs, suffered losses for which recovery is sought by this action.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

5.    Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391, because Defendant is an resident of this district, maintains its headquarters and offices in this district, and transacts business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claims occurred in this district.

## THE PARTIES

**Plaintiffs**

6.    Plaintiff Amy L. Ingenhutt is a resident of New York and a shareholder of the LifePath 2050 Funds.

7.    Plaintiff Teresa L. Odell is a resident of Iowa and a shareholder of the LifePath 2030 Funds.

8.    Plaintiffs were invested in the LifePath Funds throughout the Relevant Period.

9.    Plaintiffs discovered their claims shortly before the filing of this action.

**Defendant**

10.    On information and belief, Defendant SFIMC is a privately owned investment manager organized and operating under the laws of Illinois, with its headquarters at Three State Farm Plaza Bloomington, Illinois 61791-0001. SFIMC is an investment adviser to the Funds within the meaning of the ICA, and as such owes a fiduciary duty to the Funds and their

shareholders.

## <u>LEGAL AND HISTORIC BACKGROUND FOR PLAINTIFFS' CLAIMS</u>

11.    Congress recognized as early as 1935 that mutual funds "present[ed] special features which require[d] attention beyond simply the disclosure philosophy of the Securities Act of 1933." *See* H.R. Rep. No. 91-1382, p. 2 (1970). "[A] typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the adviser." *See* S. Rep. no. 91-184, p. 5 (1969)). "Therefore, the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.* Rather, "the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest, and potentially incestuous." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982) (internal citation omitted) (citing *Burks v. Lasker,* 441 U.S. 471, 481 (1979)).

12.    Accordingly, in 1940, Congress enacted the ICA, recognizing that:

> The national public interest and the interest of investors are ***adversely affected***…when investment companies are organized, operated [and] managed…in the interest of…investment advisers…rather than in the interest of [shareholders]…or when the investment companies…are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994) (emphasis added). The ICA was designed to regulate and to curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers and distributors.

13.    In the 1960's, Congress realized that investment advisers were still charging mutual funds excessive fees. A report produced by the Wharton School that was commissioned by the SEC found that investment advisers tended to charge mutual funds "substantially higher"

FIRST AMENDED COMPLAINT
*Amy Ingenhutt, et al. v. State Farm, et al.*

rates than they charged other clients. *See A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, p. 29 (1962)).

14.     As a result, Section 36(b), 15 U.S.C. §80a-35(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty. Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services, specifically providing that:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser . . . for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

15.     Further, and notwithstanding requirements regarding the increased disinterestedness of the board, "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 540 (1984), also adding a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate ***under all the circumstances***.

15 U.S.C. § 80a-35(b)(2) (emphasis added). Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, affording them the ability to be an independent check on unfair fees while leaving "the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court." S. Rep. 91-184, p. 6.

16.     Mutual fund fees cause a dramatic decrease in investment returns over time. Arthur Levitt, past Chairman of the SEC, criticized this "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., *Inaugural address: Costs Paid with Other People's Money*, Address at Fordham University School of Law (Nov. 3, 2000), in 6 FORDHAM J. CORP. & FIN. L. 261, 267 (2001).

17.     When a company starts a new mutual fund, a board of directors is established which contracts with other entities, including investment advisers, to provide all the services the fund needs. The board of directors meets several times a year. The members of the board of directors are typically compensated for their services based on a schedule that takes into account an annual retainer, the number of meetings attended, and expenses incurred. The Trustees of the State Farm Mutual Fund Trust are paid between $60,000 and $70,000 from the Trust and a total of in excess of $100,000 per year from the Trust and other State Farm Mutual Funds on which they serve as Trustees, including the State Farm Variable Product Trust and State Farm Associates' Funds Trust. As a result, board membership in the LifePath Funds is a lucrative part-

time job, the continuation of which is dependent (at least in part) on the continued good will and

support of Defendant.

18.     While mutual fund boards are supposed to be the "watchdogs" for the shareholders

of the funds, two noteworthy industry insiders have commented on the general failure of mutual

fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of The Vanguard

Group, Inc. ("Vanguard"), made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a
> bad joke. They've watched industry fees go up year after year,
> they've added 12b-1 fees. I think they've forgotten, maybe they've
> never been told, that the law, the Investment Company Act, says
> they're required to put the interest of the fund shareholders ahead of
> the interest of the fund adviser. It's simply impossible for me to see
> how they could have ever measured up to that mandate, or are
> measuring up to it.

19.     Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the

following comment, which was aptly quoted by a United States District Court:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for
> independent directors on the theory that they would be the
> watchdogs for all these people pooling their money. The behavior
> of independent directors in aggregate since 1940 has been to rubber
> stamp every deal that's come along from management—whether
> management was good, bad, or indifferent. Not negotiate for fee
> reductions and so on. A long time ago, an attorney said that in
> selecting directors, the management companies were looking for
> Cocker Spaniels and not Dobermans. I'd say they found a lot of
> Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

20.     Mr. Buffet further observed, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an
> 'independent' mutual fund director will suggest that his fund look at
> other managers, even if the incumbent manager has persistently

delivered substandard performance. When they are handling their own money, of course, directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others. . . . Investment company directors have failed as well in negotiating management fees . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds. And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees. Under the current system, though, reductions mean nothing to 'independent' directors while meaning everything to managers. So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably. (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

21.    The watchfulness and effectiveness of mutual fund boards of directors continue to be an issue today. As Judge Posner recently observed in his dissent from the denial of a petition for rehearing en banc in another case brought under Section 36(b), there are "growing indications that executive compensation in large publicly traded firms often is excessive because of the feeble incentives of boards of directors to police compensation." *Jones v. Harris*, 537 F.3d 728, 730 (2008), *cert. granted*, 559 U.S. 335, 129 S. Ct. 1579 (2010). Indeed, "'broad cross-sectional analysis reveals little consistent evidence that board composition is related to lower fees and higher returns for fund shareholders.'" *Id*. at 731 (quoting OEA Memorandum: Literature Review on Independent Mutual Fund Chairs and Directors," Dec. 29, 2006).

22.    An investment adviser's fiduciary duty encompasses both full disclosure and substantive fairness as concerns fund fee assessments. An adviser "may not overreach in the amount of his fee even though the other party to the transaction, in full possession of all the facts, does not believe the fee is excessive."  Letter from the Investment Company Institute included

with Mutual Funds Amendments (Part I): Hearings before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce, 91st Cong., at 441 (December 17, 1969) [hereinafter "1969 Hearings"]. See also S. Rep. 91-184, pp. 15-16 ("the ultimate test, *even if the compensation or payments are approved by the directors* . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

## SUBSTANTIVE ALLEGATIONS

### The Structure and Management of the Funds at Issue

23.    The funds at issue in this case are two of the five "LifePath" funds, the LifePath 2030 Fund and the LifePath 2050 Fund, issued by the State Farm Mutual Fund Trust ("the Trust"), an open-end management investment company organized as a business trust under the laws of the State of Delaware in June of 2000. The LifePath funds are among fifteen funds issued by the Trust.

24.    The LifePath Funds are a type of investment commonly known in the industry as "target date" funds. Each fund is purportedly designed to provide a certain level of risk / return based on the date on which the investments in the fund are expected to be needed for retirement. As the target date approaches, the investments are adjusted, becoming more conservative over time. For instance, if an investor's retirement is anticipated to be near the year 2030, he or she could choose the LifePath 2030 Fund. As that individual's anticipated retirement date approaches (in this example, 2030), the investment mix in the LifePath 2030 Fund becomes more conservative by increasing its investors' exposure to generally more conservative investment options and fewer aggressive investment options. *See* State Farm, LifePath Funds Adjust Over Time, *available at* https://www.statefarm.com/finances/mutual-funds/funds/lifepath-funds (last visited November 2,

, 2015) ("State Farm® LifePath Funds allow you to spend less time reallocating your portfolio since they adjust and become more conservative over time as your target date for needing the funds approaches.")

25.     As Defendant's marketing materials explain, over time, the asset allocations of LifePath Funds with later target dates are periodically modified to approximate those LifePath Funds with earlier target dates, until finally reaching the most conservative investment mix in the decade investors anticipate they will begin withdrawing funds. *See* State Farm, "Discover How LifePath Funds Work to Help You Save for Retirement," *available at* https://www.statefarm.com/finances/mutual-funds/funds/lifepath-funds/how-lifepath-funds-work (last visited November 13, 2015). This is sometimes referred to in the target-date fund industry as the "glide path."

26.     Unlike many mutual funds, the LifePath Funds do not invest directly in stocks, bonds or money market funds. Instead, each of the LifePath Funds is structured as a "feeder" fund in a "master-feeder" arrangement. Under this structure, each LifePath Fund invests all of its assets in a corresponding separate portfolio (collectively referred to as the "Master Portfolios"), as follows:

| LifePath Fund | Corresponding Master Portfolio |
|---|---|
| State Farm LifePath Retirement Fund | LifePath Retirement Master Portfolio |
| State Farm LifePath 2020 Fund | LifePath 2020 Master Portfolio |
| State Farm LifePath 2030 Fund | LifePath 2030 Master Portfolio |
| State Farm LifePath 2040 Fund | LifePath 2040 Master Portfolio |
| State Farm LifePath 2050 Fund | LifePath 2050 Master Portfolio |

27.     The LifePath Master Portfolios have a range of investment objectives, from conservative to more aggressive, which correspond to the investment objectives of the LifePath funds.

FIRST AMENDED COMPLAINT
*Amy Ingenhutt, et al. v. State Farm, et al.*

28.     Each of the LifePath Master Portfolios is itself one of a series of funds contained within an unaffiliated fund known as the Master Investment Portfolio, which is itself an open-end management investment company registered under the ICA, and which is referred to in State Farm's disclosure documents as the "Master Fund."  State Farm Mutual Fund Trust Statement of Additional     Information     dated     May     1,     2015,     available     at www.sec.gov/edgar/data/1119720/000119312515156698/d854782d485bpos.htm. (referred to hereafter as the "State Farm SAI").  On information and belief, the Master Investment Portfolio and each of the LifePath Master Portfolios were sponsored or launched by BlackRock, Inc. and are managed by Black Rock Fund Advisors ("BFA"), a private investment management company unaffiliated with the Trust or SFIMC.

29.     Each of the LifePath Master Portfolios in which a LifePath Fund invests is, in turn, invested in a combination of stocks, bonds, money market funds and other investments which are referred to as the "Underlying Funds". State Farm SAI at 1. The Underlying Funds are also maintained as portfolios or funds. As of March 15, 2015, the Underlying Funds in which the LifePath Funds, through the LifePath Master Portfolios, were invested included the following 12 funds:

> Master Investment Portfolio—Active Stock Master Portfolio
> Master Series – Small Cap —Small Cap Index Master Portfolio
> BlackRock Commodity Strategies Fund
> iShares Cohen & Steers REIT ETF
> BlackRock Emerging Markets Fund, Inc.
> iShares MSCI Canada ETF
> iShares International Developed Real Estate ETF
> iShares MSCI EAFE Small-Cap ETF
> Master Investment Portfolio—International TILTS Master Portfolio
> Master Investment Portfolio—Russell 1000 Index Master Portfolio
> Master Investment Portfolio—CoreAlpha Bond Master Portfolio
> iShares TIPS Bond ETF

*See,* State Farm Mutual Fund Trust Prosepctus, dated May 1, 2015, *available at* https://www.sec.gov/Archives/edgar/data/1119720/000119312515156698/d854782d485bpos.ht m (last visited November 13, 2015) (hereinafter State Farm 2015 Prospectus), at 71.

30.     By means of the above-described structure, the LifePath Funds, through the Master Fund and each corresponding LifePath Master Portfolio, are all invested in the same group of approximately 10-12 Underlying Funds or a subset of those Underlying Funds.

31.     BFA serves as the investment adviser for each of the LifePath Master Portfolios in which the LifePath Funds are fully invested. *See*, State Farm 2015 Prospectus at 80. BFA or its affiliates also generally serve as the investment adviser to each of the Underlying Funds in which the LifePath Master Portfolios invest. *Id.*

32.     BFA also serves as the portfolio manager for the LifePath Master Portfolios and employs two full-time portfolio managers, Alan Mason and Amy Whitelaw, to carry out that function. Together they are primarily responsible for the day-to-day management of the LifePath Master Portfolios, including, but not limited to, investing cash inflows, coordinating with members of their team to focus on certain asset classes, implementing investment strategy, researching and reviewing investment strategy, and overseeing members of his or her portfolio management team with more limited responsibilities. State Farm 2015 Prospectus at 86-87.

33.     In attempting to achieve the investment objective of each LifePath Fund, State Farm relies on BFA and its "proprietary investment model that analyzes securities market data, including risk, asset class correlations, and expected returns" to provide portfolio allocations among the asset classes offered through the Underlying Funds. *See* State Farm 2015 Prospectus at 70.

34.     SFIMC is the investment adviser to each of the LifePath Funds. *State Farm 2015 Prospectus* at 39, 44, 51, 57, 62.

-11-

**The Fees charged by Defendant to the LifePath Funds**

35.     The fees paid by the LifePath Funds (and therefore, by the investors in those funds) include management fees, distribution and/or service fees under Section 12b-1 of the ICA and other expenses and fees, including administrative fees. Only the management fees received by SFIMC are at issue in this action.

36.     The management fees paid by the LifePath Funds to SFIMC purport to compensate SFIMC for its services as the manager or investment adviser to the LifePath Funds and are paid as a percentage of the assets under management. For example, according to the 2015 State Farm Prospectus, the LifePath 2030 Fund pays 1.07% of the total assets under management, or 107 basis points in management fees annually. [1]

37.     As of 2015, the management fees for the LifePath Funds varied slightly by fund, ranging from 102 bps to 110 bps and averaging 104 bps.

38.     The management fees paid by the LifePath Funds include the management fees of their corresponding Master Portfolios in which they are invested, which are received by BFA as compensation for the advisory and portfolio management services it provides to the Master Portfolios and their Underlying Funds. Other fund complexes typically report such fees as "acquired funds fees."[2]

---

[1] As used herein the term "basis point" means .01%. This term is sometimes abbreviated as bps, pronounced "bips."  This is a standard term used in finance and the insurance industry. *See* Investopedia, What is a basis point?, http://www.investopedia.com/ask/answers/05/basispoint.asp (last visited July 21, 2015).

[2] For example, the filings of eight other sub-advised fund-of-funds report an Acquired Fund Fee, including (1) The American Century One Choice Funds, (2) the American Funds, (3) the Fidelity Advisor Freedom Funds, (4) the JPMorgan Smart Retirement Funds, (5) the Principal LifeTime Funds, (6) the John Hancock Retirement Funds, (7) the MassMutual RetireSMART Funds, and (8) the MFS LifeTime Funds.

39.     Plaintiffs are informed and believe, and on that basis allege, that the management fees reported in the Prospectus for the LifePath funds are comprised of the fees charged by BFA for its investment advisory and management services to the Underlying Funds, the fees charged by BFA for investment advisory and management services at the Master Portfolio level, and the management fees charged by SFIMC for management services it purportedly provides to the LifePath Funds.

40.     Because BFA is an adviser to both the Master Portfolios and most of the Underlying Funds, it has contractually agreed to waive its management fees at the Master Portfolio level in an amount equal to the management fees and administrative fees, if any, it or its affiliate receives from each investment company in which the LifePath Master Portfolios invests. State Farm 2015 Prospectus at 34m 40, 46, 52, 58.

41.     In addition to the BFA fee waivers, Defendant SFIMC, in its capacity as the investment adviser to the LifePath Funds, has contractually agreed to waive its management fees in an amount required to keep the Fund's Total Annual Operating Expenses at or below a specified amount for each share class. *Id.*

42.     As reported in the 2015 State Farm Prospectus, the fee waivers for the five LifePath Funds ranged from 41 bps to 48 bps, corresponding roughly to the variation in the management fee among the funds, causing the net management fee for each of the funds to be consistently 62 or 63 bps, as displayed in the following table:

|  | LP2020 | LP2030 | LP2040 | LP2050 | LP Retirement |
|---|---|---|---|---|---|
| Mgmt Fee | 1.04% | 1.07% | 1.09% | 1.10% | 1.02% |
| Waiver | 0.41% | 0.44% | 0.46% | 0.48% | 0.40% |
| Net Mgmt. Fee | 0.63% | 0.63% | 0.63% | 0.62% | 0.62% |

43.     Translated into dollars based on the assets under management[3] for each LifePath Fund as reported in the Annual Report, the net management fees for each LifePath Fund are as displayed in the right-hand column of the following table:

| Fund | Assets Under Mgmt. | Net Mgmt. Fee  bps | Net Mgmt. Fee $ |
|---|---|---|---|
| LT2020 | $1,863,259,115 | 63 | $11,738,532 |
| LT2030 | $1,743,927,215 | 63 | $10,986,741 |
| LT2040 | $1,277,710,442 | 63 | $8,049,576 |
| LT2050 | $219,640,699 | 62 | $1,361,772 |
| LT Retirement | $1,44,421,363 | 62 | $7,095,412 |
| Total: | $6,248,958,833 | | $39,232,034 |

44.     These net management fees are apportioned between BFA and SFIMC based on a formula that is not clear from the Prospectus because the allocation of the fee waivers is not specified. According to the SAI, however, the net management fees reportedly received by SFIMC in 2014 for all of the LifePath Funds, after fee waivers and expense reimbursements, are $17,495,659. Of that amount, SFIMC receives $5,496,095 for the LifePath 2030 and 2050 funds. The allocation of SFIMC's reported net fees by Fund is displayed in the below table, along with the fee received by BFA, calculated as the difference between SFIMC's share and the total net management fee paid by the LifePath Funds:

| Fund | SFIMC Share | BFA Share | Total |
|---|---|---|---|
| LT2020 | $5,216,508 (28bps) | $6,522,024 (35bps) | $11,738,532 (63bps) |

---

[3] The Assets Under Management amount used for these calculations is the average of the net assets for each fund at the beginning and end of calendar year 2014, as reported in the 2015 annual report.

| | | |
|---|---|---|
| LT2030 | $4,882,545 (28bps) | $6,104,196 (35bps) | $10,986,741 (63bps) |
| LT2040 | $3,582,006 (28bps) | $4,467,570 (35bps) | $8,049,576 (63bps) |
| LT2050 | $613,550 (28bps) | $748,222 (34bps) | $1,361,772 (62bps) |
| LT Retirement | $3,201,050 (28bps) | $3,894,362 (34bps) | $7,095,412 (62bps) |
| Total: | $17,495,659 (28bps) | $21,736,375 (34bps) | $39,232,034 (62bps) |

45.    The net management fee of more than $17 million that SFIMC retains is approximately 44% of the total, even though BFA provides virtually all of the investment advisory and portfolio management services.

**Facts Establishing that SFIMC's Management Fees are Excessive**

46.    The amount of the management fee extracted and retained from the LifePath Funds by SFIMC is so disproportionately large that it bears no reasonable relationship to the services rendered  in exchange for that fee, and could not have been negotiated through arms-length bargaining. *See Jones v. Harris*, 559 U.S. 335 (2010) (investment advisers breach their fiduciary duties to mutual funds when they collect fees from mutual funds that are so disproportionately large that the fees bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining).

47.    The essence of a claim for excessive or unfair fees under the Section 36(b) of the ICA is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939). "To face liability under § 36 an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris*, 559 U.S. 335, 346 (2010).

-15-

48.     Among the factors to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining are, to the extent applicable, the following: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the adviser/manager; (3) economies of scale; (4) comparative fee structure; (5) fallout benefits (i.e., indirect profits to the adviser/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors.

49.     As further alleged below, the facts bearing on the applicable considerations described above establish that the management fees charged and retained by Defendant SFIMC are excessive, such that the collection and retention of those fees by SFIMC is a breach of its fiduciary duty to the Funds and to Plaintiffs under section 36(b) of the ICA.

**_The Nature and Quality of the Services Rendered_**

50.     According to the Amended and Restated Investment Advisory and Management Services Agreement between SFIMC and the Trust, dated March 28, 2012 and in effect during the Relevant Period, SFIMC's responsibilities to the Funds fall into two categories, characterized as "Management Services" and "Investment Management Services." The services actually performed by SFIMC, however, are effectively limited to those described as "Management Services," or a subset thereof.

51.     Although the "Management Services" as described in the Advisory Agreement appear to be numerous, they are very limited in scope, and are confined to administrative or ministerial-type services such as the preparation of SEC filings, shareholder disclosures and board reports; arranging for and supporting board meetings and shareholder meetings; preparation and filing of tax returns and other accounting services; oversight of third party services; and

responding to inquiries and complaints. They do not include portfolio management or investment advisory services. The administrative nature of these services are evident from the complete list, which consists of the following 22 items:

(a) Preparation and maintenance of the Trust's Registration Statement with the SEC;

(b) Preparation and periodic updating of the prospectus and statement of additional information for the Funds

(c) Preparation, filing with appropriate regulatory authorities, and dissemination of various reports for the Funds, including but not limited to semiannual reports to shareholders under Section 30(d) of the 1940 Act, annual and semiannual reports on Form N-SAR, and notices pursuant to Rule 24f-2;

(d) Arrangement for all meetings of shareholders, including the collection of all information required for preparation of proxy statements, the preparation and filing with appropriate regulatory agencies of such proxy statements, the supervision of solicitation of shareholders and shareholder nominees in connection therewith, tabulation (or supervision of the tabulation) of votes, response to all inquiries regarding such meetings from shareholders, the public and the media, and preparation and retention of all minutes and all other records required to be kept in connection with such meetings;

(e) Maintenance and retention of all Trust charter documents and the filing of all documents required to maintain the Trust's status as a Delaware business trust and as a registered open-end investment company;

(f) Arrangement and preparation and dissemination of all materials for meetings of the Board and committees thereof and preparation and retention of all minutes and other records thereof;

(g) Preparation and filing of the Trust's Federal, state, and local income tax returns and calculation of any tax required to be paid in connection therewith;

(h) Calculation of all Trust and Fund expenses and arrangement for the payment thereof;

(i) Calculation of and arrangement for payment of all income, capital gain, and other distributions to shareholders of each Fund;

(j) Determination, after consultation with the officers of the Trust, of the jurisdictions in which Shares shall be qualified for sale, or may be sold pursuant to an exemption from such qualification, and preparation and maintenance of the qualification of the Shares for sale under the securities laws of each such jurisdiction;

-17-

(k) Provision of the services of persons who may be appointed as officers of the Trust by the Board (it is agreed that some person or persons may be officers of both the Trust and the Adviser, and that the existence of any such dual interest shall not affect the validity of this Agreement except as otherwise provided by specific provision of applicable law);

(l) Preparation and dissemination of the Trust's and each Fund's quarterly financial information to the Board and preparation of such other reports relating to the business and affairs of the Trust and each Fund as the officers and Board may from time to time reasonably request;

(m) Administration of the Trust's Code of Ethics and required reporting to the Board and officer compliance therewith;

(n) Provision of internal legal, accounting, compliance, audit, and risk management services and periodic reporting to the Board with respect to such services;

(o) Negotiation, administration, and oversight of third party services to the Trust including, but not limited to, sub-advisory, custody, tax, disaster recovery, audit, and legal services;

(p) Negotiation and arrangement for insurance desired or required of the Trust and administering all claims thereunder;

(q) Response to all inquiries by regulatory agencies, the press, and the general public concerning the business and affairs of the Trust, including the oversight of all periodic inspections of the operations of the Trust and its agents by regulatory authorities and responses to subpoenas and tax levies;

(r) Handling and resolution of any complaints registered with the Trust by shareholders, regulatory authorities, and the general public;

(s) Monitoring legal, tax, regulatory, and industry developments related to the business affairs of the Trust and communicating such developments to the officers and the Board as they may reasonably request or as the Adviser believes appropriate;

(t) Administration of operating policies of the Trust and recommendation to the officers and the Board of the Trust of modifications to such policies to facilitate the protection of shareholders or market competitiveness of the Trust and Fund and to the extent necessary to comply with new legal or regulatory requirements;

(u) Responding to surveys conducted by third parties and reporting of Fund performance and other portfolio information; and

(v) Filing of claims, class actions involving portfolio securities, and handling administrative matters in connection with the litigation or settlement of such claims

52.     Although the Statement of Additional Information issued by the Fund also describes services purportedly provided by SFIMC, as the manager, the services described are either duplicative of those described identified above, or are investment advisory services provided by BFA, not SFIMC, as further described below.

53.     The second category of services, characterized in the Agreement as "Investment Management Services," include services that are not performed by SFIMC, but by BFA as the advisor and portfolio manager for the Master Portfolios and the underlying funds. These "Investment Management Services" are the services that provide the real value to investors in the fund and that are more costly to provide, including actual portfolio management, *i.e.* researching, identifying and implementing specific investment opportunities consistent with the Funds' investment strategies.

54.     Virtually all of the "Investment Management Services" identified in Article 2.2 of the Management Agreement as services to be provided to the Trust by SFIMC are actually delegated to and performed by BFA as part of its responsibility for providing investment advisory services to the Master Portfolios. The following chart comparing SFIMC's duties under Article 2.2 of the Management Agreement with BFA's duties as the Sub-Adviser under Article 2.1 of the Investment Sub-Advisory Agreement between the Trust, SFMIC and BFA confirms this fact:

| 2.2 Investment Management Services. | Duties of SubAdviser<br>2.1 Investment Advisory Services. [4] |
|---|---|
| (a) The Adviser shall provide the Trust with such investment research, advice and supervision as the latter may from time to time consider necessary for the proper supervision of the assets of each Fund. In this regard, the Adviser shall: | (a) Subject to the supervision of the Board and the Adviser, the SubAdviser shall provide the SubAdvised Fund with such investment research, advice and supervision as is necessary for the investment and proper supervision of the assets of the SubAdvised Fund. In this regard, the SubAdviser shall: |
| (i) perform research and obtain and evaluate pertinent economic, statistical, and financial data relevant to the investment policies of each Fund as set forth in the Registration Statement; | (i) perform research and obtain and evaluate pertinent economic, statistical, and financial data relevant to the investment policies of the SubAdvised Fund as set forth in the Registration Statement; |
| (ii) consult with the Board and furnish to the Board recommendations with respect to an overall investment strategy for each Fund for approval, modification, or rejection by the Board; | (ii) at such times as shall be reasonably requested by the Board or the Adviser, consult with the Board and furnish to the Board recommendations with respect to an overall investment strategy for the SubAdvised Fund for approval, modification, or rejection by the Board; |
| (iii) seek out and implement specific investment opportunities, consistent with any investment strategies approved by the Board; | (iii) seek out and implement specific investment opportunities, consistent with any investment strategies approved by the Board; |
| (iv) take such steps as are necessary to implement any overall investment strategies approved by the Board for each Fund, including making and carrying out daytoday decisions to acquire or dispose of permissible investments, management of investments and any other property of the Fund, and providing or obtaining such services as may be necessary in managing, acquiring or disposing of investments; | (iv) take such steps as are necessary to implement any overall investment strategies approved by the Board for the SubAdvised Fund, including making and carrying out daytoday decisions to acquire or dispose of permissible investments, management of investments and any other property of the SubAdvised Fund, and providing or obtaining such services as may be necessary in |

---

[4] The sub-advisor duties listed are based on the publicly available sample of an Investment Sub-Advisor Agreement between the Trust, SFMI and BFA, which actually pertains to the Trust's S&P 500 Index Fund. Plaintiff is informed, and believes, however, that the duties of BFA described therein are identical to those described in the agreement governing the LifePath Funds.

| | managing, acquiring or disposing of investments; |
|---|---|
| (v) regularly report to the Board with respect to the implementation of any approved overall investment strategy and any other activities in connection with management of the assets of each Fund, including furnishing, within 30 days after the end of each calendar quarter, a statement of all purchases and sales during the quarter and a schedule of investments and other assets of each Fund as of the end of the quarter; | (v) regularly report to the Board with respect to the implementation of any approved overall investment strategy and any other activities in connection with management of the assets of the SubAdvised Fund including furnishing, within 10 days after the end of each calendar quarter, a statement of all purchases and sales during the quarter and a schedule of investments and other assets of the SubAdvised Fund as of the end of the quarter; |
| (vi) maintain all required accounts, records, memoranda, instructions or authorizations relating to the acquisition or disposition of investments for each Fund and the Trust; | (vi) maintain all accounts, records, memoranda, instructions or authorizations required to be maintained by the SubAdviser pursuant to the requirements of Rule 31a1under the 1940 Act, for the period required by Rule 31a2 under the 1940 Act, with respect to transactions by the SubAdviser on behalf of the SubAdvised Fund; |
| (vii) assist in determining each business day the net asset value of the shares of each Fund in accordance with applicable law; | (vii) assist in determining each business day the net asset value of the shares of the SubAdvised Fund in accordance with applicable law; and |
| [no parallel provision] | (viii) provide the Adviser with a report of each portfolio transaction no later than the close of the next business day following such transaction. |
| (viii) enter into any advisory or subadvisory contract with another affiliated or unaffiliated entity pursuant to which such entity will carry out some or all of the Adviser's responsibilities (as specified in such advisory or subadvisory contract) listed above; and | [no parallel provision] |
| (ix) monitor the performance of any Master Fund portfolio into which a portfolio of the Trust may invest substantially all of its assets. | [no parallel provision] |

55.     As alleged above, each of the LifePath Funds invests all of its assets in a Master Portfolio having exactly the same objectives as its corresponding LifePath Fund. These Master Portfolios are managed exclusively by BFA, using BFA employees. Likewise, each of the 10-12 underlying funds in which the LifePath Master Portfolios are invested is managed by BFA. As a result of this structure, it is BFA, not SFIMC, that provides virtually all of the investment advisory services to the LifePath Funds.

56.     The investment advisory services provided by BFA include virtually all of such services required for the LifePath Funds, including management of all of the Master Portfolio's assets and providing the Master Portfolios with investment guidance and policy direction in connection with daily portfolio management, subject to the supervision of the Master Fund's Board of Trustees. For providing such services BFA receives a net fee, after waivers and reimbursements, of 32 or 33 basis points, out of the total net management fee of 62 or 63 basis points.

57.     SFIMC, by contrast, does not provide any day-to-day investment services to the LifePath Funds. Nor does it provide any investment guidance or policy direction in connection with daily portfolio management. Nonetheless, it receives close to half of the net management fees collected from the LifePath funds, an average of 28 basis points, amounting to more than $17 million annually.

58.     The administrative and ministerial management services provided by SFIMC to the LifePath Funds do not begin to justify the share of the management fee it collects from LifePath Shareholders as compensation for such services. Such services are minimal, require very few resources and cost a very small fraction of the $17 million or 28 basis points collected and retained by SFIMC for providing such services, roughly $5.5 million of which is paid by the

investors in the LifePath 2030 and 2050 Funds. That amount is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining.

***The Profitability of the LifePath Funds to Defendant***

59.    "[T]he profitability of the fund to the adviser is another factor which must be taken into consideration in determining whether the price paid by a fund to its adviser is a price which would be 'the product of arms-length bargaining.'" The profitability of a fund to an adviser is a function of revenues minus the costs of providing services.

60.    The LifePath Funds collectively have more than $6 billion in assets under management. Defendant's fees are tied directly to the total assets under management for each LifePath Fund by reason of the fact that they are calculated as a percentage of the assets under management.

61.    On information and belief, and as discovery in this matter will show, the true cost of providing the services for which SFIMC collects its portion of the net management fee is similar to that of its competitors, approximately 2-3 basis points or less. In fact, many investment advisers, such as the advisers for the JPMorgan SmartRetirement Funds and the MFS Lifetime Funds, do not charge any management fee at all. Based on the Prospectus filed with the Securities and Exchange Commission ("SEC") for each of eight funds comparable to the LifePath Funds, the management fee charged by the investment advisers for those funds are as follows:

| Target Date Funds | Management Fee |
|---|---|
| John Hancock Retirement Fund | 6 bps |
| Principal LifeTime Fund | 3 bps |

| | |
|---|---|
| Fidelity Advisor Freedom Fund | 0 bps |
| American Century One Choice Funds | 0 bps |
| MFS LifeTime Fund | 0 bps |
| MassMutual RetireSMART Fund | 0 bps |
| JPM SmartRetirement Funds | 0 bps |
| American Funds Target Date Funds | 10 bps |

62.    By contrast, the net management fee SFIMC actually collects and retains for these services, based on the information set forth in the fund prospectus, SAI and Annual Report, amount to 28 basis points or more.

63.    Some of the services provided by SFIMC to the LifePath Funds in exchange for the 28 bps management fee it collects from LifePath investors are administrative services of the type for which other fund managers charge a separate "administrative" fee pursuant to a separate contract. Once again, however, the fee charged for such services are far smaller than the management fee SFIMC collects from LifePath Investors. For example, American Century One Choice Funds Investors are charged an administrative fee of 2 bps. Although the Prospectus for the LifePath 2030 Fund and LifePath 2050 Fund disclose an expense item entitled "Other Expenses" in the amount of 29 bps and 38 bps, respectively, for those funds, it is not clear what those "other expenses" are or whether they include a fee for administrative services.

64.    Although investors in target date mutual funds offered by other mutual fund complexes pay other fees and expenses, those fees and expenses are not properly considered in any comparison of management fees across fund complexes. For example, the prospectus of each of the above-identified comparator funds discloses, as part of the fund's annual operating

expenses, a line item entitled "acquired fund fees and expenses" ("AFFE") ranging from 41 to 76 basis points. The AFFE is a calculation required by the SEC, representing fees and expenses paid indirectly by investors in funds of funds based on the fees and expenses associated with the underlying funds. Included in the AFFE are amounts that are not paid to the investment manager at all, which are, therefore, not investment manager compensation covered by Section 36(b). More importantly, to the extent that investment managers for target date funds of funds in other fund complexes receive compensation that is reflected in the AFFE, that amount represents compensation for managing the ***underlying funds*** in which the target date funds invest, not for managing the target date funds themselves. In the case of the Principal's LifeTime funds, for example, the underlying funds in which the LifeTime funds are invested are all affiliated Principal funds. Principal Management Corporation ("PMC") is the investment adviser for both the Lifetime funds and the underlying funds. It receives only 3 basis points as a management fee for the LifeTime funds. Any additional amounts it receives that are reflected in the AFFE represent a "pass-through" of the fees charged for providing management and investment advisory services to the to the ***underlying funds***, not the Lifetime funds. Because the amounts included in the AFFE are not management fees for the fund of funds, they should not be included in any comparison of management fees to the management fees of the LifePath funds.

65.     Unlike comparable target date funds, the State Farm LifePath Funds do not invest in affiliated funds managed by the same manager responsible for managing the target date funds. Nor does SFIMC play any role in managing the underlying master portfolios in which the LifePath Funds are invested. Instead, those portfolios are controlled and managed by BFA, for which it receives its own portion of the management fee. Thus, the entire 28 bps that SFMIC collects from LifePath investors represents compensation for managing the LifePath funds themselves, and is

properly compared to the average of approximately 2-3 bps received by other fund managers for providing similar services to comparable target date funds.

66.    Thus, the LifePath Funds, as currently managed, are astronomically profitable for SFIMC. Indeed, and as the section on economies of scale describes in more detail, as assets under management increase the LifePath Funds become even more profitable for SFIMC. Such extreme profitability is strong evidence that the fees charged to the LifePath Funds and, through them, to their investors, are excessive.

***Economies of Scale***

67.    Economies of scale are generally described as the cost advantages that a company realizes due to size, output, or scale of operation based on the fact that fixed costs, and sometimes variable costs, are spread out over more units of output, causing the cost per unit of output to generally decrease as the volume of output increases.

68.    The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of mutual fund investment advisory services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) [hereinafter "SEC Report"], at 30-31; GAO Report on Mutual Fund Fees to the Chairman, Subcomm. on Fin. and Hazardous Materials; and the Ranking Member, Comm. on Commerce, House of Representatives (June 2000) (hereinafter "GAO Report"), at 9.

69.    The clearest example of these economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for

fund advisers to service additional assets with zero additional costs. In other words, investment advisers like Defendant can advise a fund that doubles in size purely because of market forces with no increased costs because the services in question provided by the advisers remain unchanged.

70.     The work required to operate a mutual fund does not increase proportionately with the assets under management. "[I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion." Swensen, Unconventional Success: A Fundamental Approach to Personal Investment 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.* Indeed, "break points", *i.e.* points at which fee reductions occur in when the assets under management reach certain levels, "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." *Id.* According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering." John C. Bogle, The Battle for the Soul of Capitalism 154 (2005).

71.     As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points, the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

72.     It does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment advisory services or securities selection process for a ten billion dollar fund and a one million dollar fund are virtually identical, generating enormous economies of scale. At some point (exceeded by the LifePath Funds because of their large size), the additional cost to advise each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

73.     Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted § 36(b), increasing further the economies of scale realized by mutual fund advisers.

74.      In the case of the LifePath Funds, assets under management have grown, and so the advisory fees paid to Defendant have grown dramatically, despite the economies of scale realized by Defendant. Specifically, During the period of 2010 through June of 2015, the net assets under management ("AUM") for the State Farm LifePath 2030 Fund nearly doubled in size, from $890 to $1,724 million. During the same period of time, the Lifepath 2050 Fund increased in sized from $ 45 million to $236 million. As a result of this increase in AUM, SFIMC's fees for these two funds increased over the same period of time, from $ 5.6 million to $ 10.9 million for the LifePath 2030 Fund and from $ 238,000 to $1.5 million for the LifePath 2050 Fund.

75.     This increase in the amount of fees paid by LifePath shareholders is unmatched by any possible proportional increase in costs incurred by SFIMC in providing the services for which it collected its management fee. Those services, which do not include any investment advisory or portfolio management services, are of a type for which the costs do not increase, or increase only

incrementally, with an increase in assets under management. Of the 22 services identified in the management agreement as "Management Services," none is a service that is more expensive to accomplish based on an increase in assets under management given the same fund structure and number of funds. Preparing SEC filings, arranging and supporting board and shareholder meetings, preparing and filing taxes, performing accounting functions, negotiating and arranging for insurance and third party services and the variety of other administrative services purportedly provided to the funds by SFIMC are no more expensive when provided for a larger volume of assets under management than they were prior to the substantial growth in assets experienced by the LifePath funds.

76.     Other services purportedly provided by SFIMC to the LifePath Funds, as referenced in State Farm's Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiffs' Complaint, (Dkt. #13) at 7-8, are actually responsibilities of the Board itself, are duplicative of the administrative services listed in the management agreement, or are delegated to BFA and not performed by SFIMC at all, as alleged herein.

77.     Because the State Farm LifePath Funds are simply invested in the BlackRock Master Portfolios having the same investment objectives, any oversight or monitoring by SFIMC of BFA's portfolio management or the Funds' performance is minimal. BFA is a well-respected investment advisor with extensive experience in portfolio management. It has served as the sub-advisor for the LifePath funds for years. Further, because the State Farm LifePath funds are invested in the Master Portfolios and managed as part of Blackrock's Master Investment Portfolio, with the same investment objectives, BFA has its own vested interest in maximizing the performance of those funds independent of its contract with the State Farm Mutual Fund Trust and SFIMC. Indeed, since the State Farm LifePath funds comprise a part of the BFA-managed

portfolio that includes the Blackrock LifePath funds with the same investment objective, BFA would also be independently answerable to the Blackrock Funds board for the performance of the portfolio.

78.     Likewise, BFA is responsible for reporting to the Board on the implementation of the LifePath Investment strategy, for reporting on the portfolio transactions each date, for participating in the NAV valuation process and for conducting research and evaluation relevant to the investment policies of the funds. To the extent that any such services are provided by SFIMC, the costs of providing such services do not increase significantly with an increase in the volume of assets under management.

79.     Thus, SFIMC has realized tremendous economies of scale in the form of significantly lower per-unit costs as AUM has grown. Because SFIMC's management fee is calculated as a percentage of AUM, these economies of scale have resulted in a dramatically increased management fee and higher profit for SFIMC.

80.     The economies of scale alleged above have not been passed on to LifePath Fund investors by SFIMC to any significant degree. Until at least June of 2015, the Management Agreement did not provide for any "breakpoints" in the investment management fee based on AUM. Although SFIMC agreed to "waive" a portion of its 35 bps management fee and to cap the overall investment advisory and management fee of the Funds at 62 or 63 basis points, the resulting 28 bps management fee that is alleged herein to be excessive has remained in effect for years despite substantial growth in AUM for the LifePath Funds and SFIMC's fees.

81.     As a result of Defendant's failure to pass through any significant part of these economies of scale in the form of reduced fees, the LifePath Funds and their shareholders pay excessive fees to Defendant, in violation of Defendant's fiduciary duties under 36(b).

82.     Because the economies of scale enjoyed by Defendant with respect to the LifePath Funds have not been shared with Plaintiffs, as required by Section 36(b), the Management Fee collected and retained by Defendant is excessive and grossly disproportionate to the services provided to the LifePath Funds.

*Comparative Fee Structures*

83.     The Management Fee Defendant receives from the LifePath Funds is much higher than the fees their competitors receive for substantially similar services.

84.     As alleged above,, other investment advisers who offer funds under a model similar to that of the LifePath Funds' (i.e., a fund-of-fund-like structure where the funds invest in other mutual funds and sub-advisers provide most of the investment management services at the underlying fund level) charge a substantially smaller management fee than Defendant charges the LifePath Funds or, in some cases, no management fee at all. The services provided by these other advisers are the same or greater than the advisory services that Defendant provides to shareholders of the LifePath Funds.

*The Independence and Conscientiousness of the LifePath Funds Directors*

85.     Fees paid to Defendant are technically approved by the Funds' Board of Trustees. A majority of the Board of Trustees is comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA. Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, the Board's approval of the excessive fees at issue indicates that there is a lack of conscientiousness by the directors in reviewing the fees paid to Defendant by each of the LifePath Funds and approving the advisory agreement between the State Farm Mutual Fund Trust and SFIMC.

FIRST AMENDED COMPLAINT
*AMY INGENHUTT, ET AL. V. STATE FARM, ET AL.*

86.     Even if statutorily disinterested, the Funds' independent Trustees are, in all practical respects, unduly influenced and controlled by Defendant in carrying out their statutory obligation to review and approve the advisory agreement and the fees paid to SFIMC under that agreement. In particular, Plaintiffs are informed and believe, and on that basis allege, that Defendant does not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendant has breached their fiduciary duties.

87.     The independent Trustees are supposed to serve as "watchdogs" for the shareholders of the LifePath Funds. As such, the disinterested Trustees have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendant and reviewing the reasonableness of the fees received by Defendant. Accordingly, as noted by the GAO, the directors, *i.e.* the Trustees here, are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services. (See GAO Report at 14.)  These responsibilities are intensive, requiring the Trustees to rely on information provided by Defendant. Defendant, in turn, has a fiduciary duty to provide all information reasonably necessary for the Trustees to perform their obligations. See 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

88.     The ICA contains a presumption that independent directors or trustees are in fact disinterested. However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the LifePath Funds, the lack of adequate information provided to the Trustees in connection with their approvals of the operative agreements and the control of management over the Trustees in reviewing the fees paid by the LifePath Funds are important factors in determining whether Defendant have breached their fiduciary duties.

89.     In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser. For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently."  Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444, at *36 (Oct. 28, 1980).

90.     Defendant's windfall complained of herein indicates that Defendant did not keep the purportedly disinterested independent Trustees of the LifePath Funds fully informed regarding all material facts and aspects of their fees and other compensation. A truly independent board of directors would not have tolerated the complained-of fee assessment charged by Defendant if it had obtained adequate information regarding, among other things: the sub-advisory fees paid for the LifePath Funds and the services received by the LifePath Funds from Defendant for fees they charged; the advisory fees charged and services provided by competitors with similar fund structures; the economies of scale enjoyed by Defendant; the profitability data, and how to evaluate the profitability data in light of economies of scale.

91.     The boards of directors of the LifePath Funds is materially dependent on Defendant for information concerning the investment and fee structure that applies to the LifePath Funds and has allowed Defendant to unduly influence the various boards' directorship of the funds.

92.     The specific information and materials provided to the Board by SFIMC are not disclosed by the Board or SFIMC and are therefore not currently known to Plaintiffs without the benefit of discovery. Although the Funds Semi-Annual Reports filed with the SEC include a description of the Board's contract review process and the materials reviewed by the Board as part

FIRST AMENDED COMPLAINT
*AMY INGENHUTT, ET AL. V. STATE FARM, ET AL.*

of that process, that descriptions is very general, and neither the actual materials reviewed by the Board nor a substantive description of their contents are made available to shareholders. By way of example, the Semi-Annual Report dated June 30, 2014 states that, as a basis for concluding that the advisory fees were reasonable, "the Board also considered the amount of profits (or losses incurred) earned by SFIMC in providing advisory services to each Fund, as well as the methodology by which that profit (or loss) was calculated," but neither the SFIMC's profits associated with managing the LifePath funds nor the manner in which those profits are calculated is available to shareholders.

93.     Moreover, even the generalized and self-serving information contained in the Semi-Annual Reports reveals deficiencies in the Board's contract review process with respect to its assessment of the reasonableness of SFIMC's management fee. There is no indication, for example, that the Board considers the portion of the management fees paid to and retained by SFIMC relative to the services SFIMC actually provides to the funds in exchange for such compensation. Instead, according to the Semi-Annual Reports, the Board looks at the overall expense ratio of the funds, which includes expenses other than management fees as well as fees that are received by BFA for its sub-advisory services, neither of which are relevant to the issue of whether SFIMC's compensation for the services *it* provides to the Funds are excessive.

94.     Similarly, although the Semi-Annual Reports indicate that a discussion of economies of scale occurred during the contract review process, and that the existence of economies of scale were acknowledged, the Board approved the continuation of SFIMC's exorbitant management fee without requiring breakpoints or other measures designed to pass through the savings from those economies of scale to shareholders. Once again, it did so based on an analysis of the Funds' overall expense ratio rather than on an assessment of whether SFIMC's

FIRST AMENDED COMPLAINT
*AMY INGENHUTT, ET AL. V. STATE FARM, ET AL.*

management fee was excessive in light of the economies of scale realized from the growth in assets under management.

## **CLAIM FOR RELIEF**

### **ICA §36(b)**
### **BREACH OF FIDUCIARY DUTY**
### **(Unfair and Excessive Fees)**

95.     Plaintiffs reallege and incorporates by reference as though set forth herein each of the allegations set forth in the foregoing paragraphs.

96.     By assessing, collecting and retaining the management fees it charged to the LifePath Funds for the services it provided to the Funds, Defendant breached its fiduciary duty to the LifePath Funds because they are unreasonable, excessive, and were not negotiated at arms-length in light of all the surrounding circumstances. Plaintiffs specifically allege that all unfair and excessive fees alleged herein have inured to the benefit of, and have been received by Defendant.

97.     In charging and receiving inappropriate compensation, roughly $17.5 million per year for all of the LifePath Funds and $5.5 million for the 203 and 2050 LifePath funds and in failing to put the interests of Plaintiffs and the other shareholders of the LifePath Funds ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

98.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the LifePath Funds or, pursuant to 15 U.S.C. § 80-46(b) ("§ 47(b) of the ICA"), rescission of the contracts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

a.   An order declaring that Defendant has breached its fiduciary duties under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from each Fund;

b.   An order permanently enjoining Defendant from further breaches of its fiduciary duties under Section 36(b) of the 1940 Act;

c.   An order requiring that Defendant disgorge and restore to the Fund all excessive fees charged to the fund, and imposing a constructive trust for distribution of those amounts to the extent authorized by law;

d.   An award of compensatory damages against Defendant, including repayment to each Fund of all unlawful and excessive investment advisory fees paid by such Fund from one year prior to the commencement of this action on behalf of such Fund through the date of trial, and lost investment returns on those amounts, and interest thereon;

e.   An order rescinding each Investment Management Agreement pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to each Fund of the excessive investment advisory fees paid by such Fund from one year prior to the commencement of this action on behalf of such Fund through the date of trial, lost investment returns on those amounts, and interest thereon;

f.   An order awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

g.   An order awarding such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims so triable.

Dated:  November 13, 2015

<div style="margin-left:40%">

/s Mark T. Johnson

Todd M. Schneider, CA Bar No. 158253
Mark T. Johnson CA Bar No. 076904
Kyle G. Bates, CA Bar No. 299114
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
2000 Powell Street, Suite. 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com
kbates@schneiderwallace.com

Garrett W. Wotkyns, AZ Bar No. 025887
Michael C. McKay, AZ Bar No. 023354
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
8501 North Scottsdale Rd., Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0142
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com

Todd S. Collins, PA Bar No. 29405
Shanon J. Carson, PA Bar No. 85957
Ellen Noteware, PA Bar No.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

</div>

J. Barton Goplerud, IA Bar No.AT0002983
**HUDSON MALLANEY SHINDLER &
ANDERSON PC**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
jbgoplerud@hudsonlaw.net

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT
*Amy Ingenhutt, et al. v. State Farm, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the

Court using the Court's CM/ECF system, which will send a notice of electronic filing to the

following case participants:

> Nathan Bach
> Timothy L. Bertschy
> HEYL ROYSTER VOELKER & ALLEN
> 300 Hamilton Blvd.
> P.O. Box 6199
> Peoria, IL 61601-6199
> nbach@heylroyster.com
> tbertschy@heylroyster.com
> *Attorneys for Defendant State Farm Investment Management Corporation*

I further certify that I served the foregoing document on the additional case participants

listed below via U.S. Mail by placing a true copy of the document enclosed in a sealed envelope

and deposited in the mail with postage thereon fully prepaid, addressed as set for below.

> John D. Donovan, Jr.
> Robert A. Skinner
> Amy D. Roy
> ROPES & GRAY LLP
> Prudential Tower
> 800 Boylston Street
> Boston, MA 02199-3600
> *Of Counsel Attorneys for Defendant State Farm Investment Management*
> *Corporation*

Dated: November 13, 2015                    <u>s/ *Mark T. Johnson*</u>
                                            Mark T. Johnson
                                            SCHNEIDER WALLACE
                                            COTTRELL KONECKY WOTKYNS LLP
                                            2000 Powell Street, Suite 1400
                                            Emeryville, California 94608
                                            Telephone: (415) 421-7100
                                            Facsimile: (415) 421-7105
                                            mjohnson@schneiderwallace.com

                                            Attorney for Plaintiffs