## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

AMY L. INGENHUTT and TERESA L. ODELL,

                              Plaintiffs,

          v.

STATE FARM INVESTMENT MANAGEMENT CORPORATION,

                              Defendant.

NO. 15-cv-01303-JES-JEH

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 4

    A.    Mutual Funds and the Investment Company Act of 1940 ....................................... 4

    B.    SFIMC and the LifePath Funds .............................................................................. 6

    C.    Advisory Agreements and Fees ............................................................................. 7

    D.    Annual Approval of the SFIMC Advisory Agreement by the Statutorily
         Independent Board of Trustees ............................................................................ 10

ARGUMENT ........................................................................................................................ 12

I.     THE FIRST AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE
      CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA ................. 12

    A.    Legal Standard for Pleading a Section 36(b) Claim .............................................. 12

    B.    Plaintiffs' Inapt Comparison of SFIMC's Advisory Fees to a Small Portion
         of the Fees Paid by Other Mutual Funds is Misleading and Does Not
         Provide the Arm's-Length "Bargaining Range" for the Challenged Fees ............. 14

    C.    Plaintiffs' Conclusory and Unsupported Allegations Regarding the Services
         Provided by SFIMC Provide No Basis to Conclude that the Advisory Fees
         Could Not Have Been Negotiated at Arm's Length .............................................. 20

    D.    Plaintiffs' Recitation of Other *Gartenberg* Factors Provides No Basis for a
         Conclusion that the Fees were Outside an Arm's-Length Range ......................... 25

         1.    Profitability ............................................................................................. 25

         2.    Economies of Scale ................................................................................ 27

         3.    Board Independence and Conscientiousness ........................................... 28

II.    SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM ...................... 31

III.   PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL ........................................... 32

CONCLUSION ..................................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*188 LLC v. Trinity Indus., Inc.*,
    300 F.3d 730 (7th Cir. 2002) ...................................................................................6

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006)...............................................................19, 23, 26, 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................1, 3, 12, 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................12, 22

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)...........................................................................23

*Bissessur v. Indiana Univ. Bd. of Trs.*,
    581 F.3d 599 (7th Cir. 2009) ...........................................................................12

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ...........................................................................12

*Burks v. Lasker*,
    441 U.S. 471 (1979)..........................................................................................4

*Davis v. Bailey*,
    No. 05-civ-0042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005) ............................................32

*Fitzgerald v. Citigroup, Inc.*,
    No. 03 CIV. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007)...........................................23

*Forsythe v. Sun Life Fin., Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) ......................................................13, 23, 27

*Garcia v. City of Chi.*,
    No. 91-civ-5535, 1991 WL 289204 (N.D. Ill. Dec. 23, 1991) ...............................................22

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    528 F. Supp. 1038 (S.D.N.Y. 1981)...............................................................30

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982)................................................................. passim

*Henson v. CSC Credit Servs.*,
    29 F.3d 280 (7th Cir. 1994) ...........................................................................24

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   No. 04 CIV. 4885, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006)................................................23

*In re Am. Mut. Funds Fee Litig.*,
   No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)....................................................26

*In re Eaton Vance Mut. Funds Fee Litig.*,
   380 F. Supp. 2d 222 ..............................................................................................................23

*In re Franklin Mut. Funds Fee Litig.*,
   478 F. Supp. 2d 677 (D.N.J. 2007) ...............................................................................23, 28

*In re Gartenberg*,
   636 F. 2d 16 (2d Cir. 1980)...................................................................................................32

*In re Goldman Sachs Mut. Funds*,
   No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)........................................23, 28

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006)...................................................................................23

*In re Scudder Mut. Funds Fee Litig.*,
   No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ....................................23, 28

*Jarmuth v. City of Chi.*,
   43 F. Supp. 3d 889, 891 .........................................................................................................22

*Jones v. Harris*,
   611 Fed. App'x 359 (7th Cir. 2015) ............................................................................. passim

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010)....................................................................................................... passim

*Kalish v. Franklin Advisers, Inc.*,
   74 F. Supp. 1222 (S.D.N.Y. 1990) ...................................................................................23, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
   908 F.2d 1338 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991).........................32

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989).....................................................................................................5

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ......................................................................................13, 23, 27

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
   631 F.3d 436 (7th Cir. 2011) ...................................................................................................24

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ...................................................................6

*Strougo v. BEA Assocs.*,
    No. 98 Civ. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999) ..............................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................6

*Turner v. Davis Selected Advisers, LP*,
    No. 08-cv-00421, slip. op. (D. Ariz. June 1, 2011), *aff'd*, No. 13-15742, 2015 WL
    5692324 (9th Cir. Sept. 29, 2015)...................................................23, 31

*Turner v. Davis Selected Advisers, LP*,
    No. 13-15742, 2015 WL 5692324 (9th Cir. Sept. 29, 2015) ..................................31

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
    No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204
    (2d Cir. 2000).......................................................................23

*Zehrer v. Harbor Capital Advisors, Inc.*,
    No. 14-CV-00789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ...........................32

## STATUTES

15 U.S.C. § 80a-10(a)-(b) .......................................................................4

15 U.S.C. § 80a-15(a)-(c) .....................................................................4, 5

15 U.S.C. § 80a-35(b) .........................................................................1, 5

15 U.S.C. § 80a-46(b)(1) .......................................................................31

## PRELIMINARY STATEMENT

This is an action for allegedly "excessive" mutual fund fees in violation of Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b).  That statute authorizes a mutual fund shareholder to sue the fund's service providers to recover on behalf of the fund for any "excess" fees paid during the past year.  Plaintiffs Amy Ingenhutt and Teresa Odell bring this action against State Farm Investment Management Corp. ("SFIMC") to recoup ostensibly "excessive" fees paid by two State Farm LifePath Funds (the "Funds") for which SFIMC serves as investment adviser.  After SFIMC filed a motion to dismiss the original Complaint in this action, the plaintiffs filed the First Amended Complaint ("FAC") rather than oppose the motion.  They dropped their claim about three additional funds for which they plainly had no standing, and attempted to shore up their allegations about the remaining two funds.  Like the first pleading, however, the FAC fails to state a cognizable claim.

The Supreme Court set a high bar for liability in excessive fee cases:  "[t]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)).  In order to state a Section 36(b) claim, then, the *Jones* standard requires a plaintiff to plead facts to support a plausible conclusion that the challenged fee is *outside* the arm's-length range.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Jones*, 559 U.S. at 346.  As the Seventh Circuit recently put it, the job of the court is "to identify the outer bounds of arm's length bargaining and not engage in rate regulation."  *Jones v. Harris*, 611 Fed. App'x 359, 360 (7th Cir. 2015) (on remand from Supreme Court).

Here, the FAC is devoid of non-conclusory facts and fails the "plausibility" test.

-1-

The plaintiffs' claim of "excessiveness" is based on allegations that fail to suggest the "range" that *could* have been negotiated.  The FAC overlooks the fees the Funds actually pay, ignores the record of what similar funds pay their advisers, and makes no attempt to measure the costs of the services the Funds obtain.  Those omissions are gaping holes in the logic *Jones* imposes:  without facts from which to deduce what the "negotiating range" *is*, there is no factual predicate for the allegation that the Funds' fees *exceed* that range.  Indeed, those lapses flout precisely what the Seventh Circuit requires.  On remand in *Jones*, the court in August held that comparable charges "tell[] us the bargaining range," and required proof that the challenged fees exceed it.  *Id.* at 361.  The omission of that information here is accordingly fatal.

Instead of dealing with these Funds' fees and their competitors' comparable charges, the FAC advances broad criticisms of mutual funds in general, claiming that fees across the industry are too high.  And the plaintiffs claim that SFIMC does essentially *nothing* in exchange for its fees.  But the first charge sheds no light whatsoever on SFIMC's fees, where they fit in the competitive market, or even whether fees in the industry reflect what "could" have been fairly negotiated.   And the bald allegation that SFIMC provides only "minimal" services is contradicted by the pleading's own acknowledgement that SFIMC performs a wide array of services for the Funds – some of which are itemized in the FAC itself – including "oversight" of the Funds' sub-adviser and other services providers; "legal, accounting, compliance, audit, and risk management services"; and preparation of the Funds' SEC-mandated regulatory filings and tax returns.  FAC ¶ 51.  The FAC offers no *facts* explaining why these services purportedly do not justify SFIMC's fees.  It just concludes without elaboration that the services are "ministerial" and "require very few resources."  *Id.* ¶ 58.

The plaintiffs' criticism of the Funds' fees seems instead to be aimed at the Funds'

operating structure, under which SFIMC delegates aspects of its responsibility to manage the Funds – including daily security selection for the portfolios – to BlackRock Fund Advisors ("BFA"), effectively as a sub-adviser.  But that is a structure shareholders know of and approved, as recently as this year.  Importantly, the FAC does not – and cannot – say that the overall fee paid to SFIMC and BFA for investment advisory and management services to the Funds is "beyond" the range that similar funds pay for the same array of services.  That omission is glaring because, as the Seventh Circuit said, the comparison "tells us the bargaining range." *Jones*, 611 Fed. App'x at 361.  And the omission is particularly conspicuous because, although the FAC identifies the Funds' competitors and a *portion* of their respective fees, it neglects to mention how much the other funds are paying for all management services.  Small wonder the FAC leaves that information out:  the public records cited elliptically by the plaintiffs show the Funds' management fees to be *below* both the mean and median for the plaintiffs' claimed comparators.  Simply put, the plaintiffs fail to set forth the facts that the Seventh Circuit says are critical to define the "bargaining range."

In short, there is no basis in the FAC for evaluating whether SFIMC's fees are inside or outside of the "negotiating range" other than the plaintiffs' say-so.  But such naked allegations do not suffice under *Iqbal*, and by ignoring the "bargaining range" those allegations are not plausible under *Jones*.

On those threadbare assertions, the plaintiffs ask this Court to overturn the judgment of the Funds' statutorily independent trustees who approved the Funds' advisory fees.  That too is inconsistent with the statute and *Jones*.  Once again, the plaintiffs offer no facts upon which to discredit the trustees' judgment.  They say only that because the Funds' fees are too high in the plaintiffs' judgment, the trustees *must* not have been conscientious and independent.  According

-3-

to the FAC, the ostensible "windfall" fees paid to SFIMC "indicate[]" insufficient trustee diligence.  FAC ¶ 90.  But that logic is circular:  the plaintiffs' own say-so about excessive fees "establishes" their own say-so about trustee approval.  That irrational reasoning is equally rebutted by the public record.  Section 15(c) of the ICA *requires* trustees to request, and SFIMC to provide, all information reasonably necessary to an informed judgment about an advisory contract.  15 U.S.C. § 80a-15(c).  The Funds' publicly filed documents describe the nature of the materials the trustees requested, received and considered in exercising their business judgment.  The plaintiffs conveniently ignore that fulsome record.  There is accordingly no basis for the Court to do what the plaintiffs request and dishonor the trustees' decision-making.  Indeed, that would contradict the Supreme Court's explicit admonition that courts *not* "second-guess[ ] . . . informed board decisions" or "supplant the judgment of disinterested directors apprised of all relevant information."  *Jones*, 559 U.S. at 352.

For the reasons set forth below, the FAC should be dismissed with prejudice.

## BACKGROUND

### A.    Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a pool of assets, consisting primarily of a portfolio of securities, that belongs to the individual investors who own shares in the fund. *Jones*, 559 U.S. at 338.  Under industry practice, the management and operations of a mutual fund are typically externalized and contractually delegated to a mutual fund's investment adviser and other vendors.  The ICA directly acknowledges that externalization, and enshrines the legal separation of a mutual fund and its adviser as the hallmark of the Act's principal purpose, establishing the independent trustees as the "cornerstone" of the Act's control of conflicts of interest.  *See Burks v. Lasker*, 441 U.S. 471, 482–85 (1979); 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

-4-

The ICA therefore entrusts noninterested directors or trustees sitting on a mutual fund's board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from any conflicts of interest with the fund's adviser and its affiliates.  A majority of independent trustees must approve the advisory and other service agreements annually, including the compensation received by the adviser for the services it provides to the fund.  15 U.S.C. § 80a-15(c); *accord Jones*, 559 U.S. at 340.  To fulfill that obligation, under Section 15(c) of the ICA, the trustees must "request and evaluate" all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds.  15 U.S.C. § 80a-15(c).[1]

The ICA's reliance on independent trustees to police conflicts of interest between a fund and its adviser also lies at the heart of Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund.  *Id.* § 80a-35(b).  To state a cognizable claim for a breach of this duty, a shareholder plaintiff must show that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining."  *Jones*, 559 U.S. at 346 (emphasis added).  In making that inquiry, the statute obliges a court to consider the role of the independent trustees in negotiating that fee:  "[A]pproval by the board of directors of such investment company of such compensation or payments . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances."  15 U.S.C. § 80a-35(b)(2) (emphasis added).  The statute does not oblige the directors to negotiate the "'best deal' possible."  *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).  And it does not authorize the Court to sit as a "super-trustee" charged with "setting" a fee, or to second-

---

[1]    The FAC quotes from news articles and industry pundits to suggest that independent trustees of mutual funds do a poor job of serving as "watchdogs" for the benefit of investors.  *E.g.*, FAC ¶¶ 18–20.  But that is just polemics.  The pleading says nothing about the performance of *these* independent trustees that could fit the stereotype they imagine.

guess informed board decisions.  *See Jones*, 559 U.S. at 352.  Instead, it requires a plaintiff to

plausibly allege and ultimately prove that the result of the independent trustees' deliberation

could not have derived from an arm's-length negotiation.

### B.      SFIMC and the LifePath Funds

SFIMC offers customers various investment products, including a family of fifteen

mutual funds.  State Farm Mutual Fund Trust, Statement of Additional Information, at 1 (May 1,

2015, as supplemented June 24, 2015) ("SAI") (Ex. A to the Declaration of Robert A. Skinner in

Support of Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint (the "Skinner

Declaration")).[2]  Certain of these funds are entirely managed by SFIMC's investment personnel,

while some (including the LifePath Funds) utilize the specialized expertise of external advisory

firms like BFA (referred to here for convenience as "sub-advisers") to perform a portion of the

management services.  SFIMC then provides the balance of the necessary services and bears all

the risks inherent in fund sponsorship (*i.e.*, developing, launching and maintaining a branded

fund in the highly competitive and regulated fund marketplace).  *Id.* at 1, 57–58.  The LifePath

---

[2]      All exhibits to the Skinner Declaration are cited hereinafter as "Ex. __."  As discussed in
the Request for Judicial Notice in Support of Defendant's Motion to Dismiss Plaintiffs' First
Amended Complaint, filed concurrently herewith (the "Request for Judicial Notice"), the FAC
directly references nearly all public disclosures filed by the Funds and the plaintiff-identified
comparator funds with respect to which SFIMC seeks judicial notice.  Having relied extensively
on the public disclosures, the plaintiffs have incorporated them into the FAC by reference and
thus have no basis to suggest that the same documents should be ignored for purposes of this
Motion.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that
the district court may consider "documents incorporated into the complaint by reference" when
ruling on a motion to dismiss); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)
(courts should consider documents referenced in the complaint "to prevent parties from surviving
a motion to dismiss by artful pleading or by failing to attach relevant documents").  In addition,
the Court may take judicial notice of documents in the public record, such as required disclosures
on file with the SEC, without converting a motion to dismiss into a motion for summary
judgment.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take
judicial notice of documents in the public record, including publicly reported stock prices,
without converting a motion to dismiss into a motion for summary judgment.").

Funds are "target date" funds[3] structured as "feeder" funds in a "master-feeder" arrangement. Each LifePath Fund invests all its assets in a separate unaffiliated Master Investment Portfolio with a substantially similar investment objective, which is itself an investment company registered under the ICA.  *Id.* at 1.  For example, during the relevant period, the State Farm LifePath 2030 Fund invested all its assets in the LifePath 2030 Master Portfolio – a portfolio with the same investment objective as its corresponding LifePath 2030 Fund.  *Id.*  BFA served as the investment adviser and administrator to each Master Portfolio.[4]  *Id.* at 23, 68.  The Master Portfolios were then invested in a combination of stock, bond and money market funds (the "Underlying Funds"), all of which were advised by BFA affiliates.  *Id.* at 1, 23.

### C.      Advisory Agreements and Fees

SFIMC serves as the investment adviser to the Funds pursuant to the Investment Advisory and Management Service Agreement ("SFIMC Advisory Agreement") which the entire State Farm Mutual Fund Trust Board (the "Board"), and its independent trustees separately, must approve annually.  SAI at 64 (Ex. A).  In its capacity as investment adviser, SFIMC provides the

---

[3]      "Target date" funds, such as the LifePath Funds, seek to provide retirement outcomes based on quantitatively measured risk that investors accept for a defined time horizon.  State Farm Mutual Fund Trust, Prospectus, at 70 (May 1, 2015) ("Prospectus") (Ex. B).  For example, the LifePath 2030 Fund is designed for investors who plan to begin withdrawing a substantial portion of their investment in the decade beginning in the year 2030.  *See id.*  As is typical with target date funds, the LifePath Fund's asset mix becomes more conservative as the "target date" for retirement approaches.  *Id.*

[4]      As part of a structural reorganization approved by the Funds' shareholders by vote on June 12, 2015, the Funds have transitioned from a master-feeder structure to a somewhat simpler structure in which the Funds will directly own securities in the form of index funds, though BFA advises nearly all of the underlying funds and will also serve as sub-adviser.  Also as part of this transition, the Funds will move from their current investment strategy – which utilizes a combination of active and indexed BlackRock funds – to the index-fund strategy, with lower costs and lower fees for shareholders.  State Farm Mutual Fund Trust, Shareholder Proxy Statement, at 6–7 (Feb. 23, 2015) (Ex. C).  These changes are not discussed in the FAC and were not in effect during the applicable one-year damages period (July 22, 2014 through July 22, 2015), and therefore are not addressed in this Motion.

Funds with a range of advisory services.  As acknowledged in the FAC, the following list of

SFIMC services is enumerated in the publicly available SFIMC Advisory Agreement:

(a)  Preparation and maintenance of the [Funds'] Registration Statement with the SEC;

(b)  Preparation and periodic updating of the [Funds'] prospectus and statement of additional information . . .;

(c)  Preparation, filing . . ., and dissemination of various reports for the Funds, including . . . annual and semiannual reports on Form N-SAR . . .;

(d)  Arrangement for all meetings of shareholders, including the collection of all information required for preparation of proxy statements . . .;

(e)  Maintenance and retention of . . . [the Funds'] charter documents and the filing of all documents required to maintain the [Funds'] status as a Delaware business trust and as a registered open-end investment company;

(f)  Arrangement and preparation and dissemination of all materials for meetings of the Board and committees thereof . . .;

(g)  Preparation and filing of the [Funds'] Federal, state, and local income tax returns and calculation of any tax required to be paid in connection therewith;

(h)  Calculation of all . . . Fund expenses and arrangement for the payment thereof;

(i)  Calculation of and arrangement for payment of all income, capital gain, and other distributions to shareholders of [the Funds];

(j)  Determination . . . of the jurisdictions in which [the Funds' shares] shall be qualified for sale . . . and preparation and maintenance of the qualification of the [Funds' shares] for sale under the securities laws of each such jurisdiction;

(k)  Provision of the services of persons who may be appointed as officers of the [Funds] by the Board . . .;

(l)  Preparation and dissemination of the [Funds'] quarterly financial information to the Board and preparation of such other reports . . . as the officers and Board may . . . reasonably request;

(m) Administration of the [Funds'] Code of Ethics and required reporting to the Board and officer compliance therewith;

(n)  Provision of internal legal, accounting, compliance, audit, and risk management services and periodic reporting to the Board with respect to such services;

(o)  Negotiation, administration, and oversight of third party services to the [Funds] including . . . sub-advisory, custody, tax, disaster recovery, audit, and legal services;

(p)  Negotiation and arrangement for insurance desired or required of the [Funds] and administering all claims thereunder;

(q)  Response to all inquiries by regulatory agencies, the press, and the general public concerning . . . the [Funds], including the oversight of all periodic inspections . . . by regulatory authorities and responses to subpoenas and tax levies;

(r) Handling and resolution of any complaints registered with the [Funds] by shareholders, regulatory authorities, and the general public;

(s) Monitoring legal, tax, regulatory, and industry developments related to . . . the [Funds] and communicating such developments to the officers and the Board . . . ;

(t) Administration of operating policies of the [Funds] and recommendation . . . of modifications to such policies to facilitate the protection of shareholders or market competitiveness . . . [and] to comply with new legal or regulatory requirements;

(u) Responding to surveys conducted by third parties and reporting of Fund performance and other portfolio information; and

(v) Filing of claims, class actions involving portfolio securities, and handling administrative matters in connection with the litigation or settlement of such claims.

Amended and Restated Investment Advisory and Management Services Agreement, at 2–4 (Mar. 28, 2012) ("SFIMC Advisory Agreement") (Ex. S).

SFIMC's services to the Funds are distinct from those assigned to BFA under its separate advisory agreement with the LifePath Master Portfolios. *See* Amended Investment Advisory Contract, at 2 (Dec. 28, 2012) ("BFA Advisory Agreement") (Ex. T). Pursuant to that publicly available agreement, BFA (1) makes investments consistent with each Master Portfolio's objectives; (2) advises the Master Portfolio Trust's board regarding those investments; (3) provides "investment guidance and policy direction in connection with its daily management of the assets of each Master Portfolio"; and (4) provides the Master Portfolio Trust's board with periodic reports on investment strategy and performance of each Master Portfolio. *Id.*

In addition to the services SFIMC provides as the Funds' sponsor, it also bears a variety of risks that are not borne by any sub-adviser. These include both investment risk (*i.e.*, risk that the Funds will not succeed or may be inappropriately invested by BFA), and compliance and regulatory risk (*i.e.*, risk that the Funds will not comply with applicable federal and state laws, resulting in enforcement actions, litigation, potential penalties, and other potential harms imposed upon SFIMC). SAI at 57–58 (Ex. A). SFIMC also undertakes significant business risk (*i.e.*, risk that sales of the Funds or redemptions by shareholders will make the Funds

uneconomic to offer).  SFIMC works with the Board to continuously evaluate the Funds' risk management processes in connection with these risks and to adjust those processes whenever SFIMC or the Board deems it necessary.  *Id*. at 58.

In exchange for the services SFIMC provides and the risks it bears under the SFIMC Advisory Agreement, the Funds pay a fee to SFIMC that is subject to approval annually.  As alleged in the FAC, the net fee paid to SFIMC is equal to 0.28% (or 28 basis points) of the assets under management in the Funds.  FAC ¶ 44.  The 28 basis point fee is net of a 7 basis point reimbursement that SFIMC voluntarily pays back to the Funds.  State Farm Mutual Fund Trust, Annual Report, at 184 (Dec. 31, 2014) ("AR") (Ex. D).  For its work managing the Master Investment Portfolios and the Underlying Funds, BFA is paid a fee (also after various voluntary waivers) equal to 34 basis points for the LifePath 2050 Fund and 35 basis points for the LifePath 2030 Fund.  FAC ¶ 44; AR at 185 (Ex. D).  Accordingly, the total fee paid by the Funds to SFIMC and BFA for investment management and advisory services (net of all waivers) is 0.62% or 0.63% (or 62 or 63 basis points).[5]  FAC ¶ 44.  It is only SFIMC's portion of the total management fees that the plaintiffs challenge in this action.  *Id.* ¶ 35.

### D.   Annual Approval of the SFIMC Advisory Agreement by the Statutorily Independent Board of Trustees

As required by SEC rules, the Funds' public disclosures detail the annual 15(c) approval process and the Board's thorough review and analysis of the Funds' service agreements, including the SFIMC Advisory Agreement, throughout the course of each year.  *See* State Farm Mutual Fund Trust, 2015 Semi-Annual Report, at 22–24 (June 30, 2015) ("2015 SAR") (Ex. E).

---

[5]     Further, in addition to the fee waivers, prior to this lawsuit, SFIMC agreed to reimburse the Funds to the extent any Fund's annual operating expenses exceed defined percentages of the Fund's average net assets.  SAI at 66 (Ex. A).  As a result of the expense reimbursement agreements, SFIMC reimbursed the LifePath 2030 Fund and LifePath 2050 Fund $1,220,636 and $153,387, respectively, in 2014 alone.  *Id.* at 67.

The Board is composed of nine trustees, seven of whom (or 77%) are statutorily disinterested as defined in the ICA, exceeding the requirement that 50% of the trustees be disinterested.[6]  *See* SAI at 56 (Ex. A).

In connection with the 15(c) approval process, SFIMC and the external advisory firms – including BFA and the sub-advisers to other funds – provide the Board with written materials relaying information to assist the Board with its consideration of continuing the respective service agreements, including a report prepared by an independent consulting firm, Strategic Insight.  *See* 2015 SAR at 22 (Ex. E).  This report provides information comparing the performance and expenses of the Funds to those of competitor funds with similar investment objectives.  *Id.*  The information provided to the Board includes materials addressing the various so-called "*Gartenberg* factors" raised by the plaintiffs in the FAC, including information relating to economies of scale, comparisons to the fees and performance of similar funds, and SFIMC's profitability.  *See Jones*, 559 U.S. at 344 & n.5 (citing with approval the Second Circuit's non-exhaustive list of factors in *Gartenberg* that may be considered by a court in determining whether beyond arm's-length fees were charged); 2015 SAR at 22–24 (Ex. E).  At a meeting on June 13, 2014, the Board completed this review and approved the SFIMC Advisory Agreement for a one-year period ending June 30, 2015 – which covers most of the relevant time period for this action.  The Board most recently conducted this review on June 12, 2015 and agreed to extend the SFIMC Advisory Agreement for one additional year, until June 30, 2016.  State Farm

---

[6]     The disinterested trustees are all knowledgeable and financially sophisticated individuals with a wealth of experience in finance and business.  They include two university presidents, a former partner of a public accounting firm, a former head of the enforcement program for the SEC's Chicago Regional office, and former executives of public companies and investment management firms.  *See* SAI at 58-59 (Ex. A).

Mutual Fund Trust, 2014 Semi-Annual Report, at 20–22 (June 30, 2014) ("2014 SAR") (Ex. F);

2015 SAR at 22–24 (Ex. E).

## ARGUMENT

I.   **THE FIRST AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA**

 A. **Legal Standard for Pleading a Section 36(b) Claim**

The standard established by the Supreme Court to show a breach of Section 36(b) is exacting: the plaintiff must demonstrate that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added).  Just a few months ago, when applying this standard on remand to affirm dismissal on summary judgment of the plaintiffs' claims in *Jones*, the Seventh Circuit further explained, "[T]he Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees; *the goal is to identify the outer bounds* of arm's length bargaining and not engage in rate regulation." *Jones*, 611 Fed. App'x at 360 (emphasis added).  The "bargaining range" for these purposes is informed by fees "produced by bargaining at other mutual-fund complexes." *Id.* at 361.

To sustain a cognizable claim, the plaintiffs must plead factual allegations that satisfy *Jones*' rigorous standard and are "plausible on [their] face." *See Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support." *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009).  Rather, to survive a motion to dismiss, a complaint "must state sufficient facts to raise a plaintiff's right to relief above the speculative level." *Id.* at 602; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a

cause of action or conclusory legal statements."). In the context of a Section 36(b) claim, that means the allegations of fact must support a *plausible* claim that the fees are "so disproportionately large" relative to the services provided that they are *beyond* the range of what "could" have been bargained at arm's-length.

In assessing whether the beyond-arm's-length standard is met, "all relevant circumstances [are to] be taken into account." *Jones*, 559 U.S. at 347 (citing *Gartenberg*, 694 F.2d at 929). These circumstances may include economies of scale achieved by the adviser and other factors set forth by the Second Circuit in *Gartenberg* and cited favorably by the Supreme Court in *Jones*:

> (1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care and conscientiousness of the board in evaluating adviser compensation.

*Id.* at 344 n.5 (quoting *Gartenberg*, 694 F.2d at 929–32). Importantly, these so-called "*Gartenberg* factors" are not themselves the standard of liability or the elements for establishing a Section 36(b) claim. The "factors" only provide a rubric for analyzing whether the beyond-arm's-length standard is met under *Jones*. Accordingly, it is not sufficient simply to assert rote allegations about any one "factor," or even all of them. Rather, a valid pleading must connect the dots between the factual allegations about a "factor" and its *effect* on the challenged fee. *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services"); *see also Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 115 (D. Mass. 2006) ("[C]laims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser[.]"). Stated differently, the

nonconclusory allegations about any "factor" must plausibly *push* the fee *outside* of the arm's-length range.  The specifics about any "factor" must be tied to the challenged fee so that those details permit the inference that the fee is "so disproportionately large" it "could not have been" negotiated at arm's length.

**B.    Plaintiffs' Inapt Comparison of SFIMC's Advisory Fees to a Small Portion of the Fees Paid by Other Mutual Funds is Misleading and Does Not Provide the Arm's-Length "Bargaining Range" for the Challenged Fees**

Despite the Seventh Circuit's directive that a Section 36(b) claim requires a court to "identify the outer bounds of arm's length bargaining," *Jones*, 611 Fed. App'x at 360, the FAC alleges no facts from which to discern the arm's-length bargaining range for the Funds' advisory fees.  Forced by the Seventh Circuit's mandate to acknowledge in the FAC that fees paid by comparable target date funds for services of the type provided by SFIMC are integral to the Court's inquiry, the plaintiffs fail to provide the facts allowing such a comparison.  Critically, the FAC does not even attempt to illustrate how the Funds' overall fee – that is, SFIMC's advisory fee from the Funds plus BFA's fees for managing the Master Portfolios and the Underlying Funds – stacks up against the total management fees paid by comparable target date funds for the same set of services.  And the reason for that omission is obvious:   the relevant comparison demonstrates that the Funds' fees are *below* the mean and median of comparable funds, and thus easily within the arm's-length range paid by comparable funds.

The FAC identifies a group of eight allegedly comparable target date funds with a similar "fund-of-funds" structure that the plaintiffs allege to be the Funds' competitors (the "Comparators"), but the plaintiffs do not make the relevant apples-to-apples fee comparison.  FAC ¶¶ 38, 61.  Each of the Comparators that the FAC earmarks pays an "acquired fund fee" that compensates the investment manager of the funds underlying the target date fund – that is,

the costs for managing the funds the Comparator fund "acquires."[7]  Unlike the Funds, which invest in *unaffiliated* underlying funds, the Comparators invest in underlying funds managed *in-house*, so their advisers capture their income mainly through acquired fund fees.  *See id.* ¶¶ 64–65.  The FAC specifically acknowledges that the acquired fund fee is the equivalent of the fees BFA is paid by the LifePath Funds for managing the Master Portfolios and the Underlying Funds (*id.* ¶ 38), yet fails to say anything about how much those fees are for the Comparators.

That omission makes a dispositive difference.  A clear comparison of the total management fees the Comparators pay to the 62 or 63 basis points the plaintiffs' Funds pay (*id.* ¶ 42) *is* readily available because it is mandated by SEC rules.  The SEC requires prospectus disclosure of every fund's total management fees (including acquired fund fees) in a mandatory uniform format to provide fund investors a simple means of comparing costs across competitive funds.[8]  That comparison – drawn directly from the prospectuses of the Funds and the Comparators – shows that the Funds' fees are not only *within* the "bargaining range," but are actually *at or below* all the competitors' fees except one:

---

[7]   SEC rules require "funds of funds" like the LifePath Funds to report a total expense ratio in its prospectus fee table that accounts for both the expenses a fund pays directly out of its own assets, as well as the expense ratios of the underlying funds it acquires, frequently called "acquired fund fees."  Specifically, "the acquiring fund's pro rata portion of the cumulative expenses charged by funds in which the acquiring fund invests [*i.e.*, the acquired funds]" must "be included in the acquiring funds' total annual fund operating expenses."  Fund of Funds Investments, 71 Fed. Reg. 36640-01, 36645 (June 27, 2006).  Because a "fund of funds" structure includes *both* those direct and indirect expenses, the Rule aims at complete transparency so investors can compare aggregate expenses and make informed investment decisions.

[8]   *See* SEC, *Invest Wisely: An Introduction to Mutual Funds*, Investor Publications (July 2, 2008) (informing investors that "SEC rules require funds to disclose both shareholder fees and operating expenses in a 'fee table' near the front of a fund's prospectus" and that "[l]ooking at the expense ratio can help you make comparisons among funds").  Available at http://www.sec.gov/investor/pubs/inwsmf.htm (last visited Dec. 15, 2015).

| Target Date Fund | Total Management Fee |
|---|---|
| John Hancock Retirement Fund | 82 bp |
| Principal LifeTime Fund | 79 bp |
| Fidelity Advisor Freedom Fund | 76 bp |
| American Century One Choice Funds | 75 bp |
| MFS LifeTime Fund | 74 bp |
| MassMutual RetireSMART Fund | 67 bp |
| JPM SmartRetirement Funds | 65 bp |
| **State Farm LifePath Funds** | **62-63 bp** |
| American Funds Target Date Funds | 51 bp |

In short, the FAC omits the information that reveals the "bargaining range," and shows the fees

SFIMC charges to be easily within that range.[9]   There is accordingly no plausible basis for the

FAC's conclusory allegations that SFIMC's fees *could not* be within the arm's-length range.

Instead, the plaintiffs would have the Court ignore this relevant comparison of overall

management fees in favor of a facially inapt comparison.  The FAC sets out a chart purporting to

compare SFIMC's *portion* of the Funds' management fees (not including BFA's fees) to a *subset*

of the Comparators' fees ostensibly charged at the target-fund level (*i.e.*, *not* including the

acquired fund fees), ranging from 0 to 10 basis points.  FAC ¶ 61.  On this basis, the plaintiffs

maintain that SFIMC's net fee of 28 basis points is excessive when compared to "the average of

approximately 2-3 bps received by other fund managers for providing similar services to

comparable target date funds."  *Id.* ¶ 65.  But the plaintiffs tellingly ignore the much higher

acquired fund fees paid by the Comparators, through which those funds' advisers receive the

---

[9]      In addition to being the second-lowest fees in rank order, the fees paid by the Funds are also well below the mid-point or median of the range, which is 75 basis points.  *See e.g.*, John Hancock Retirement Living through 2050 Portfolio, Summary Prospectus, at 1 (Jan. 1, 2015) (Ex. G); Principal LifeTime 2050 Fund, Summary Prospectus, at 2 (Mar. 1, 2015) (Ex. H); Fidelity Advisor Freedom 2050 Fund, Summary Prospectus, at 1 (Oct. 1, 2015) (Ex. I); American Century Investments One Choice 2050 Portfolio, Summary Prospectus, at 1 (Mar. 20, 2015) (Ex. J); MFS Lifetime 2050 Fund, Summary Prospectus, at 1 (Aug. 28, 2015) (Ex. K); MassMutual RetireSMART 2050 Fund, Summary Prospectus, at 1 (Apr. 1, 2015) (Ex. L); JPMorgan SmartRetirement 2050 Fund, Summary Prospectus, at 1 (Nov. 1, 2014) (Ex. M); American Funds 2050 Target Date Retirement Fund, Summary Prospectus, at 1 (Jan 1, 2015) (Ex. N).

bulk of their compensation.   And they allege no factual predicate to establish that services or costs are comparable that would make the FAC's proposed comparison appropriate.   The pleading simply does not explain what other fund sponsors do for their "2-3 bps" to compare with the array of services performed by SFIMC (and described at FAC ¶ 51(a)-(v)) for 28 bps. And that omission makes the FAC's comparison meaningless.

By suggesting a myopic focus on the portion of the fees paid at the "target date fund level," the FAC asks the Court to ignore altogether the acquired fund fee – which represents the lion's share of the total management fees paid by the Comparators, and ranges from 41 to 76 basis points.  *Id.* ¶ 64.  Critically, the Comparators invest in underlying funds that are managed *internally.  See id.* ¶¶ 64–65.  Advisers to the Comparators do not charge a full advisory fee at the target-fund level because the fee charged at the underlying-fund level – the acquired fund fee – compensates for advisory and management services at *both* fund levels.   In short, the plaintiffs' erasure of the acquired fund fee from the equation eliminates the very disclosure the SEC requires – embracing *all* mutual fund expenses, both direct and indirect –  to achieve "more transparent disclosure of the costs of investing in these arrangements" and allow investors "to compare directly the costs of investing in alternative funds of funds."   Fund of Funds Investments, 71 Fed. Reg. at 36648, 36651.[10]  Self-evidently, the plaintiffs do not make out a plausible claim by concealing the complete costs investors pay for the Comparators.

Another Section 36(b) action that the plaintiffs' attorneys brought against the adviser to

---

[10]     *See also* Lipper Inc., *Multi-Manager Fee Trends*, Lipper Fund Industry Insight Reports (June 2008), at 2 ("[F]unds of funds that invest into internal funds [pursue] the common practice of not charging a full annual management fee at both fund of funds and underlying fund levels. This is done either by not charging a management fee for the fund of funds itself, or by investing into institutional share classes of the underlying funds."). Available at http://www.lipperweb.com/docs/Research/Fiduciary/Multimanager_UK.pdf (last visited Dec. 15, 2015).

the Principal LifeTime fund – one of the Comparators – illustrates how the acquired fund fee is part and parcel of the relevant fee comparison.  In challenging that fund adviser's retention of a portion of the acquired fund fee equal to 67 basis points, which was *twice* as large as the portion retained by its affiliated sub-advisers for managing the underlying funds, the complaint made readily apparent that the adviser to the internally-managed target date fund uses the acquired fund fee, and not the 3-basis-point management fee charged at the target-fund level, as the chief mode of compensation.  *See* Compl. ¶¶ 12, 18–19, *Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, 13-cv-01601 (N.D. Ala. Aug. 28, 2013), ECF No. 1 (Ex. Q) (alleging that advisers retained, on top of the management fee, $80 million of the $120 million collected via the acquired fund fee); *id.* ¶ 48 (claiming that "[t]o put Defendants' retention of Defendants' $80 million of the Acquired Fund Fee in proper context, worth noting is that Defendants collect in addition to this portion of the Acquired Fund Fee an Investment Management Fee").  The allegations in *Principal* make clear that the management fee and the acquired fund fee must be considered together precisely because the adviser to the internally-managed target date fund received most, if not all, compensation from the latter.

Moreover, the FAC's allegations fail to provide the required factual predicate for the comparability of SFIMC's advisory fee to a subset of the Comparators' management fee.  As the Seventh Circuit has made clear, such fee comparisons require that the Comparators' advisers provided "the same sort of services" as SFIMC in exchange for their average fee of 2-3 basis points, or that SFIMC "incurred the same costs" for those services.  *See Jones*, 611 Fed. App'x at 361.  There are no factual allegations that the nominal or non-existent fee paid by the Comparators at the target-fund level is tied to the same services that SFIMC provides to the Funds.  As discussed below, the FAC acknowledges (indeed, itemizes) "numerous" services that

-18-

SFIMC performs.   FAC ¶ 51.   The plaintiffs rely on nothing but their say-so that the Comparators receive "similar" services in exchange for the management fee charged at the target-fund level.  *Id.* ¶ 65.

The FAC likewise makes no attempt to measure the costs of SFIMC's services to the Funds to show that SFIMC incurred the same costs as the Comparators' advisers did in exchange for their target-fund-level fee.   Instead, the plaintiffs merely aver, "On information and belief, and as discovery in this matter will show, the true cost of providing the services for which SFIMC collects its portion of the net management fee is similar to that of its competitors, approximately 2-3 basis points or less."  *Id.* ¶ 61.[11]  That meager allegation does not suffice, and the plaintiffs cannot save their deficient allegation about SFIMC's costs with a promise to discover unknown facts; that puts the cart before the horse.   *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (rejecting plaintiffs' attempt to short-circuit pleading requirements at the motion to dismiss stage by asserting that specific factual allegations – including those relating to the adviser's costs to provide services – were impossible without discovery).   Hence, the plaintiffs' comparison of SFIMC's net fee to the target-fund-level management fees paid by the Comparators lacks the factual basis of comparable services or costs.

---

[11]    This unsupported cost allegation also defies common sense when viewed in real-world terms.  The FAC acknowledges that SFIMC provides a long list of services (itemized above) for the LifePath 2030 Fund, which has $1.74 billion under management.  FAC ¶ 43.  The plaintiffs criticize SFIMC's annual compensation of $4.88 million (or 28 basis points) for these services (*id.*), but provide no colorable basis to support their assertion that providing such an array of services to a billion-dollar-plus investment fund with thousands of investors actually costs SFIMC only approximately $350,000 to $525,000 (the equivalent of 2-3 basis points).  The plaintiffs' cost assumptions are ludicrous as applied to the LifePath 2050 Fund, with $219 million under management.  *Id.*  At 2-3 basis points, the supposed cost to SFIMC of servicing the fund and its shareholders (per the FAC) would be approximate $44,000–$66,000 – enough for perhaps one full-time employee.

The FAC's assertions thus provide no support for an inference that SFIMC's fee is beyond arm's length.  Instead, the apt comparison of total management fees paid by the Comparators demonstrates that the Funds' overall fee paid to SFIMC and BFA for investment advisory and management services easily falls within the bargaining range.

### C.   Plaintiffs' Conclusory and Unsupported Allegations Regarding the Services Provided By SFIMC Provide No Basis to Conclude that the Advisory Fees Could Not Have Been Negotiated at Arm's Length

The plaintiffs allege that SFIMC delegated "virtually all" investment advisory services needed to operate the Funds to BFA, leaving SFIMC to provide only "limited" management services that cannot justify SFIMC's retention of 28 basis points from the aggregate 62-63 basis point fee.  FAC ¶¶ 51, 55.  To shore up these allegations, the FAC offers nothing but conclusory – and contradictory – statements that fall short of stating a plausible Section 36(b) claim.

Forced to acknowledge in their amended pleading that SFIMC provides a wide array of advisory services to the Funds (now itemized in the FAC), the plaintiffs dismiss them all out of hand as "ministerial" tasks that "require very few resources."  *Id.* ¶ 51, 58.  But the FAC's description of SFIMC's extensive services plainly contradicts the plaintiffs' conclusory assertion that those services provide no "real value to investors."  *Id.* ¶ 53.  SFIMC is responsible for "oversight" of the Funds' sub-adviser and other services providers; "legal, accounting, compliance, audit, and risk management services"; preparation of the Funds' SEC-mandated regulatory filings and tax returns; and administration of the Funds' business affairs, among other services.  *Id.* ¶ 51 (itemizing a list of 22 categories of services set forth in the SFIMC Advisory Agreement with the Funds).  The plaintiffs offer not a shred of factual support for the bald allegation that provision of those services cannot justify SFIMC's fees.

Apart from the plaintiffs' unsupported allegations that the acknowledged services amount to naught, the FAC's only attempt to discuss the nature of SFIMC's services seeks to downplay

the extent of SFIMC's oversight of BFA.  According to the FAC, SFIMC's supervision of BFA is "minimal" because BFA is "well-respected," has a "vested interest" in the LifePath Master Portfolio's performance, and is "independently answerable" to the Master Portfolio Trust's board.  *Id.* ¶ 77.  The fact that BFA was fulfilling its duties to the Master Portfolios and had incentive to keep doing so in no way means that SFIMC could forego its oversight and effectively relinquish stewardship of the Funds, all the while remaining accountable for the Funds' assets and supervision of BFA under the SFIMC Advisory Agreement.

Equally unavailing is the FAC's attempt to show that SFIMC delegated to BFA "virtually all" investment advisory services with a chart comparing provisions of the SFIMC Advisory Agreement and a sub-advisory agreement between SFIMC and BFA pertaining to an *unrelated* fund, the State Farm Mutual Fund Trust's S&P 500 Index Fund.  *Id.* ¶ 54 & n.4.  The plaintiffs assert, again on information and belief and without factual support, that the duties of BFA as described in that sub-advisory agreement are "identical" to those described in the agreement governing the Funds.  *Id.*  Yet again the public record contradicts the plaintiffs' contention. Contrary to the plaintiffs' chart, the BFA Advisory Agreement – on file with the SEC and readily available to the public – does *not* track the provisions of the SFIMC Advisory Agreement.  BFA Advisory Agreement at 2 (Ex. T).  In fact, a comparison of the two agreements shows that SFIMC retained significant investment advisory responsibilities, including consulting with the Board and providing the Board with investment research and advice with respect to the Funds. *Compare id. with* SFIMC Advisory Agreement at 4 (Ex. S).  Notably, BFA advises and reports to a *different* board – the Master Portfolio Trust's board.  BFA Advisory Agreement at 2 (Ex. T). In short, the FAC's chart allegedly showing that BFA performs "virtually all" advisory services the Funds need does no such thing.  In cases like this, where conclusory and unsupported

allegations are contradicted by judicially noticeable information such as SEC filings, the allegations need not be accepted as true on a motion to dismiss.  *See, e.g.*, *Garcia v. City of Chi.*, No. 91-civ-5535, 1991 WL 289204, at *1 (N.D. Ill. Dec. 23, 1991) ("To the extent the judicially noticed facts contradict allegations of the complaint, the allegations will not be accepted as true."); *accord Jarmuth v. City of Chi.*, 43 F. Supp. 3d 889, 891 n.2 (N.D. Ill. 2014) (citing *In re Woodmar Realty Co.*, 294 F.2d 785 (7th Cir. 1961)).  The plaintiffs cannot gain the benefit of a favorable presumption merely by refusing to cite to a readily available, contradictory public document.

Under established pleading standards, a viable claim that is "plausible on its face" must be based on well-pled facts, not merely unsupported conclusions dressed up as ostensible facts. Yet conclusions are all the plaintiffs offer here:  their own say-so that SFIMC does little or nothing for its fees, and that the cost to SFIMC of any "ministerial" services it provides is limited to 2-3 basis points.  Simply put, the plaintiffs ask the Court to take their word for it that the services are minimal or inexpensive, so they can prove it up later with the benefit of discovery. But this is precisely the style of pleading that is no longer valid in the wake of *Twombly*, *Iqbal*, and their progeny.  The plausibility of the plaintiffs' allegations is directly undermined by the established public record detailing (i) the array of services actually provided by SFIMC to the Funds and acknowledged in the FAC, (ii) the additional risks it bears as fund sponsor, and (iii) the review of those services and risks by a statutorily independent board of trustees prior to approving the fee.

Accordingly, the FAC's flimsy assertions do not come close to moving the plaintiffs' theory from merely *possible* to the required plausible.  *See Iqbal*, 556 U.S. at 678–89 (holding that plausibility requires "more than a sheer possibility that a defendant has acted unlawfully,"

and that pleading facts that are "merely consistent with a defendant's liability . . . stops short of

the line between possibility and plausibility") (citation omitted); *see also In re AllianceBernstein*

*Mut. Fund Excessive Fee Litig.*, No. 04 CIV. 4885, 2006 WL 74439, at \*2 (S.D.N.Y. Jan. 11,

2006) (granting motion to dismiss Section 36(b) claim where allegations were contradicted by

public records that "paint a more complete picture . . . of the Fund in question").  Indeed, if the

allegations in this pleading were adequate to state a plausible claim, the very same allegations –

that the adviser retains a fee in exchange for little or no work – could be leveled (without

supporting factual allegations) against *any* adviser that utilizes a sub-adviser and survive a

motion to dismiss.  But courts have routinely rejected such attempts to base Section 36(b) claims

on conclusory allegations with no nexus to a beyond-arm's-length fee – repeatedly dismissing

such claims at the pleading stage – and this pleading fares no better.[12]

The plaintiffs cannot save the FAC by ignoring this authority and pointing instead to

cases where courts have recently denied motions to dismiss complaints alleging improper "gaps"

between advisory and sub-advisory fees.  Those complaints did not rest on such uniquely barren

allegations.  While all of those cases asserted the similar theory that the adviser-defendant does

---

[12]        *See, e.g.*, *Amron*, 464 F.3d at 338; *Migdal*, 2000 WL 350400, at \*3; *Turner v. Davis Selected Advisers, L.P.*, 08-cv-00421, slip. op. (D. Ariz. June 1, 2011), *aff'd*, No. 13-15742, 2015 WL 5692324 (9th Cir. Sept. 29, 2015); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Fitzgerald v. Citigroup, Inc.*, No. 03 CIV. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *AllianceBernstein*, 2006 WL 74439; *Forsythe*, 417 F. Supp. 2d 100; *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163 (D. Mass. 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000); *Strougo v. BEA Assocs.*, No. 98 Civ. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999); *Kalish v. Franklin Advisers, Inc.*, 74 F. Supp. 1222 (S.D.N.Y. 1990).

little or nothing in exchange for the portion of the advisory fee it retains, the plaintiffs in the other cases have at least asserted *facts* describing the supposed paucity of services by the adviser – supporting facts that are noticeably absent here.

For example, in *Zehrer v. Harbor Capital Advisors, Inc.*, the complaint alleges that the adviser delegated not only portfolio management services to the sub-advisers, but also substantially all other services called for in the investment advisory agreement, effectively leaving the adviser with the sole task of overseeing sub-advisers and other service providers. Consolidated Am. Compl. ¶¶ 65–68, No. 14-CV-00789 (N.D. Ill. Dec. 22, 2014), ECF No. 82 (Ex. R) (describing services – including regulatory compliance, preparation of materials for meetings of the board, preparation of shareholder reports and SEC filings, legal and regulatory support for the funds, and fund valuation – allegedly performed by the sub-advisers under the sub-advisory agreement rather than the adviser).[13]   The FAC, by contrast, expressly acknowledges that SFIMC performed many of the same extensive services that Harbor Capital allegedly delegated to other service providers.  FAC ¶ 51.

The decisions by some courts to allow such sub-advisory fee "gap" claims to proceed to discovery thus have no bearing in this case.[14]  Here, the plaintiffs have utterly failed to allege any

---

[13]     As discussed in the Request for Judicial Notice, the Court is permitted to consider publicly filed complaints in deciding SFIMC's motion to dismiss.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co*., 631 F.3d 436, 443 (7th Cir. 2011) (taking judicial notice of a complaint in another lawsuit); *Henson v. CSC Credit Servs*., 29 F.3d 280, 284 (7th Cir. 1994) (on motion to dismiss, a court may take notice of documents in the public record, including public court documents).

[14]     The FAC fails when measured against all other similar complaints that have recently survived motions to dismiss.  *See* Verified Amend. Compl. ¶¶ 43, 89–95, *Curd v. SEI Inv. Mgmt. Corp.*, No. 2:13-cv-07219 (E.D. Pa. Oct. 2, 2014), ECF No. 51 (Ex. O) (alleging that the retained advisory fee cannot be justified in light of the fact that the defendant-adviser's own affiliate serves as sub-adviser to some of the funds thereby reducing the adviser's costs of oversight, and separately challenging "fees of nearly the same size as the investment advisory fees" charged by the funds' administrator for "services such as regulatory reporting, office space, equipment,

facts which raise their allegations to the requisite level of plausibility to state a claim for relief. Rather, this case fits neatly into the lengthy list of cases where unsupported conclusory allegations were held insufficient to state a valid Section 36(b) claim.

### D.    Plaintiffs' Recitation of Other *Gartenberg* Factors Provides No Basis for a Conclusion that the Fees were Outside an Arm's-Length Range

In addition to the allegations regarding the comparative fee structure and the services provided in exchange for SFIMC's fee, discussed above, the FAC walks through three other "*Gartenberg* factors," advancing conclusory allegations about profitability, economies of scale, and the independence and conscientiousness of the Board.[15]  Viewed individually or collectively, these allegations do not help the FAC state a viable claim under Section 36(b).  No allegation about any "factor" permits an inference that it affected the challenged fee at all, much less pushed it outside of the range that could have been negotiated at arm's length.

#### 1.    *Profitability*

Although courts may consider a fund's profitability in evaluating whether an adviser's fee exceeded the arm's-length range, courts have recognized that "Section 36(b) does not

---

personnel and facilities"); Second Am. Compl. ¶¶ 50–54, 56–72, *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 11-cv-01083 (D.N.J. Nov. 14, 2011), ECF No. 35 (Ex. P) (alleging that defendant-adviser's fee compensates solely for oversight of the funds' sub-advisers and other service providers because the adviser delegates all "investment management services" to sub-adviser *and* specific "administrative services" – including the supervision of all aspects of funds' operations (*e.g*., custodial, legal, accounting, etc.) and provision of office space – allegedly provided under the advisory agreement are actually paid for by the funds pursuant to separate agreements and/or fees); Compl. ¶¶ 5–12, 14–23, 47–49, 56, *Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*, 13-cv-01601 (N.D. Ala. Aug. 28, 2013), ECF No. 1 (Ex. Q) (challenging the defendant-adviser's retention of a fee *twice* as large as that retained by its sub-advisers (retaining $80 million of the total $120 million) with allegations regarding the adviser's additional retention of a wholly separate management fee in exchange for the advisory services actually provided pursuant to the advisory contract).

[15]    Apparently recognizing that the public record flatly contradicts their claim in the original Complaint that SFIMC obtained "fallout benefits" as a result of its management of the Funds, the plaintiffs have dropped discussion of this factor entirely in the FAC.

prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755, at \*50 (C.D. Cal. Dec. 28, 2009) (citing S. Rep. No. 91-184, at 15 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902); *see also Gartenberg*, 694 F.2d at 928 (Senate Report indicated that "a 'cost-plus' type of [advisory] contract is not required").

The plaintiffs assert that SFIMC's management of the Funds is "astronomically profitable," but offer no supporting factual allegations.  FAC ¶ 66.  Indeed, the plaintiffs say *nothing* about SFIMC's revenue *or* the costs incurred by SFIMC in providing the Funds the suite of services that the plaintiffs themselves acknowledge SFIMC provides.  From the FAC, one cannot tell whether the adjective "astronomical" means 1 basis point or 27; nothing is advanced to justify the label at all.  Instead, the plaintiffs focus on the assets under collective management of all LifePath Funds (*id.* ¶ 60) – without tying those assets to SFIMC's revenue for each Fund – and the purported costs incurred by the Comparators (SFIMC's competitors) in providing an undefined set of services to their wholly separate and distinct funds.  *Id*. ¶ 61.  But that comparison is meaningless.  Without context, including whether the purported Comparators provide the same services, and the basis for the FAC's claims about costs, the comparison does not permit *any* inference about SFIMC's profitability.  *See, e.g.*, *Amron*, 464 F.3d at 344–45 (dismissing Section 36(b) claim and finding plaintiffs' assertions regarding size of investment advisory fees "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds").

Most importantly, even if the plaintiffs alleged sufficient facts to allow the Court to make an inference about the profitability of SFIMC's services (they have not), they have completely omitted the lynchpin that establishes a connection between some degree of profitability and the

size of the challenged fee.  As noted above, it is not enough merely to invoke some "factor" like "profitability."  Rather, the plaintiffs must *link* the facts about the invoked "factor" to an adverse effect on the fee; something about the "factor" must tip the fee into the range *beyond* what could be negotiated for the "factor" to assume any significance. [16]  Merely claiming SFIMC's profitability to be "astronomical" does no such thing.

2.    *Economies of Scale*

The plaintiffs' conclusory allegations about the growth in assets under management and presumed economies of scale likewise do not plausibly support an inference that the fees were outside the range of what could have been bargained at arm's length.  The plaintiffs plead no *facts* suggesting that economies of scale actually existed.  They simply assert that "assets under management have grown, and so the advisory fees paid to Defendant have grown dramatically, despite the economies of scale realized by Defendant."  FAC ¶ 74.  The plaintiffs then assert that these presumed economies of scale have not been shared with the plaintiffs "to any significant degree."  *Id.* ¶ 80.  They cite to industry articles about economies of scale generally, but allege absolutely nothing of substance specific to SFIMC or its cost structure.[17]  The FAC relies on bare allegations that the services provided by SFIMC "are of a type for which the costs do not increase, or increase only incrementally, with an increase in assets under management."  *Id.* ¶ 75. The pleading provides no explanation in support of this allegation beyond repeated variations on the same bald assertion that the services provided by SFIMC "are no more expensive when

---

[16]    *See Migdal*, 248 F.3d at 327 (affirming grant of motion to dismiss Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services"); *Forsythe*, 417 F. Supp. 2d at 115 ("[C]laims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser.").

[17]    Indeed, the FAC hints that "economies of scale" *were* shared with the Funds, because SFIMC waived a portion of its fee to reduce it to 28 basis points, and to cap the overall investment advisory and management fee of the Funds at 62 or 63 basis points.  FAC ¶ 80.

provided for a larger volume of assets under management." *Id*.  These allegations lend no weight whatsoever to the plausibility of SFIMC's fee being outside the arm's-length range.  *See Goldman Sachs*, 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").[18]

The plaintiffs' sole attempt to provide more detailed allegations – concerning allegedly "minimal" oversight of BFA – falls flat and seems to suggest that SFIMC could ignore its obligation to oversee BFA's performance because of the sub-adviser's good reputation and vested interest in the performance of the Master Portfolios.  FAC ¶ 77.  At any rate, the plaintiffs have not alleged any connection between oversight of BFA and the purported economies of scale achieved by SFIMC in its management of the Funds.

### 3.  *Board Independence and Conscientiousness*

With respect to approval of the fees by the independent trustees, the plaintiffs offer nothing but circular allegations that the Board *must have* lacked independence, conscientiousness, and adequate information because – on the plaintiffs' otherwise unsupported allegations – SFIMC charged excessive fees.  FAC ¶¶ 85–86, 90.  The FAC acknowledges the efforts the Board undertook and the relevant documentation they reviewed in that process.  The FAC even goes so far as to cite specific materials that the Board reviewed – materials the plaintiffs also would like to review, presumably in an attempt to substitute their own judgment for that of the statutorily presumed independent board.  *Id*. ¶ 92.  Despite recognizing the

---

[18]    *See also Franklin Mut. Funds*, 478 F. Supp. 2d at 687; *Scudder*, 2007 WL 2325862; *Kalish*, 74 F. Supp. at 1238.  By contrast, the complaint in *Zehrer v. Harbor Capital* at least alleges (i) facts and figures regarding the funds' alleged growth in assets over time; (ii) how much advisory fees have increased due to increased assets over the years; and (iii) examples as to why the adviser's cost have allegedly not increased as assets have increased.  Consolidated Am. Compl. ¶¶ 92–95, 98–106, No. 14-CV-00789 (N.D. Ill. Dec. 22, 2014), ECF No. 82 (Ex. R).

substantive process the Board undertook, the FAC leaps to the conclusion that the trustees were not diligent by virtue of the result the plaintiffs criticize.

The public record contradicts the plaintiffs' illogical conclusion by supplying the requisite premise. It tells an entirely different story regarding the Board's review and approval of the fees. The Funds' Semi-Annual Shareholder reports for the relevant period, publicly filed with the SEC, describe in detail the rigorous fee review process undertaken by the Board, with advice of independent counsel, and based upon extensive materials provided by SFIMC, BFA, and third-party consultant Strategic Insight. 2015 SAR at 22–24 (Ex. E); 2014 SAR at 20–22 (Ex. F). The materials reflect information relating to the *Gartenberg* factors, including the Funds' performance record, and how that performance and the Funds' fees compare to those of a universe of peer funds. 2015 SAR at 22–24 (Ex. E); 2014 SAR at 20–22 (Ex. F).

That public record is dispositive, because it illustrates the holes in the plaintiffs' pleading. The FAC makes no factual allegation that calls into question the independence of the seven noninterested trustees. It offers no specifics attesting to the Board's processes. It says nothing about the trustees' conscientiousness. The FAC does not identify a shred of information that the trustees were required to review but lacked. At most, the plaintiffs state that the Board did not review the reasonableness of the portion of the management fee retained by SFIMC independent of the sub-advisory fee paid to BFA, but focused rather on the entire expense ratio in concluding that the fee paid to SFIMC was appropriate. FAC ¶¶ 93–94. The plaintiffs offer no facts to support the contention that the Board did not review a detailed breakdown of the fees paid; however, even if the Board did only review the total expense ratio, the plaintiffs have not articulated any reason or authority that supports their allegation that doing so is demonstrative of a lack of conscientiousness or independence. From the perspective of the Board and the

shareholders they represent, the total fee paid is the key consideration when negotiating with the adviser. *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1055 (S.D.N.Y. 1981) (holding that "[t]he ultimate decision of the Trustees was objectively reasonable, as the total fee was fair to the Fund"). Reviewing the total fee is the most effective way to ensure that the fund is not making excessive payments for the services it receives, and the plaintiffs have provided no reason to second-guess that method. In short, the FAC advances no facts to justify questioning the Board's "independence and conscientiousness" as a "factor" relevant to scrutinizing the challenged fees. They instead warrant the Court's application of the mandate to *defer* to independent trustee decision-making. *See Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process."). On the plaintiffs' allegations and the public record, the Court should not "second-guess[ ] . . . informed board decisions" or "supplant the judgment of disinterested directors apprised of all relevant information." *Id.* at 352 (citations omitted).

Attempting to remedy their thin allegations regarding the Board process, the plaintiffs allege that "[t]he specific information and materials provided to the Board by SFMIC are not disclosed . . . and are therefore not currently known to Plaintiffs without the benefit of discovery." FAC ¶ 92. This is another transparent attempt on the part of the plaintiffs to short-circuit the pleading process by asserting that specific factual allegations are impossible without discovery. *See Amron*, 464 F.3d at 343. There is no obligation for the Board to disclose in the Funds' public filings the exact contents of the materials the trustees considered (many of which contain information which is extremely sensitive from a competitive standpoint) when considering the fee structure with SFIMC. The fact that the plaintiffs allege, with nothing more

than their say-so, that there *might* be something in those documents pointing to the trustees' lack of conscientiousness is not sufficient grounds for this Court to reverse the presumption of the Board's independence.  The Ninth Circuit, in a recent decision affirming the dismissal of a Section 36(b) action under the *Jones* standard, held that the court was required to "'afford commensurate deference to the outcome of the . . . [board's] bargaining process,'" despite allegations that the board "met only infrequently" and that the adviser "controlled what information the board possessed."  *Turner v. Davis Selected Advisers, LP*, No. 13-15742, 2015 WL 5692324, at *2 (9th Cir. Sept. 29, 2015) (quoting *Jones*, 559 U.S. at 351).  The Ninth Circuit's conclusion is equally applicable here.  Much like the concession in *Turner* that the board there had the "data necessary" to evaluate the advisory fees, the public filings cited in the FAC – which are part of the pleading, *see supra* n.2 – establish that the Board had the relevant information in approving SFIMC's fees.  *See Turner*, 2015 WL 5692324, at *2.

## II.   SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM

The plaintiffs are not entitled to rescission under Section 47(b) because they failed to state a plausible claim under Section 36(b).  Section 47(b) authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter."  15 U.S.C. § 80a-46(b)(1).  The FAC's failure to plead a violation of Section 36(b) necessarily dooms the rescission claim.  Additionally, the plain language of Section 47(b) makes rescission available only to a "party" to that contract – in this case, State Farm Mutual Fund Trust and SFIMC.  *Id.*  The plaintiffs are not parties to the SFIMC Advisory Agreement, so they lack standing to seek its rescission.  *See Turner v. Davis Selected Advisers, LP*, No. 08-cv-00421, slip. op. at 18–19 (D. Ariz. June 1, 2011), *aff'd*, No. 13-15742, 2015 WL 5692324 (9th Cir. Sept. 29, 2015) (dismissing Section 47(b) claim because Section 36(b) plaintiff was not

standing in the shoes of the fund and was not a party to the challenged advisory agreement); *see also Davis v. Bailey*, No. 05-civ-0042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting rescission of advisory agreement because "[p]laintiffs were not parties" to it).

## III.   PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL

The FAC's demand for a jury trial is also a dead letter.  Controlling authority from the Seventh Circuit – echoed by courts across the nation – holds that Section 36(b) claims are equitable in nature and thus do not fall within the Seventh Amendment's right to jury trial on actions at law.  *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) (holding that plaintiff was not entitled to a jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line"), *rev'd on other grounds*, 500 U.S. 90, 95 n.3 (1991); *see also In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) (holding that plaintiff "is not entitled to a jury trial" because "this case involves the equitable inquiry whether the Trust adviser violated its fiduciary obligations by charging an exorbitant fee").  Under the Seventh Circuit's explicit ruling in *Kamen*, the plaintiffs' jury trial demand contravenes controlling authority and should be stricken. *See Zehrer v. Harbor Capital Advisors, Inc*., No. 14-CV-00789, 2014 WL 6478054, at *5 (N.D. Ill. Nov. 18, 2014) (striking plaintiff's jury trial demand at motion to dismiss stage).

## CONCLUSION

For the foregoing reasons, the plaintiffs' FAC should be dismissed with prejudice.

Dated: December 15, 2015                              Respectfully submitted,

/s/ Nathan R. Bach
Timothy L. Bertschy/ARDC #199931
Nathan R. Bach/ARDC #6292316
**Heyl, Royster, Voelker & Allen, P.C.**
300 Hamilton Boulevard

Peoria, IL 61601-6199
Tel: (309) 676-0400
Fax: (309) 676-3374
TBertschy@heylroyster.com
NBach@heylroyster.com

*Of Counsel*

John D. Donovan, Jr.
Robert A. Skinner
Amy D. Roy
**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
john.donovan@ropesgray.com
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

*Attorneys for Defendant State Farm Investment Management Corp.*

-33-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 15, 2015.

<u>/s/ Nathan R. Bach</u>
Nathan R. Bach