**E-FILED**
Tuesday, 09 August, 2016  05:29:49 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMY L. INGENHUTT and TERESA L. ODELL, | NO. 15-cv-01303-JES-JEH |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| STATE FARM INVESTMENT MANAGEMENT CORPORATION, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................4

    A.    Mutual Funds and the Investment Company Act of 1940 ..........................4

    B.    SFIMC and the LifePath Funds ................................................................6

    C.    Advisory Agreements and Fees ...............................................................7

    D.    Annual Approval of the SFIMC Advisory Agreement by the Board's Statutorily Independent Trustees ...........................................................10

ARGUMENT ............................................................................................................12

  I.    LIKE ITS PREDECESSOR, THE SECOND AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA ..........................................................12

    A.    Legal Standard for Pleading a Section 36(b) Claim .................................12

    B.    Plaintiffs Have Again Failed to Establish a Basis for Comparability to Peer Mutual Funds and Thus to Define the Relevant "Bargaining Range" ...................................................................................................14

    C.    Plaintiffs' Naked Assertions that SFIMC Provides only "Business" Services that are "Minimal" and Cost Next to Nothing are Insufficient to Show that the Challenged Fees are Beyond the Range of Arm's-Length Bargaining ...........................................................20

    D.    The Remaining Allegations Aimed at Other "Gartenberg Factors" are the Same Allegations that the Court Already Deemed Insufficient ............................................................................................28

      1.    Plaintiffs' "Economies of Scale" Allegations Remain Sheer Speculations ....................................................................................28

      2.    The Same Thin Allegations about SFIMC's Profitability are Insufficient to Rescue the SAC ....................................................29

      3.    The SAC Repeats the Identical Allegations Questioning Independence and Conscientiousness of the Board that the Court Already Found Lacking ....................................................................31

  II.    SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM ...........31

  III.    PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL ..............................32

CONCLUSION .........................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*188 LLC v. Trinity Indus., Inc.*,
  300 F.3d 730 (7th Cir. 2002) ............................................................................. 6

*Am. Chems. & Equip., Inc. 401(K) Ret. Plan v. Principal Mgmt. Corp.*,
  No. 13-cv-01601 (N.D. Ala. Aug. 28, 2013)............................................... 27, 28

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006) ....................................................... 20, 26, 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................... passim

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................... passim

*Bissessur v. Indiana Univ. Bd. of Trs.*,
  581 F.3d 599 (7th Cir. 2009) ............................................................... 12

*Brooks v. Ross*,
  578 F.3d 574 (7th Cir. 2009) ............................................................... 12

*Burks v. Lasker*,
  441 U.S. 471 (1979)............................................................................. 4

*Curd v. SEI Inv. Mgmt. Corp.*, Verified Amend. Compl., ECF No. 51
  No. 2:13-cv-07219 (E.D. Pa. Oct. 2, 2014)............................................. 27

*Davis v. Bailey*,
  No. CIVA05-CV-00042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005)............................... 32

*Delta Mining Corp. v. Big Rivers Elec. Corp.*,
  18 F.3d 1398 (7th Cir. 1994) ............................................................... 24

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................... 3, 4, 21

*Fitzgerald v. Citigroup, Inc.*,
  No. 03 CIV. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007)........................... 26

*Forsythe v. Sun Life Fin., Inc.*,
  417 F. Supp. 2d 100 (D. Mass. 2006) ............................................ 13, 26

*Garcia v. City of Chi.*,
  No. 91 C 5535, 1991 WL 289204 (N.D. Ill. Dec. 23, 1991)...........................................23, 24

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982) .................................................................................................11

*Henson v. CSC Credit Servs.*,
  29 F.3d 280 (7th Cir. 1994) ..................................................................................................27

*ING Principal Prot. Funds Derivative Litig.*,
  369 F. Supp. 2d 163 (D. Mass. 2005) ...................................................................................26

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
  No. 04 CIV. 4885, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ......................................24, 26

*In re Eaton Vance Mut. Funds Fee Litig.*,
  380 F. Supp. 2d 222 (S.D.N.Y. 2005)...................................................................................26

*In re Franklin Mut. Funds Fee Litig.*,
  478 F. Supp. 2d 677 (D.N.J. 2007) .................................................................................20, 26

*In re Gartenberg*,
  636 F. 2d 16 (2d Cir. 1980) ..................................................................................................32

*In re Goldman Sachs Mut. Funds Fee Litig.*,
  No. 04 Civ 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ......................................26, 29

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
  434 F. Supp. 2d 233 (S.D.N.Y. 2006)...................................................................................26

*In re Scudder Mut. Funds Fee Litig.*,
  No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) .........................................26

*Jarmuth v. City of Chi.*,
  43 F. Supp. 3d 889, 891 ........................................................................................................24

*Jones v. Harris Assocs., L.P.*,
  611 Fed. App'x 359 (7th Cir. 2015).............................................................................3, 12, 20

*Jones v. Harris Assocs. L.P.*,
  559 U.S. 335 (2010) .......................................................................................................passim

*Kalish v. Franklin Advisers, Inc.*,
  742 F. Supp. 1222 (S.D.N.Y. 1990)......................................................................................26

*Kamen v. Kemper Fin. Servs., Inc.*,
  908 F.2d 1338 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991) ........................32

*Kasilag v. Hartford Inv. Fin. Servs., LLC*, Second Am. Compl., ECF No. 35
    No. 11-cv-01083 (D.N.J. Nov. 14, 2011) ................................................................ 27

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989) ..................................................................................... 5

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ................................................................... 13, 14 , 26

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ................................................................................. 27

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ................................................................................... 6

*Sivolella v. AXA*,
    No. 3:11-cv-04194 (D.N.J. 2016), Trial Transcript, ECF No. 259 ................... 18, 22

*Strougo v. BEA Assocs.*,
    No. 98 Civ. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999) .......................... 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................. 6

*Turner v. Davis Selected Advisers, L.P.*,
    08-cv-00421, slip. op. (D. Ariz. June 1, 2011), *aff'd*, 626 F. App'x 713 (9th Cir. Sept.
    29, 2015) .......................................................................................................... 26, 32

*Turner v. Davis Selected Advisers, LP*,
    626 F. App'x 713 (9th Cir. 2015) ..................................................................2, 14,19, 20

*U.S., ex rel Danielides v. Northrop Grumman Sys. Corp.*,
    No. 09 CV 7306, 2015 WL 5916871 (N.D. Ill. Oct. 8, 2015) .............................. 24

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
    No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204
    (2d Cir. 2000) ........................................................................................................ 26

*Zehrer v. Harbor Capital Advisors, Inc.*,
    No. 14-CV-00789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ................... 32, 27

## STATUTES

15 U.S.C. § 80a-10(a)-(b) ............................................................................................ 4

15 U.S.C. § 80a-15(a)-(c) ............................................................................................ 4

15 U.S.C. § 80a-15(c) .................................................................................................. 5

15 U.S.C. § 80a-35(b) .................................................................................................... 1, 5

15 U.S.C. § 80a-35(b)(2) .................................................................................................... 5

15 U.S.C. § 80a-46(b)(1) .................................................................................................. 31

**OTHER AUTHORITIES**

17 C.F.R. § 239.15A ........................................................................................................ 16

71 Fed. Reg. 36640, 36645 (June 27, 2006) ............................................................... 15

Form N1-A, https://www.sec.gov/ about/forms/formn-1a.pdf.................................... 16

Illinois Demographics, http://www.illinois-demographics.com/mclean-county-
demographics# (last visited July 23, 2016) ........................................................... 25

Investment Company Act Amendments of 1967 Hearings, Hearings on H.R. 9510, H.R.
9511 Before the H. Comm. on Interstate and Foreign Commerce, 90th Cong., 1st
Sess., 688 (1967) .................................................................................................... 30

## PRELIMINARY STATEMENT

Plaintiffs Amy Ingenhutt and Teresa Odell bring this action under Section 36(b) of the Investment Company Act of 1940 (the "ICA" or the "Act"), 15 U.S.C. § 80a-35(b), against State Farm Investment Management Corp. ("SFIMC") to recoup ostensibly "excessive" fees paid by two State Farm LifePath Funds ("Funds") for which SFIMC serves as investment adviser.  On June 22, 2016, this Court granted SFIMC's motion to dismiss plaintiffs' First Amended Complaint ("FAC") for failure to state a claim ("Order").  (ECF No. 34).  The Court held that plaintiffs had done nothing more than "artfully craft 'facts' that are in reality speculative assertions."  Order at 6.  The Second Amended Complaint ("SAC") – plaintiffs' *third* bite at the apple – does not come close to correcting this fatal flaw.

Plaintiffs' challenge in this case was to advance plausible allegations that the management fees SFIMC charged to the Funds were so disproportionate to the value of services rendered that they "*could not* have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added).  Their attempt to meet this challenge remains grounded in unsupported allegations that fail to "demonstrate[] some connection between the services provided and fees charged that could establish fees charged beyond the outer bounds of arm's length bargaining that is plausible rather than merely possible."  Order at 8.  Indeed, the SAC contains, in large part, a recitation of the same allegations the Court found deficient in the dismissed FAC.

Like its predecessors, the SAC proffers a facially inapt comparison of SFIMC's *total* advisory fees to a *subset* of the advisory fees charged to other target date funds.  The Court has already deemed substantively identical allegations in the FAC insufficient as a basis for defining the bargaining range for the challenged fees.  Order at 7.  Undeterred, plaintiffs again ignore the judicially noticed public record of what those funds actually pay their advisers and lay no factual

-1-

foundation for the comparison. The public filings reveal plaintiffs' claim to be manufactured through manipulation (and outright omission) of data *required* to be public. The data actually disclosed by the documents put the lie to plaintiffs' claim that the competitor funds are charged much lower fees than the Funds for purportedly the same services that SFIMC provides.[1]

Otherwise, the plaintiffs continue to speculate that SFIMC provides "minimal" services to the Funds that are "non-advisory" in nature and cost little or nothing to perform; that the "advisory" services SFIMC delegated to the Funds' sub-adviser are, by contrast, extensive and cost substantially more; and that economies of scale must have been realized but not shared with the Funds' shareholders. SAC ¶¶ 55-58, 76-77. As the Court held upon review of essentially the same allegations in the FAC, "without an adequate foundation or factual support, Plaintiffs' summary allegations are inapposite." Order at 8. The bald allegation that SFIMC provides only minimal "business" services and thus does practically nothing in exchange for its fees is contradicted by the pleading's own acknowledgement that SFIMC performs a wide array of services for the Funds pursuant to the advisory agreement between SFIMC and the Funds – as expressly itemized in the SAC itself. SAC ¶ 55. Plaintiffs' attempted dichotomy between "business" and "advisory" services is false, and the pleading offers no *facts* explaining why the services concededly provided by SFIMC purportedly do not justify its fees. It just concludes without elaboration that the services are "administrative and ministerial" and "require very few resources," citing nothing but equally speculative assertions of plaintiffs' purported expert. *Id.* ¶¶ 49, 58 (citing Pomerantz Decl. ¶¶ 15-16). This does nothing to cure the defects in the FAC.

---

[1] The SAC's new comparison of the Funds' fees to management fees paid by *index* funds is an even less apt comparison than that offered by plaintiffs in the FAC. Index funds are *passively* managed and as such bear no resemblance to SFIMC's *actively* managed Funds. The Ninth Circuit has found such a comparison inapt, and thus insufficient to avoid dismissal. *Turner v. Davis Selected Advisers, LP*, 626 F. App'x 713, 717 (9th Cir. 2015).

Unable to deny the array of management services SFIMC provides to the Funds, plaintiffs resort again to criticizing the Funds' operating structure, under which SFIMC delegates other aspects of its management responsibility – including daily security selection for the portfolios – to BlackRock Fund Advisors ("BFA"). Importantly, the SAC does not – and cannot – say that the overall fee paid to SFIMC and BFA for investment advisory and management services to the Funds is *beyond* the range that similar funds pay for the same array of services. That omission is glaring because, as the Seventh Circuit said, the comparison "tells us the bargaining range." *Jones v. Harris Assocs., L.P.*, 611 Fed. App'x 359, 361 (7th Cir. 2015) (on remand from Supreme Court). And the omission is particularly conspicuous because, although the SAC identifies the Funds' competitors and a *portion* of their respective fees, it neglects to mention how much the other funds are paying for *all* management services they receive. Indeed, the public records cited elliptically by the plaintiffs show the Funds' management fees to be *below* both the mean and median for plaintiffs' claimed comparators. Simply put, plaintiffs fail to set forth the facts that the Seventh Circuit says are critical to define the "bargaining range."

Rather than bolster their new pleading with new or additional *facts*, plaintiffs have attached to the SAC a declaration from an ostensible expert named Steve Pomerantz ("Pomerantz Declaration"). This tactic is both improper[2] and ineffective. Dr. Pomerantz's unfounded opinions – which simply parrot plaintiffs' own conclusory allegations – are no substitute for pleading facts. Dr. Pomerantz's sweeping assertions about the nature and cost of SFIMC's services are based on nothing but his supposed general industry knowledge, and are untethered to any specifics about SFIMC. That is plainly insufficient to fill the holes the Court identified in dismissing the FAC. *See DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1222

---

[2] *See* SFIMC's Motion to Strike Declaration of Steve Pomerantz, filed concurrently herewith.

(S.D. Cal. 2001) ("Conclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the affidavit of a retained expert.").

Like the prior pleading, the SAC does not state a plausible claim that SFIMC's fees are *beyond* what "*could*" be bargained for at arm's length. There is no basis in the SAC (or the Pomerantz Declaration) for evaluating whether SFIMC's fees are inside or outside of the "negotiating range" other than plaintiffs' – and now their alleged expert's – say-so. But such naked allegations do not suffice under *Iqbal* and *Twombly*, and by ignoring the "bargaining range" those allegations are not plausible under *Jones*. The pleading rules that command "plausible" assertions simply cannot be read to permit plaintiffs to conjure up allegations of facts that contradict public sources upon which they otherwise rely and hope to give them credence by having their retained "expert" repeat them in an affidavit. Plaintiffs have already had three opportunities to properly plead their case, and more than a year since the filing of their original complaint. Accordingly, the SAC should be dismissed with prejudice.

## BACKGROUND

### A.      Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a "pool of assets, consisting primarily of [a] portfolio [of] securities," that belongs to the individual investors who own shares in the fund. *Jones*, 559 U.S. at 338. Under industry practice, the management and operations of a mutual fund are typically externalized and contractually delegated to a mutual fund's investment adviser and other vendors. The ICA recognizes that structure and enshrines the legal separation of a mutual fund and its adviser as the hallmark of the Act's principal purpose, establishing the independent trustees as the "cornerstone" of the Act's control of conflicts of interest. *See Burks v. Lasker*, 441 U.S. 471, 482–85 (1979); 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

The ICA therefore entrusts noninterested directors or trustees sitting on a mutual fund's

board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from any conflicts of interest with the fund's adviser and its affiliates.  A majority of independent trustees must approve the advisory and other service agreements annually, including the compensation received by the adviser for the services it provides to the fund.  15 U.S.C. § 80a-15(c); *accord Jones*, 559 U.S. at 340.  To fulfill that obligation, under Section 15(c) of the ICA, the trustees must "request and evaluate" all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds.  15 U.S.C. § 80a-15(c).[3]

The ICA's reliance on independent trustees to police conflicts of interest between a fund and its adviser also lies at the heart of Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund.  *Id.* § 80a-35(b).  To state a cognizable claim for a breach of this duty, a shareholder plaintiff must show that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining."  *Jones*, 559 U.S. at 346 (emphasis added).  In making that inquiry, the statute obliges a court to consider the role of the independent trustees in negotiating that fee:  "[A]pproval by the board of directors of such investment company of such compensation or payments . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances."  15 U.S.C. § 80a-35(b)(2) (emphasis added).  The statute does not oblige the directors to negotiate the "'best deal' possible."  *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).  And it does not authorize the Court to sit as a "super-trustee" charged with "setting" a fee, or to second-guess informed board decisions.  *See Jones*, 559 U.S. at 352.  Instead, it requires a plaintiff to

---

[3]  The SAC quotes from news articles and industry pundits to suggest that independent trustees of mutual funds do a poor job of serving as "watchdogs" for the benefit of investors.  *E.g.*, SAC ¶¶ 20–22.  But that is just polemics.  The pleading says nothing about the performance of *these* independent trustees that could fit the stereotype plaintiffs project.

plausibly allege and ultimately prove that the result of the independent trustees' deliberation could not have derived from an arm's-length negotiation.

### B.      SFIMC and the LifePath Funds

SFIMC offers customers various investment products, including a family of fifteen mutual funds. State Farm Mutual Fund Trust, Statement of Additional Information, at 1 (May 1, 2015, as supplemented June 24, 2015) ("SAI") (Ex. A to the Declaration of Robert A. Skinner in Support of Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint (the "Skinner Decl.")).[4] Certain of these funds are entirely managed by SFIMC's investment personnel, while some (including the LifePath Funds) utilize the specialized expertise of external advisory firms like BFA (referred to here for convenience as "sub-advisers") to perform a portion of the management services. SFIMC then provides the balance of the necessary services and bears all the risks inherent in fund sponsorship (*i.e.*, developing, launching and maintaining a branded fund in the highly competitive and regulated fund marketplace). *Id*. at 1, 57–58. The LifePath Funds are "target date" funds[5] structured as "feeder" funds in a "master-feeder" arrangement.

---

[4]  All exhibits to the Skinner Declaration are cited hereinafter as "Ex. __." The Court judicially noticed these exhibits in dismissing the FAC (Order at 7), with the exception of Exhibits U and V, which SFIMC has added here based on new allegations in the SAC. As discussed in the Request for Judicial Notice in Support of Defendant's Motion to Dismiss, filed concurrently herewith ("Request for Judicial Notice"), the SAC directly references nearly all public disclosures filed by the Funds and the plaintiff-identified comparator funds with respect to which SFIMC seeks judicial notice. Having relied extensively on the public disclosures, plaintiffs have incorporated them into the SAC by reference and thus have no basis to suggest that the same documents should be ignored for purposes of this Motion. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). In addition, the Court may judicially notice documents in the public record, such as required disclosures on file with the SEC, without converting a motion to dismiss into a motion for summary judgment. *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

[5]  "Target date" funds, such as the LifePath Funds, seek to provide retirement outcomes based on quantitatively measured risk that investors accept for a defined time horizon. State Farm Mutual Fund Trust, Prospectus, at 70 (May 1, 2015) ("Prospectus") (Ex. B). For example, the LifePath 2030 Fund is designed for investors who plan to begin withdrawing a substantial portion of their

Each LifePath Fund invests all its assets in a separate unaffiliated Master Investment Portfolio with a substantially similar investment objective, which is itself an investment company registered under the ICA.  *Id.* at 1.  For example, during the relevant period, the State Farm LifePath 2030 Fund invested all its assets in the LifePath 2030 Master Portfolio – a portfolio with the same investment objective as its corresponding LifePath 2030 Fund.  *Id.*  BFA served as the investment adviser and administrator to each Master Portfolio.[6]  *Id.* at 23, 68.  The Master Portfolios were then invested in a combination of stock, bond and money market funds (the "Underlying Funds"), all of which were advised by BFA affiliates.  *Id.* at 1, 23.

### C.      Advisory Agreements and Fees

SFIMC serves as the investment adviser to the Funds pursuant to the Investment Advisory and Management Service Agreement ("SFIMC Advisory Agreement"), which the entire State Farm Mutual Fund Trust Board (the "Board"), and its independent trustees separately, must approve annually.  SAI at 64 (Ex. A).  In its capacity as investment adviser, SFIMC provides the Funds with a range of investment management and advisory services.  As acknowledged in the SAC, the following list of SFIMC services is enumerated in the publicly available SFIMC Advisory Agreement:

---

investment in the decade beginning in the year 2030.  *See id.*  As is typical with target date funds, the LifePath Fund's asset mix becomes more conservative as the "target date" for retirement approaches.  *Id.*

[6]  As part of a structural reorganization approved by the Funds' shareholders on June 12, 2015, the Funds have transitioned from a master-feeder structure to a somewhat simpler structure in which the Funds will directly own securities in the form of index funds, though BFA advises nearly all of the underlying funds and will also serve as sub-adviser.  Also as part of this transition, the Funds will move from their current investment strategy – which utilizes a combination of active and indexed BlackRock funds – to an index-fund strategy, with lower costs and lower fees for shareholders.  State Farm Mutual Fund Trust, Shareholder Proxy Statement, at 6–7 (Feb. 23, 2015) (Ex. C).  These changes are not discussed in the SAC and were not in effect during the applicable one-year damages period (July 22, 2014 through July 22, 2015), and therefore are not addressed in this Motion.

(a)  Preparation and maintenance of the [Funds'] Registration Statement with the SEC;

(b)  Preparation and periodic updating of the [Funds'] prospectus and statement of additional information . . .;

(c)  Preparation, filing . . ., and dissemination of various reports for the Funds, including . . . annual and semiannual reports on Form N-SAR . . .;

(d)  Arrangement for all meetings of shareholders, including the collection of all information required for preparation of proxy statements . . .;

(e)  Maintenance and retention of . . . [the Funds'] charter documents and the filing of all documents required to maintain the [Funds'] status as a Delaware business trust and as a registered open-end investment company;

(f)  Arrangement and preparation and dissemination of all materials for meetings of the Board and committees thereof . . .;

(g)  Preparation and filing of the [Funds'] Federal, state, and local income tax returns and calculation of any tax required to be paid in connection therewith;

(h)  Calculation of all . . . Fund expenses and arrangement for the payment thereof;

(i)  Calculation of and arrangement for payment of all income, capital gain, and other distributions to shareholders of [the Funds];

(j)  Determination . . . of the jurisdictions in which [the Funds' shares] shall be qualified for sale . . . and preparation and maintenance of the qualification of the [Funds' shares] for sale under the securities laws of each such jurisdiction;

(k)  Provision of the services of persons who may be appointed as officers of the [Funds] by the Board . . .;

(l)  Preparation and dissemination of the [Funds'] quarterly financial information to the Board and preparation of such other reports . . . as the officers and Board may . . . reasonably request;

(m) Administration of the [Funds'] Code of Ethics and required reporting to the Board and officer compliance therewith;

(n)  Provision of internal legal, accounting, compliance, audit, and risk management services and periodic reporting to the Board with respect to such services;

(o)  Negotiation, administration, and oversight of third party services to the [Funds] including . . . sub-advisory, custody, tax, disaster recovery, audit, and legal services;

(p)  Negotiation and arrangement for insurance desired or required of the [Funds] and administering all claims thereunder;

(q)  Response to all inquiries by regulatory agencies, the press, and the general public concerning . . . the [Funds], including the oversight of all periodic inspections . . . by regulatory authorities and responses to subpoenas and tax levies;

(r)  Handling and resolution of any complaints registered with the [Funds] by shareholders, regulatory authorities, and the general public;

(s)  Monitoring legal, tax, regulatory, and industry developments related to . . . the [Funds]

and communicating such developments to the officers and the Board . . . ;

(t) Administration of operating policies of the [Funds] and recommendation . . . of modifications to such policies to facilitate the protection of shareholders or market competitiveness . . . [and] to comply with new legal or regulatory requirements;

(u) Responding to surveys conducted by third parties and reporting of Fund performance and other portfolio information; and

(v) Filing of claims, class actions involving portfolio securities, and handling administrative matters in connection with the litigation or settlement of such claims.

Amended and Restated Investment Advisory and Management Services Agreement, at 2–4 (Mar. 28, 2012) ("SFIMC Advisory Agreement") (Ex. S).

SFIMC's services to the Funds are distinct from those assigned to BFA under its separate advisory agreement with the LifePath Master Portfolios. *See* Amended Investment Advisory Contract, at 2 (Dec. 28, 2012) ("BFA Advisory Agreement") (Ex. T). Pursuant to that publicly available agreement, BFA (1) makes investments consistent with each Master Portfolio's objectives; (2) advises the Master Portfolio Trust's board regarding those investments; (3) provides "investment guidance and policy direction in connection with its daily management of the assets of each Master Portfolio"; and (4) provides the Master Portfolio Trust's board with periodic reports on investment strategy and performance of each Master Portfolio. *Id.*

In addition to the services SFIMC provides as the Funds' adviser, it also bears a variety of risks as the Funds' sponsor not borne by BFA as their sub-adviser. These include both investment risk (*i.e.*, risk that the Funds will not succeed or may be ineffectively invested by BFA), and compliance and regulatory risk (*i.e.*, risk that the Funds will not comply with applicable federal and state laws, resulting in enforcement actions, litigation, potential penalties, and other potential harms imposed upon SFIMC). SAI at 57–58 (Ex. A). SFIMC also undertakes significant business risk (*i.e.*, risk that sales of the Funds or redemptions by shareholders will make the Funds uneconomical to offer). SFIMC works with the Board to

continuously evaluate the Funds' risk management processes in connection with these risks and to adjust those processes whenever SFIMC or the Board deems it necessary. *Id*. at 58.

In exchange for the services SFIMC provides and the risks it bears under the SFIMC Advisory Agreement, the Funds pay a fee to SFIMC that is subject to annual approval by the Board's independent trustees. As alleged in the SAC, the net fee paid to SFIMC is equal to 0.28% (or 28 basis points) of the assets under management in the Funds. SAC ¶ 43. The 28 basis point fee is net of a 7 basis point reimbursement that SFIMC voluntarily pays back to the Funds. State Farm Mutual Fund Trust, Annual Report, at 184 (Dec. 31, 2014) ("AR") (Ex. D). For its work managing the Master Investment Portfolios and the Underlying Funds, BFA is paid a fee (also after various voluntary waivers) equal to 34 basis points for the LifePath 2050 Fund and 35 basis points for the LifePath 2030 Fund. SAC ¶ 43; AR at 185 (Ex. D). Accordingly, the total fee paid by the Funds to SFIMC and BFA for investment management and advisory services (net of all waivers) is 0.62% or 0.63% (or 62 or 63 basis points).[7] SAC ¶ 43. It is only SFIMC's portion of the total management fees that plaintiffs challenge here. *Id.* ¶ 35.

### D. Annual Approval of the SFIMC Advisory Agreement by the Board's Statutorily Independent Trustees

As required by the SEC, the Funds' public disclosures detail the annual 15(c) process and the Board's thorough review and analysis of the Funds' service agreements, including the SFIMC Advisory Agreement, throughout the course of each year. *See* State Farm Mutual Fund Trust, 2015 Semi-Annual Report, at 22–24 (June 30, 2015) ("2015 SAR") (Ex. E). The Board has nine trustees, seven of whom (or 77%) are statutorily disinterested as defined in the ICA,

---

[7] In addition to the fee waivers, SFIMC reimbursed the Funds to the extent any Fund's annual operating expenses exceeded defined percentages of the Fund's average net assets. SAI at 66 (Ex. A). Due to the expense reimbursement agreements, SFIMC reimbursed the LifePath 2030 Fund and LifePath 2050 Fund $1,220,636 and $153,387, respectively, in 2014 alone. *Id*. at 67.

well exceeding the requirement that 50% of the trustees be disinterested.[8]  *See* SAI at 56 (Ex. A).

In connection with the 15(c) approval process, SFIMC and the external advisory firms including BFA and the sub-advisers to other funds provide the Board with written materials relaying information to assist the Board with its consideration of continuing the respective service agreements, including a report prepared by an independent consulting firm, Strategic Insight.  *See* 2015 SAR at 22 (Ex. E).  This report provides information comparing the performance and expenses of the Funds to those of competitor funds with similar investment objectives.  *Id*.  The information provided to the Board includes materials addressing the various so-called "*Gartenberg* factors" raised by the plaintiffs in the SAC, including information relating to economies of scale, comparisons to the fees and performance of similar funds, and SFIMC's profitability.  *See Jones*, 559 U.S. at 344 & n.5 (citing with approval the Second Circuit's non-exhaustive list of factors in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982) that may be considered by a court in determining whether beyond arm's-length fees were charged); 2015 SAR at 22–24 (Ex. E).  At a meeting on June 13, 2014, the Board completed this review and approved the SFIMC Advisory Agreement for a one-year period ending June 30, 2015 – which covers most of the relevant time period for this action.  The Board subsequently conducted this review on June 12, 2015 and agreed to extend the SFIMC Advisory Agreement for one additional year, until June 30, 2016.  State Farm Mutual Fund Trust, 2014 Semi-Annual Report, at 20–22 (June 30, 2014) ("2014 SAR") (Ex. F); 2015 SAR at 22–24 (Ex. E).

---

[8]  The disinterested trustees are all knowledgeable and financially sophisticated individuals with a wealth of experience in finance and business.  They include two university presidents, a former partner of a public accounting firm, a former head of the enforcement program for the Securities and Exchange Commission's Chicago Regional office, and former executives of public companies and investment management firms.  *See* SAI at 58-59 (Ex. A).

<u>**ARGUMENT**</u>

I.  **LIKE ITS PREDECESSOR, THE SECOND AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA**

    A.    **Legal Standard for Pleading a Section 36(b) Claim**

The standard established by the Supreme Court to show a breach of Section 36(b) is exacting: the plaintiff must demonstrate that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). When applying this standard on remand to affirm dismissal on summary judgment of the plaintiffs' claims in *Jones*, the Seventh Circuit further explained, "[T]he Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees; *the goal is to identify the outer bounds* of arm's length bargaining and not engage in rate regulation." *Jones*, 611 Fed. App'x at 360 (emphasis added). The "bargaining range" for these purposes is informed by fees "produced by bargaining at other mutual-fund complexes." *Id.* at 361.

To sustain a cognizable claim, the plaintiffs must plead factual allegations that satisfy *Jones*' rigorous standard and are "plausible on [their] face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support." *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). Rather, to survive a motion to dismiss, a complaint "must state sufficient facts to raise a plaintiff's right to relief above the speculative level." *Id.* at 602; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."). In the context of a Section 36(b) claim, that means the allegations of fact must support a *plausible* claim that

the fees are "so disproportionately large" relative to the services provided that they are *beyond* the range of what *could* have been bargained at arm's-length.  It follows that to say what lies beyond the "bargaining range," a pleading needs to identify the end of the negotiating spectrum. A complaint that fails to defines the bargaining range cannot plausibly place a fee *beyond* it.

In assessing whether the beyond-arm's-length standard is met, "all relevant circumstances [are to] be taken into account."  *Jones*, 559 U.S. at 347 (citing *Gartenberg*, 694 F.2d at 929).  These circumstances may include economies of scale achieved by the adviser and other factors set forth by the Second Circuit in *Gartenberg* and cited favorably by the Supreme Court in *Jones*:

> (1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care and conscientiousness of the board in evaluating adviser compensation.

*Id.* at 344 n.5 (quoting *Gartenberg*, 694 F.2d at 929-32).  Importantly, the "*Gartenberg* factors" are not themselves the standard of liability or the elements for establishing a Section 36(b) claim. Rather, the "factors" provide a rubric for analyzing whether the beyond-arm's-length standard is met under *Jones*.  Accordingly, it is not sufficient simply to assert rote allegations about any one "factor," or even all of them.  Rather, a valid pleading must connect the dots between the factual allegations about a "factor" and its *effect* on the challenged fee.  *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services"); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 115 (D. Mass. 2006) ("[C]laims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser. . . .").  The specifics about any "factor" must be tied to

-13-

the challenged fee so that those details permit the inference that the fee is "so disproportionately large" it "could not have been" negotiated at arm's length.

The recent decision of the Ninth Circuit in *Turner* illustrates the point. *See* 626 F. App'x 713. *Turner* was the first appellate court decision applying *Jones* at the motion to dismiss stage, and affirmed the dismissal of the plaintiff's complaint. Importantly, the *Turner* court made clear that when applying *Jones* and the pleading standard under Rule 12(b)(6), a plaintiff cannot cobble together conclusory allegations of "excessiveness" and survive a dismissal motion. Of particular importance, the Ninth Circuit held that a valid claim could not be supported by (i) "inapt comparisons" to other funds' fees that did not lay a factual foundation for comparability; or by (ii) "conclusory statement[s]" about the defendant's costs unadorned with supporting factual allegations. *Id.* at 717. *Turner* makes clear that unparticularized allegations that attest to "excessiveness" in the eyes of a mutual fund shareholder are not sufficient to make out a cognizable claim under the *Jones* liability standard. Rather, a Section 36(b) plaintiff must specifically allege *why* a challenged fee *could not* have been bargained for at arm's length. That is not tantamount to requiring a plaintiff to "prove" his claim at the pleading stage. *See also Migdal*, 248 F.3d at 327 (affirming dismissal of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services").

### B.      Plaintiffs Have Again Failed to Establish a Basis for Comparability to Peer Mutual Funds and Thus to Define the Relevant "Bargaining Range"

The SAC alleges no facts that enable the Court to "identify the outer bounds of arm's length bargaining" for the challenged fees. Order at 5 (quoting *Jones*, 611 F. App'x at 360). In rejecting the FAC's comparison of the Funds' fees to a fraction of fees charged by other target date funds, the Court correctly observed that "a review of the judicially noticed materials from the public record reveals that Plaintiffs have not presented a sufficient foundation to find that

-14-

they are similar enough to be comparable" or made "any effort to compare the services being provided by SFIMC to those being provided by the chosen comparators." Order at 7. The SAC continues to suffer from the same defects.

Plaintiffs again proffer an inapt comparison to the same eight external target date funds with a "fund of funds" structure (the "Comparators") without supplying a factual predicate that the Comparators are in fact similar to the Funds. *See* SAC ¶¶ 62, 66. Critically, the SAC acknowledges that the Comparators invest exclusively in "affiliated funds managed by the same manager," whereas the Funds are structured as "feeder" funds in an *unaffiliated* "master-feeder" arrangement. *Id.* ¶¶ 62, 66-67. That difference is dispositive. As the Comparators' respective SEC-mandated "fee tables" show, there is no truth to plaintiffs' claim that the management fee collected by the Comparators' advisers from the target date funds is "in exchange for precisely the same types of management services" that SFIMC provides to the Funds. *See id.* ¶ 62.

As a matter of law, SEC regulations require mutual fund fees to be disclosed in a way that permits "comparison shopping" by investors. To that end, a "fund of funds" must report a total expense ratio in its prospectus fee table that accounts for both the expenses a fund pays directly out of its own assets, as well as the expense ratios of the underlying funds it acquires, called "acquired fund fees." [9] Each of the Comparators pays an acquired fund fee that compensates the investment manager of the funds underlying the target date fund – that is, the costs for managing the funds the Comparator fund "acquires." Unlike the Funds, which invest in *unaffiliated* underlying funds, the Comparators invest in underlying funds managed *in-house*, so

---

[9] Specifically, "the acquiring fund's pro rata portion of the cumulative expenses charged by funds in which the acquiring fund invests [*i.e.*, the acquired funds]" must "be included in the acquiring funds' total annual fund operating expenses." Fund of Funds Investments, 71 Fed. Reg. 36640, 36645 (June 27, 2006). Because a "fund of funds" structure includes *both* those direct and indirect expenses, the regulation aims at complete transparency so investors can compare aggregate expenses and make informed investment decisions.

their advisers capture their income mainly through acquired fund fees. *See id.* ¶¶ 66–67. This vertical integration enables the Comparators' advisers to reduce the management fee at the target-fund level to extremely low rates – or even to eliminate it altogether – because they are compensated through the acquired fund fee. Vertical integrators are masters of the allocation and can mask where costs are actually incurred. The SAC specifically acknowledges that the acquired fund fee is the equivalent of the fees BFA is paid by the LifePath Funds for managing the Master Portfolios and the Underlying Funds (*id.* ¶ 37), yet fails to say anything about how much those fees are for the Comparators.

Plaintiffs here omitted that information from the SAC (and its predecessors) and published instead an illustration of "comparative" fees that – by virtue of the omission of acquired funds fees – is completely misleading. The SEC requires prospectus disclosure of every fund's total management fees (including acquired fund fees) in a mandatory uniform format to provide fund investors a simple means of comparing costs across competitive funds.[10] The comparison mandated by the SEC refutes plaintiffs' assertion that the Comparators pay next to nothing for the types of services that SFIMC provides. Drawn from the text of the Comparators' prospectuses, the chart below shows that SFIMC's fees are actually *below* both the mean and median of the Comparators:[11]

---

[10]  This format is mandated by SEC Form N-1A, which governs the substance and format of the registration statements that must be updated and filed with the SEC at least annually by every open-end investment company. Form N1-A, 17 C.F.R. § 239.15A, https://www.sec.gov/about/forms/formn-1a.pdf.

[11]  *See e.g.*, John Hancock Retirement Living through 2050 Portfolio, Summary Prospectus, at 1 (Jan. 1, 2015) (Ex. G); Principal LifeTime 2050 Fund, Summary Prospectus, at 2 (Mar. 1, 2015) (Ex. H); Fidelity Advisor Freedom 2050 Fund, Summary Prospectus, at 1 (Oct. 1, 2015) (Ex. I); American Century Investments One Choice 2050 Portfolio, Summary Prospectus, at 1 (Mar. 20, 2015) (Ex. J); MFS Lifetime 2050 Fund, Summary Prospectus, at 1 (Aug. 28, 2015) (Ex. K); MassMutual RetireSMART 2050 Fund, Summary Prospectus, at 1 (Apr. 1, 2015) (Ex. L); JPMorgan SmartRetirement 2050 Fund, Summary Prospectus, at 1 (Nov. 1, 2014) (Ex. M);

| Target Date Fund | Total Management Fee |
|---|---|
| Principal LifeTime Fund | 79 bp |
| Fidelity Advisor Freedom Fund | 76 bp |
| American Century One Choice Funds | 75 bp |
| MFS LifeTime Fund | 74 bp |
| MassMutual RetireSMART Fund | 67 bp |
| JPM SmartRetirement Funds | 65 bp |
| **State Farm LifePath Funds** | **62-63 bp** |
| John Hancock Retirement Fund | 55 bp |
| American Funds Target Date Funds | 41 bp |

This illustrates that the Comparators on average pay *more* in management fees than the Funds. And it demonstrates that plaintiffs' comparison, based on dubious arithmetic that isolates a slice of those management fees in direct contravention of the SEC rules that require disclosure of total management fees, cannot define the "arm's-length bargaining" range.

The SAC sets out a chart purporting to compare SFIMC's *portion* of the Funds' management fees (not including BFA's fees) to a *subset* of the Comparators' fees ostensibly charged at the target-fund level (*i.e.*, *not* including the acquired fund fees), ranging from 0 to 10 basis points. SAC ¶ 63. On this basis, plaintiffs maintain that SFIMC's net fee of 28 basis points is excessive when compared to "the average of approximately 2-3 bps received by other fund managers for providing similar services to comparable target date funds." *Id.* ¶ 67. But plaintiffs tellingly ignore the much higher acquired fund fees paid by the Comparators, through which those funds' advisers receive the bulk of their compensation. On top of that, they allege no factual predicate to establish that the services or costs are even comparable as between the Funds and the Comparators. The pleading simply does not explain what other fund sponsors do for their "2-3 bps" to compare with the array of services performed by SFIMC (and described at SAC ¶ 55(a)-(v)) for 28 bps. Instead, plaintiffs merely cite Dr. Pomerantz's opinion that

---

American Funds 2050 Target Date Retirement Fund, Summary Prospectus, at 1 (Jan 1, 2015) (Ex. N).

"[e]very mutual fund adviser necessarily provides the same or similar services." *Id.* ¶ 56; Pomerantz Decl. ¶ 15. But such a conclusory assertion cannot pass muster under *Iqbal* and *Twombly* simply by being veiled as the opinion of a retained expert.[12] Thus, plaintiffs have alleged no *facts* "to compare the services being provided by SFIMC to those being provided by the chosen comparators." Order at 7. That omission makes the SAC's comparison meaningless.

The SAC likewise makes no attempt to measure the costs of SFIMC's services to the Funds to show that SFIMC incurred the same costs as the Comparators' advisers in exchange for their fees at the target-fund level. Plaintiffs again urge that the cost of SFIMC's services is 2-3 basis points (SAC ¶ 58), supported by nothing more than Dr. Pomerantz's opinion (purportedly based on his review of 15(c) materials in other cases) that "3 bp is entirely consistent with the range of cost for non-portfolio management services." Pomerantz Decl. ¶ 22. But the façade of "expertise" is no substitute for pleading facts. Dr. Pomerantz provides none, and his unsubstantiated opinions just repeat nearly verbatim plaintiffs' conclusory statements in the dismissed FAC. *Compare* Pomerantz Decl. ¶¶ 15-16, 22, *with* FAC ¶¶ 61, 65.

Plaintiffs' new comparison of the Funds to BFA's LifePath Funds ("BFA Funds") is similarly flawed because it ignores that, like the Comparators, the BFA Funds invest in underlying funds managed internally through which BFA collects the bulk of its fees. The SAC

---

[12]   Dr. Pomerantz states that his opinions are based on his industry experience. Pomerantz Decl. ¶ 5. A district court in another Section 36(b) case, based upon Dr. Pomerantz's proffered trial testimony, recently summarized his experience as lacking "any management in a mutual fund." Trial Tr. at 1785, *Sivolella v. AXA*, No. 3:11-cv-04194 (D.N.J. Jan. 28, 2016), ECF 259 (Ex. V). The *AXA* court did not allow Dr. Pomerantz to testify as to the challenged fees precisely because he had no knowledge of the services performed for those fees. *See id.* at 1829-30 ("[A]s to the excessive amount of the fees that are being – that plaintiff alleges [the adviser] is making or profiting by, at the present time I don't see how [Dr. Pomerantz] can make that opinion without knowing about the precise services that [the adviser] offers. Especially like the compliance area, the transfer agent area, the legal department area; he's not an accountant, he doesn't have that overall ability or knowledge of how those numbers come together into a report.").

alleges that the BFA Funds pay 3-4 basis points for the same services that SFIMC charges 28 basis points to the Funds.  SAC ¶ 61.  Dr. Pomerantz says the BFA Funds pay 5 basis points in management fees at the target-fund level and hazards that this fee covers all the services that SFIMC provides the Funds.  Pomerantz. Decl. ¶ 23.  Setting aside the inconsistency, the critical fact accepted by Dr. Pomerantz is that this fee is "*in addition to* the . . . Acquired Funds Fees." *Id.* (emphasis added).  Because BFA serves as the investment adviser of each Master Portfolio *and* the underlying funds in which the Master Portfolios invest, the BFA Funds pay an *additional* 32-34 basis points in acquired funds fees.  BlackRock Funds III, Prospectus, at 26, 58 (Apr. 30, 2015) (Ex. U).  In other words, BFA receives compensation for its services at the target-fund level through fees collected at the underlying fund level via acquired funds fees.  To assert, then, that BFA performs for the BFA Funds all the services that SFIMC provides to the Funds for 5 basis points or less is plainly contradicted by the judicially noticeable public records.

Plaintiffs' last-ditch effort to define the arm's-length bargaining range for the Funds' fees by comparing them to passive index funds utterly fails to satisfy their burden.  The SAC alleges that S & P 500 Index funds offered by Vanguard, Fidelity, BlackRock and Schwab pay 3-6 basis points "for the same types of management services" that SFIMC charges the Funds 28 basis points.  SAC ¶¶ 59-60.  Predictably, it cites Dr. Pomerantz's parallel conclusion that index funds "provide all the same services of an active mutual fund like LifePath, *less an investment advisory component*" at the cost of 2.4 basis points.  Pomerantz Decl. ¶ 21 (emphasis added).  As Dr. Pomerantz acknowledges, *passively* managed index funds and *actively* managed target date funds are by definition not comparable.

The Ninth Circuit in *Turner* specifically rejected a comparison of index funds to actively managed funds as "grounded in inapt comparisons."  626 F. App'x at 716-17.  Plaintiff in *Turner*

alleged that "the Davis Fund underperformed the S & P 500 Total Return Index." *Id.*  The court dismissed the comparison because "unlike an index fund, the Davis Fund is an actively managed fund." *Id.*  Plaintiff's "juxtapositions" lent no support to his claim because "allegations pertaining to a fund's performance must use mutual funds pursuing *similar investment strategies* as comparators." *Id.* (emphasis added).  *Turner* confirmed that this reasoning applies with equal force to a proffered fee comparison, rejecting a comparison to other mutual funds because the plaintiff "fail[ed] to allege that these other funds' advisers provided the same services or pursued a similar investment strategy." *Id. Turner*'s rejection of index funds in this context is consistent with the Seventh Circuit's holding on remand in *Jones* that fees charged by "comparable" mutual funds "tell[] us the bargaining range," *Jones*, 611 F. App'x at 361.[13]

The SAC's fee comparisons thus provide no support for an inference that SFIMC's fee is beyond arm's length.  Instead, an apt comparison of total management fees paid by the Comparators demonstrates that the Funds' overall fee paid to SFIMC and BFA for investment advisory and management services easily falls within the bargaining range.

### C.   Plaintiffs' Naked Assertions that SFIMC Provides only "Business" Services that are "Minimal" and Cost Next to Nothing are Insufficient to Show that the Challenged Fees are Beyond the Range of Arm's-Length Bargaining

Like its predecessors, the SAC concedes a long list of management services provided by

---

[13]  The Second Circuit, in a pre-*Jones* decision, also affirmed the dismissal of a Section 36(b) claim that hinged on a comparison of an actively managed fund to an index fund.  *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("Regarding the nature and quality of the services provided, the [complaint] . . . fails to allege the Fund's performance is appreciably worse than comparable funds. In comparing AO Fund share returns to gains and losses of the S & P 500 Index, the [complaint] demonstrates little, if anything, about the nature or quality of the specific services offered to AO Fund customers."); *accord In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (dismissing Section 36(b) complaint because "the allegations pertaining to these Funds' resemblance to index funds does not address the actual services rendered to those Funds. Such an allegation is necessary 'to show how the fees were disproportionate to th[e] relationship between fees and services.'") (quoting *Migdal*, 248 F.3d 327).

SFIMC pursuant to the SFIMC Advisory Agreement, but then "baldly assert[s] that they are on their face limited in scope and ministerial." Order at 6; *see* SAC ¶¶ 49, 58. The only difference is that plaintiffs now label the services concededly provided by SFIMC as "business" services – supposedly distinct from "advisory" services – and rely on an unsupported opinion of Dr. Pomerantz that SFIMC's services are "mostly ministerial in nature." SAC ¶ 49 (quoting Pomerantz Decl. ¶ 15). But "averments in an expert affidavit carry no additional probative weight merely because they appear within an affidavit rather than numbered paragraphs of the complaint." *DeMarco*, 149 F. Supp. 2d at 1222. Absent facts supporting such baseless assertions, Dr. Pomerantz's opinion does not begin to address the concerns the Court identified in dismissing the FAC.

Plaintiffs' response to the dismissal Order is to suggest that emphasis on the adjective "minimal" is sufficient to cure the Order's directive that any new pleading substitute real facts for artfully crafted conclusions. As the Order recognized, plaintiffs' own description of SFIMC's extensive management services plainly contradicts the conclusions in the SAC (and now the Pomerantz Declaration) that those services are "minimal" and "require very few resources." SAC ¶¶ 49, 58; Pomerantz Decl. ¶ 15. SFIMC is responsible for "oversight" of the Funds' sub-adviser and other services providers; "legal, accounting, compliance, audit, and risk management services"; providing preparation of the Funds' SEC-mandated regulatory filings and tax returns; reporting to the Board; and administration of the Funds' business affairs, among other services. SAC ¶ 55 (itemizing a list of 22 categories of services set forth in the SFIMC Advisory Agreement with the Funds). Plaintiffs offer not a shred of factual support for the bare allegation that provision of those services cannot justify SFIMC's fees.

The SAC's reliance on Dr. Pomerantz's unsubstantiated characterization of SFIMC's

services as "ministerial" amounts to naught. Dr. Pomerantz has no specific knowledge of what SFIMC does and only speculates that SFIMC's services are minimal. Pomerantz Decl. ¶ 15. But absent actual knowledge of SFIMC's services, Dr. Pomerantz's opinion is baseless. *See* Trial Tr. at 1829-30, *Sivolella v. AXA*, No. 3:11-cv-04194 (D.N.J. 2016) (Ex. V) (refusing to permit Dr. Pomerantz to testify as to fees challenged under Section 36(b) because he had no knowledge of the services provided for those fees). Further, Dr. Pomerantz does not bother to explain how his experiences lead to the conclusions that he claims to have reached. He merely offers his own say-so as the basis for his opinions, and provides no reason to doubt the accuracy of the representations about SFIMC's services in the public filings. And his assertion that "[e]very mutual fund adviser necessarily provides the same or similar services" (Pomerantz Decl. ¶ 15), says nothing about the worth or cost of those services.

Plaintiffs' attempted dichotomy between "advisory" services and the mere "business" services supposedly provided by SFIMC (SAC ¶¶ 49, 55) is likewise flatly contradicted by the public record. In dismissing the FAC, the Court rejected plaintiffs' summary allegations that investment advisory services provided by SFIMC, as detailed in the public filings, are actually responsibilities of the Board of Trustees or are delegated to BFA as lacking "an adequate foundation or factual support." Order at 7-8. The SAC fares no better. Plaintiffs' attempt to draw an artificial distinction between "investment advisory" and "business" services is at war with the plaintiffs' own acknowledgment that SFIMC is responsible for a variety of services pursuant to the SFIMC Advisory Agreement, which are in fact advisory in nature. For instance, SFIMC must "monitor the performance of any Master Fund portfolio into which a portfolio of the Trust may invest substantially all of its assets" (*id.* ¶ 51); provide "risk management services" (*id.* ¶ 55); and report to the Board (*id.*), among other responsibilities.

In their attempt to show that BFA performs "virtually all" investment advisory services, plaintiffs continue to compare the services language in the SFIMC Advisory Agreement to the services language in the *wrong* sub-advisory contract (pertaining to a wholly unrelated fund which is not even a target date fund). SFIMC identified the correct sub-advisory contract – the BFA Advisory Agreement – in its motion to dismiss the FAC and attached a copy of the publicly available document from the SEC's website as an exhibit to that motion. Plaintiffs' attempt to turn a blind eye to the BFA Advisory Agreement is no doubt because of the inconvenient fact that it does *not* track the provisions of the SFIMC Advisory Agreement. In fact, a comparison of the two agreements shows that SFIMC retained significant responsibilities, including consulting with and providing the Board with investment research and advice relating to the Funds. *Compare* BFA Advisory Agreement at 2 (Ex. T) *with* SFIMC Advisory Agreement at 4 (Ex. S). The Funds' public filings confirm that SFIMC performs such services. *See, e.g.*, SAI at 57–58 (Ex. A) ("The Manager regularly reports to both the [Committee of Independent Trustees] and the Board on the implementation of [valuation] procedures [for determining each Fund's Net Asset Value], including reporting to the Board each instance in which a security owned by a Fund is 'fair valued.' . . . The Board and the Manager continually evaluate the appropriateness of the Trust's risk management processes, and adjust those processes whenever the Manager or the Board deems it necessary."). Notably, BFA advises and reports to a *different* board – the Master Portfolio Trust's board. BFA Advisory Agreement at 2 (Ex. T).

Simply put, plaintiffs' attempt to show that BFA performs "virtually all" services for the Funds does no such thing. In cases like this, where conclusory and unsupported allegations are contradicted by judicially noticeable material such as SEC filings, the allegations need not be accepted as true on a motion to dismiss. *See, e.g.*, *Garcia v. City of Chi.*, No. 91 C 5535, 1991

WL 289204, at *1 (N.D. Ill. Dec. 23, 1991) ("To the extent the judicially noticed facts contradict allegations of the complaint, the allegations will not be accepted as true."); *Jarmuth v. City of Chi.*, 43 F. Supp. 3d 889, 891 n.2 (N.D. Ill. 2014) (citing *In re Woodmar Realty Co.*, 294 F.2d 785 (7th Cir. 1961)).  Plaintiffs cannot gain the benefit of a favorable presumption merely by refusing to cite to readily available, contradictory public documents.  *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 CIV. 4885, 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006) (granting motion to dismiss Section 36(b) claim where allegations were contradicted by public records that "paint a more complete picture . . . of the Fund in question").

All that is left is plaintiffs' own say-so that SFIMC provides no real services to the Funds, parroted by their alleged expert.  *See* SAC ¶ 34; Pomerantz Decl. ¶ 11.  Apparently based only on his review of the services agreements, Dr. Pomerantz opined that "[i]t appears . . . that most or all of [investment advisory] services are performed by [BFA]."  Pomerantz Decl. ¶ 11. Interpreting the language of contracts is the province of the Court, not experts.  *See Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994) ("Absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible.") (internal quotation marks omitted); *U.S., ex rel Danielides v. Northrop Grumman Sys. Corp.*, No. 09 CV 7306, 2015 WL 5916871, at *5 (N.D. Ill. Oct. 8, 2015) ("An expert witness may not testify simply regarding his reading of a contract.").  Further, Dr. Pomerantz provides no factual basis for his conclusion, and merely asks the Court to take his word for it.

Plaintiffs' claims regarding the underlying costs of services that SFIMC provides are similarly bare-boned.  The Order criticized plaintiffs for asserting "without factual support" that the services delegated to BFA "are more costly to provide and provide the real value to investors."  Order at 6.  The SAC has not cured this flaw.  Plaintiffs still merely allege that

"neither the cost . . . nor the value" of SFIMC's management services "is substantial relative to the investment advisory services," (SAC ¶ 57), this time with Dr. Pomerantz's declaration that such services are "considerably less substantial, costly or valuable than portfolio management." Pomerantz Decl. ¶ 15.  Plaintiffs again urge that the cost of SFIMC's services is 2-3 basis points (SAC ¶ 58), based on Dr. Pomerantz's opinion that "3 bp is entirely consistent with the range of cost for non-portfolio management services."   Pomerantz Decl. ¶¶ 22.[14]   But absent facts supporting that opinion, it is no different than plaintiffs' nearly identical statements in the FAC that the Court rejected precisely because they lacked factual foundation.  *See* Order at 6.

Under established pleading standards, a viable claim that is "plausible on its face" must be based on well-pled facts, not merely unsupported conclusions dressed up as ostensible facts. Conclusions are all plaintiffs offer here:  their own and their purported expert's say-so that SFIMC does little or nothing for its fees and that the cost to SFIMC of any "ministerial" services it provides is limited to 2-3 basis points.  This is just the style of pleading that is no longer valid after *Twombly* and *Iqbal*.  The plausibility of plaintiffs' allegations is directly undermined by the public record detailing (i) the array of services actually provided by SFIMC to the Funds and acknowledged in the SAC, (ii) the additional risks it bears as fund sponsor, and (iii) the review of those services and risks by a statutorily independent board of trustees prior to approving the fees.

Accordingly, the SAC's flimsy assertions do not come close to moving plaintiffs' theory from merely *possible* to the required plausible.  *See Iqbal*, 556 U.S. at 678-79 (holding that

---

[14]  If SFIMC charged only 2-3 basis points, that would mean SFIMC must provide the long list of services itemized in the SAC – and presumably still make at least some profit – for only $350,000 to $525,000 for the LifePath 2030 Fund and just $44,000-$66,000 for the LifePath 2050 Fund.  In view of the median household income of $61,955 in McLean County (where SFIMC is located), that latter amount would be unlikely even to pay the costs of a single full-time employee.  *See* Illinois Demographics, http://www.illinois-demographics.com/mclean-county-demographics# (last visited July 23, 2016).

plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," and that pleading facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility") (citation omitted).  Indeed, if the allegations in this pleading were adequate to state a plausible claim, the very same allegations – that the adviser retains a fee in exchange for little or no work – could be leveled (without supporting factual allegations) against *any* adviser that utilizes a sub-adviser and survive a motion to dismiss.  But courts have routinely rejected such attempts to base Section 36(b) claims on conclusory allegations with no nexus to a beyond-arm's-length fee – repeatedly dismissing such claims at the pleading stage – and this pleading fares no better.[15]

Plaintiffs cannot save the SAC by ignoring this authority and pointing instead to cases where courts have denied motions to dismiss complaints alleging improper "gaps" between advisory and sub-advisory fees.  Those complaints did not rest on such uniquely barren allegations.  While all of those cases asserted the similar theory that the adviser-defendant does little or nothing in exchange for the portion of the advisory fee it retains, plaintiffs in the other cases have at least asserted *facts* describing the supposed paucity of services by the adviser – supporting facts that are noticeably absent here.

---

[15]  *See, e.g.*, *Amron*, 464 F.3d at 338; *Migdal*, 2000 WL 350400, at *3; *Turner v. Davis Selected Advisers, L.P.*, 08-cv-00421, slip. op. (D. Ariz. June 1, 2011), *aff'd*, 626 F. App'x 713 (9th Cir. Sept. 29, 2015); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687; *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007); *Fitzgerald v. Citigroup, Inc.*, No. 03 CIV. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 23, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *AllianceBernstein*, 2006 WL 74439; *Forsythe*, 417 F. Supp. 2d 100; *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163 (D. Mass. 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000); *Strougo v. BEA Assocs.*, No. 98 Civ. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990).

For example, in *Zehrer v. Harbor Capital Advisors, Inc.*, the complaint alleges that the adviser delegated not only portfolio management services to the sub-advisers, but also substantially all other services called for in the investment advisory agreement, effectively leaving the adviser with the sole task of overseeing sub-advisers and other service providers. Consolidated Am. Compl. ¶¶ 65−68, No. 14-CV-00789 (N.D. Ill. Dec. 22, 2014), ECF No. 82 (Ex. R) (describing services – including regulatory compliance, preparation of materials for meetings of the board, preparation of shareholder reports and SEC filings, legal and regulatory support for the funds, and fund valuation – allegedly performed by the sub-advisers under the sub-advisory agreement rather than the adviser). [16]   The SAC, by contrast, expressly acknowledges that SFIMC performed many of the same extensive services that Harbor Capital allegedly delegated to other service providers.  SAC ¶ 49.

The decisions by some courts to allow such sub-advisory fee "gap" claims to proceed to discovery thus have no bearing in this case.[17]  Here, plaintiffs have utterly failed to allege any

---

[16]  As discussed in the Request for Judicial Notice, the Court is permitted to consider publicly filed complaints in deciding SFIMC's motion to dismiss.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).

[17]  The SAC fails when measured against all other similar complaints that have recently survived motions to dismiss.  *See* Verified Amend. Compl. ¶¶ 43, 89–95, *Curd v. SEI Inv. Mgmt. Corp.*, No. 2:13-cv-07219 (E.D. Pa. Oct. 2, 2014), ECF No. 51 (Ex. O) (alleging that the retained advisory fee cannot be justified in light of the fact that the defendant-adviser's own affiliate serves as sub-adviser to some of the funds thereby reducing the adviser's costs of oversight, and separately challenging "fees of nearly the same size as the investment advisory fees" charged by the funds' administrator for "services such as regulatory reporting, office space, equipment, personnel and facilities"); Second Am. Compl. ¶¶ 50–54, 56–72, *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-cv-01083 (D.N.J. Nov. 14, 2011), ECF No. 35 (Ex. P) (alleging that defendant-adviser's fee compensates solely for oversight of the funds' sub-advisers and other service providers because the adviser delegates all "investment management services" to sub-adviser *and* specific "administrative services" – including the supervision of all aspects of funds' operations (*e.g.*, custodial, legal, accounting, etc.) and provision of office space – allegedly provided under the advisory agreement are actually paid for by the funds pursuant to separate agreements and/or fees); Compl. ¶¶ 5–12, 14–23, 47–49, 56, *Am. Chems. & Equip., Inc. 401(K)*

facts which raise their allegations to the requisite level of plausibility to state a claim for relief. Rather, this case fits neatly into the lengthy list of cases where unsupported conclusory allegations were held insufficient to state a valid Section 36(b) claim.

> **D.**    **The Remaining Allegations Aimed at Other "*Gartenberg* Factors" are the Same Allegations that the Court Already Deemed Insufficient**

In addition to the allegations regarding the comparative fee structure and the services provided in exchange for SFIMC's fees, discussed above, the SAC discusses three other "*Gartenberg* factors," advancing conclusory allegations about economies of scale, profitability, and the independence and conscientiousness of the Board. Viewed individually or collectively, these allegations do not help the SAC state a viable claim under Section 36(b). Indeed, these allegations are virtually identical to the FAC's allegations that the Court discredited because none permitted an inference that it affected the challenged fees at all, much less pushed the fees outside the range that could have been negotiated at arm's length.

> 1.    *Plaintiffs' "Economies of Scale" Allegations Remain Sheer Speculations*

Plaintiffs' allegations about the growth in assets under management and presumed economies of scale in the SAC remain conclusory, as they were in the FAC. The Order placed no weight on plaintiffs' contention that economies of scale necessarily resulted in cost savings as the Funds' assets increased, which were purportedly not shared with the shareholders, because the plaintiffs offered "no facts supporting these bare observations" or attempted to "address any corresponding change in expenses." Order at 7.

The single addition to the SAC on this factor is a citation to a paragraph of the Pomerantz

---

*Ret. Plan v. Principal Mgmt. Corp.*, No. 13-cv-01601 (N.D. Ala. Aug. 28, 2013), ECF No. 1 (Ex. Q) (challenging the defendant-adviser's retention of a fee *twice* as large as that retained by its sub-advisers (retaining $80 million of the total $120 million) with allegations regarding the adviser's additional retention of a wholly separate management fee in exchange for the advisory services actually provided pursuant to the advisory contract).

Declaration (SAC ¶ 77), that reflects Dr. Pomerantz's unsupported opinion that the services performed by SFIMC are "independent of the size of the underlying fund," have "fixed cost," and thus "all benefit from economies of scale."  Pomerantz Decl. ¶ 17.  But having an expert state such bare observations as his opinions does not amount to pleading *facts*.  And self-evidently the opinion that certain costs are "fixed" says nothing about how any resulting economies could have pushed fees outside of the bargaining range.  Accordingly, like the prior pleading, the SAC's allegations as to economies of scale lend no weight whatsoever to the plausibility of SFIMC's fee being outside the arm's-length range.  *See Goldman Sachs*, 2006 WL 126772, at *9 ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").

> 2.   *The Same Thin Allegations about SFIMC's Profitability are Insufficient to Rescue the SAC*

The SAC provides no new allegations regarding SFIMC's profitability due to the Funds.  Like the prior pleading, the SAC merely asserts that SFIMC's management of the Funds is "astronomically profitable," but offers no supporting factual allegations.  SAC ¶ 68.  Plaintiffs still have nothing to say about SFIMC's revenue or the costs incurred by SFIMC in providing the Funds the suite of services that the plaintiffs acknowledge SFIMC provides.  From the SAC, one cannot tell whether the adjective "astronomical" means 1 basis point or 27; nothing is advanced to justify the label at all.  Instead, plaintiffs focus on the assets under collective management of all LifePath Funds (*id.* ¶ 85) – without tying those assets to SFIMC's revenue for each Fund – and otherwise reference their allegations regarding the purported costs incurred by the Comparators in providing an undefined set of services to their wholly separate and distinct funds.  *Id.*  But that comparison is meaningless.  Without context, including whether the purported Comparators provide the same services, and the basis for the SAC's claims about costs, the

comparison does not permit any inference about SFIMC's profitability. *See, e.g.*, *Amron*, 464 F.3d at 344-45 (dismissing Section 36(b) claim and finding plaintiffs' assertions regarding size of investment advisory fees "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds").

Plaintiffs make no allowance for the fact that SFIMC bears risks as the Funds' sponsor, including entrepreneurial risk. Section 36(b)'s legislative history shows that Congress accepted the premise that fund sponsors should be compensated for developing the investment product and assuming the business risk that it will not succeed in the marketplace, in addition to payment for services. *See Investment Company Act Amendments of 1967 Hearings, Hearings on H.R. 9510, H.R. 9511 Before the H. Comm. on Interstate and Foreign Commerce*, 90th Cong., 1st Sess., 688 (1967) ("We are accepting the fact that [advisers] should have some entrepreneurial profit, for those who have been successful in starting and building an investment vehicle. We recognize . . . that the creation and the building of a fund does involve certain risks, and that those who are successful are entitled to some reward" beyond "compensation for their services").

Most importantly, even if plaintiffs alleged sufficient facts to allow the Court to make an inference about the profitability of SFIMC's services (they have not), they have completely omitted the lynchpin that establishes a connection between some degree of profitability and the size of the challenged fee. As noted above, it is not enough merely to invoke some "factor" like "profitability." Rather, plaintiffs must link the facts about the invoked "factor" to an adverse effect on the fee; something about the "factor" must tip the fee into the range beyond what could be negotiated for the "factor" to assume any significance. Merely claiming SFIMC's profitability to be "astronomical" does no such thing.

3.    *The SAC Repeats the Identical Allegations Questioning Independence and Conscientiousness of the Board that the Court Already Found Lacking*

With respect to approval of the fees by the independent trustees, plaintiffs offer nothing but circular allegations that the Board *must have* lacked independence, conscientiousness, and adequate information because – on plaintiffs' otherwise unsupported allegations – SFIMC charged excessive fees.  SAC ¶¶ 86-87, 91.  The SAC repeats the allegations in the FAC that the trustees are not sufficiently informed about the challenged fees and specifically that they only considered the Funds' overall expense ratios and not the portion that SFIMC retains.  The Order held that "this inference standing alone requires more conjecture than it permitted under *Twombly* and *Iqbal.*"  Order at 8.  Plaintiffs have again offered no specifics to permit an inference that the trustees lacked diligence in approving the fees.

Absent factual allegations that would justify questioning the Board's "independence and conscientiousness" as a "factor" relevant to scrutinizing the challenged fees, the Court should defer to independent trustee decision-making.  *See Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.").  On plaintiffs' allegations and the public record, the Court should not "second-guess[ ] . . . informed board decisions" or "supplant the judgment of disinterested directors apprised of all relevant information."  *Id.* at 352 (citations omitted).

## II.    SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM

Plaintiffs are not entitled to rescission under Section 47(b) because they failed to state a plausible claim under Section 36(b).  Section 47(b) authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter."  15 U.S.C. § 80a-46(b)(1).  The SAC's failure to plead a violation of Section 36(b)

-31-

necessarily dooms the rescission claim.  Additionally, the plain language of Section 47(b) makes rescission available only to a "party" to that contract – in this case, State Farm Mutual Fund Trust and SFIMC.  *Id.*  Plaintiffs are not parties to the SFIMC Advisory Agreement, so they lack standing to seek its rescission.  *See Turner*, No. 08-cv-00421, slip. op. at 18–19 (dismissing Section 47(b) claim because Section 36(b) plaintiff was not standing in the shoes of the fund and was not a party to the challenged advisory agreement); *Davis v. Bailey*, No. CIVA05-CV-00042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting rescission of advisory agreement because "[p]laintiffs were not parties" to it).

## III.   PLAINTIFFS ARE NOT ENTITLED TO A JURY TRIAL

The SAC's demand for a jury trial is also a dead letter.  Controlling authority from the Seventh Circuit – echoed by courts across the nation – holds that Section 36(b) claims are equitable in nature and thus do not fall within the Seventh Amendment's right to jury trial on actions at law.  *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) (holding that plaintiff was not entitled to a jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line"), *rev'd on other grounds*, 500 U.S. 90, 95 n.3 (1991); *see also In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) (holding that plaintiff "is not entitled to a jury trial" because "this case involves the equitable inquiry whether the Trust adviser violated its fiduciary obligations by charging an exorbitant fee").  Under the Seventh Circuit's explicit ruling in *Kamen*, the plaintiffs' jury trial demand contravenes controlling authority and should be stricken. *See Zehrer v. Harbor Capital Advisors, Inc.*, No. 14-CV-00789, 2014 WL 6478054, at *5 (N.D. Ill. Nov. 18, 2014) (striking plaintiff's jury trial demand at motion to dismiss stage).

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' SAC should be dismissed with prejudice.

-32-

Dated: August 9, 2015

Respectfully submitted,

/s/ Nathan R. Bach
Timothy L. Bertschy/ARDC #199931
Nathan R. Bach/ARDC #6292316
**Heyl, Royster, Voelker & Allen, P.C.**
300 Hamilton Boulevard
Peoria, IL 61601-6199
Tel: (309) 676-0400
Fax: (309) 676-3374
TBertschy@heylroyster.com
NBach@heylroyster.com

*Of Counsel*

John D. Donovan, Jr.
Robert A. Skinner
Amy D. Roy
**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
john.donovan@ropesgray.com
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

*Attorneys for Defendant State Farm
Investment Management Corp.*

-33-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on August 9, 2016.

<u>/s/ Nathan R. Bach</u>
Nathan R. Bach

-34-